*Reassigned to*
*Chief Judge Hogan*
*on 2/25/08.*
*MEB*

Copies to: Judge
AUSA – Special Proceedings
Dft.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | : |
| | : |
| ***v.*** | : |
| | : |
| | : **Cr. No. 98-329 ~~(TPJ)~~ ( *TFH* )** |
| **SEAN COATES** | : |
| | : **FILED** |
| ***Defendant.*** | : |
| | : **FEB 19 2008** |
| | : Clerk, U.S. District and |
| | Bankruptcy Courts |

## MOTION PURSUANT TO 28 U.S.C. § 2255 TO
## *VACATE, SET ASIDE OR CORRECT SENTENCE*

### INTRODUCTION

Defendant, Sean Coates, by and through his Counsel, Veronice A. Holt,

Esq., hereby moves, pursuant to 28 U.S.C. § 2255, to vacate, set aside or correct

his judgment and his sentence on the grounds that: 1) Trial Counsel, Frederick

Jones,[1] was totally ineffective throughout the entire proceeding; 2) the

---

[1]     Counsel has not spoken to Mr. Jones concerning this matter.
Counsel has learned that in late 2007, Mr. Jones withdrew his appearance in
representing Glendale Earl Lee in *United States v. Suggs et al* 07-cr-00152-ESH
because of illness and moved to Arizona.   There are several references to Mr.
Jones having health problems during the trial and this may account for his poor
performance.  At one point, Mr. Jones needs to recess the trial to pass a kidney
stone.  At another point he mention the need to go to the hospital weekly to give
a blood sample.  Finally during closing Mr. Jones notes that he has had a cold for
six months.

Mr. Jones:  your honor, this is the time each week that I have to go down
to G. W.  I have never been late before. I just want to alert the court that

Government intentionally failed to disclose *Brady* information and otherwise engaged in misconduct; and 3) Appellate Counsel failed to appeal the admission of an identification of Coates fingerprint by hearsay testimony; and 4) both Trial and Appellate Counsel failed to inform the Court that Coates three convictions for Use of a Firearm During and in Relation to a Crime of Violence or Drug Trafficking on or about November 17, 1996 merged. Trial Counsel, Frederick Jones, was clearly unprepared for trial. Most importantly,  Mr. Jones failed to exercise Mr. Coates Sixth Amendment right to confront the evidence and the witnesses against him.  For the most part, he did not cross examine witnesses at all.  On the occasions, that he did, he simply winged it for a few minutes and then sat down without challenging the witnesses substantive testimony.  Mr. Jones made promises in open statement that he did not keep, failed to make a hearsay objection to fingerprint evidence that was admitted without a copy of the

---

I have to go down and give some blood.  So I will be right back as soon as I can.

"Excuse me.  I'll tell you one thing.  This old man has had a cold ever since we started this thing.  I have been carrying it throughout.  As a matter of fact, colds have been going around these two tables here, but, nonetheless, fresh air is soon to be found." (Tr.070301 am p.33)

fingerprint or expert opinion regarding the print, consistently allowed hearsay evidence to be put before the jury without objection, and failed to make arguments on the law and facts that any competent lawyer would have recognized the need to make.  He filed only one original pretrial pleading.[2]  That pleading was a supplement to a pleading filed by a co-defendant and it failed to make a critical legal argument.  In six months of testimony, Mr. Jones did not introduce a single exhibit and only on one occasion completed an impeachment by presenting a document.   Mr. Jones did not make any discovery requests and appeared confused about the scope of the charges against his client.  The first substantive witness to give testimony against Mr. Coates was Yusef Simmons.  Simmons testified about a kidnapping for which  Coates had been adjudicated as a juvenile.  Although Jones had mentioned this incident in opening statement, he appeared to be surprised when Simmons was called as a witness until he was informed that this was an overt act charged in the indictment.   Jones then proceeded to cross examine Simmons as if Simmons were making this up.

Mr. Jones failed to preserve his client's files and records.  The documents

---

[2]        Jones did file joinders to motions filed by other counsel.

that Jones turned over to Appellate Counsel did not include any discovery.[3]

Mr. Coates further asserts that the Government withheld critical *Brady* information.   The Government at all times knew that a critical government witness, James Montgomery, had accused co-defendant William Kyle Sweeney of a murder that another person, Steven Dewitt, had been convicted by a jury of and had been incarcerated on for 10 years.  Because this evidence would have sharply challenged Montgomery's testimony, the Government chose to withhold it until after the convictions in this case.

Coates, further asserts that the Government engaged in willful misconduct. The Government knew it had admissibility problems with the fingerprint attributed to the kidnapping of Anthony Pryor.  It therefore improperly elicited the fingerprint evidence through rank hearsay and did not put on any foundational evidence or a fingerprint expert to testify to whether the fingerprint matched.

---

[3]Counsel has obtained a copy of the numbered discovery produced by overt act from another attorney involved in this matter.   Counsel has also obtained FBI Agent Lisi's Grand Jury testimony, but does not have *Jencks* or *Giglio* for any other witness. Counsel has not been able to obtain a copy of a relevant videotape, Government's Exhibit V-35.   Subsequent to filing this case, Counsel will requests an opportunity to obtain the missing records through discovery and to examine the FBI 302's that were sealed during the trial and to obtain certain records, for example medical records that should have been a part of the discovery in this case or obtained through defense subpoena.

Coates also asserts that the Government knowingly elicited false testimony regarding his involvement in the June 20th shooting of Michael Jones.  Counsel has reviewed the discovery provided with respect to this incident and the Government simply did not have a good faith basis for the testimony it elicited placing Mr. Coates as being involved in this incident.  More importantly, the government did not have a good faith basis for suggesting that Michael Jones was a victim of the June 20, 1992 shooting.  Jones was neither shot nor shot at.  He was a witness to the shooting of Jermaine Hall.   Although the jury found this Racketeering Act (No.25) unproved, it added ballast to the assertion that Mr. Coates was involved in the conspiracy to kill Michael Jones and shooting Michael Jones on June 28, 1992.

Both Trial Counsel and Appellate Counsel were ineffective in their failure to assert that Mr. Coates three convictions for Use of Firearm During and in Relation to a Crime of Violence or Drug Trafficking on or About November 17, 1996 (The Triple) Counts 35, 36, and 37 merged.  Mr. Coates received a total sentence of 60 years for these counts.  He should have received 20.  The total sentence that Mr. Coates received for Use of a Firearm During and in Relation to a Crime of Violence or Drug Trafficking was 85 years.  These 85 years were cited

by the Court of Appeals in denying Mr. Coates *Coles* remand[4].

## *I.  PROCEDURAL HISTORY*

Sean Coates was arrested on October 2, 1998 and charged in a multiple

count indictment, commonly referred to as the "K Street Case".  On August 16,

---

4

" Finally, we turn to the appellants' challenges to their sentences under *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Coles,* 403 F.3d 764 (D.C. Cir. 2005). Appellants argue that the district court erred under Booker when it imposed their sentences and that our decision in Coles requires us to remand their case to the district court because, they assert, the record is insufficient to determine if the district court's errors were prejudicial. We conclude that a remand is not  required and affirm each appellant's sentence.***[38] In setting these sentences, the district court treated the Guidelines as mandatory. It made no statements regarding what it might  have done were the Guidelines only advisory, nor did it provide alternative sentences. None of the appellants objected. At issue before us is whether the district court's sentencing of the appellants is consistent with *United States v. Booker*, 543 U.S. 220 (2005), and this Court's subsequent application of Booker.***[38] No remand is needed for Carson, Coates, and Sweeney because the   Violent Crime in Aid of Racketeering statute (VICAR), 18 U.S.C. §̂ 1959(a)(1), and not the Guidelines, mandates that each of them receives a  life sentence for their convictions.

> [38] ...Coates received concurrent life sentences for each federal offense of narcotics conspiracy, RICO conspiracy, and three counts of murder in aid of racketeering. [He] also received a 20-year concurrent sentence for the federal offense of attempted murder in aid of racketeering, as well as a statutorily-mandated 5-year consecutive sentence for the federal offense of use of a firearm during and in relation to attempted murder, and 20 years each on four additional counts of use of a firearm during and in relation to murder.

2001, the jury returned the following verdicts against Sean Coates.

Count 2:      RICO

                  Racketeering Acts

                  Racketeering Act 1:      Marijuana Conspiracy 1988 through 1999

                  Racketeering Act 27:     Conspiracy to murder Michael Jones from
                                           June 20-June 28, 1992

                  Racketeering Act 28:     Assault with Intent to Murder while Armed -
                                           Michael Jones on June 28, 1992

                  Racketeering Act 33:     Kidnapping while armed of Norman Yusuf
                                           Simmons April 28, 1990

                  Racketeering Act 35:     AWIMW/A  Ronald  Sowells, October 30,
                                           1996

                  Racketeering Act 39:     Kidnapping  W/A  Anthony Pryor October
                                           22, 1993

                  Racketeering Act 49:     Attempted  Robbery  W/A Alonzo Gaskins,
                                           Darnell  Mack,  and  Melody  Anderson,
                                           November 17, 1996

                                           First-degree Felony Murder W/A of Alonzo
                                           Gaskins, November 17, 1996

                                           First-Degree  Felony  Murder  of  Darnell
                                           Mack

                                           First-degree Felony Murder W/A of Melody
                                           Anderson

COUNT 11:       Attempted Murder in aid of Racketeering Activity of Anthony
                Pryor, October 30, 1996

COUNT 23:       AWIKW/A Ronald Sowells on or about October 30, 1996

COUNT 24:       Attempted Murder in Aid of Racketeering Activity of Ronald
                Sowells, October 30, 1996

COUNT 25:       Murder in Aid of Racketeering Activity of Alonzo Gaskins,
                November 17, 1996

COUNT 26:       Murder in Aid of Racketeering Activity of Darnell Mack,
                November 17, 1996

COUNT 27:       Murder in Aid of Racketeering Activity of Melody Anderson,
                November 17, 1996

COUNT 28:       Use of firearm During and in Relation to a Crime of Violence
                or Drug Trafficking on or About October 22, 1993 (Anthony
                Pryor)

COUNT 34:       Use of firearm During and in Relation to a Crime of Violence
                or Drug Trafficking on or About October 30, 1996 (Ronald
                Sowells)

COUNT 35:       Use of firearm During and in Relation to a Crime of Violence
                or Drug Trafficking on or About November 17, 1996 (The
                Triple)

COUNT 36:       Use of firearm During and in Relation to a Crime of Violence
                or Drug Trafficking on or About November 17, 1996 (The
                Triple)

COUNT 37:       Use of firearm During and in Relation to a Crime of Violence
                or Drug Trafficking on or About November 17, 1996 (The
                Triple)

COUNT 45:       Possession of a Firearm during a Crime of Violence on
                Dangerous Offense on or about October 30, 1996[5]

The Court of Appeals for the District of Columbia denied Coates' appeal

on July 21, 2006. **United States v. Carson** 455 F.3d 336, (D.C. Cir. 2006)

The Supreme Court denied his petition for certiorari on February 20, 2007,

Order List 02/20/2007.

## II.   THE EVIDENCE RELATED TO SEAN COATES AND TRIAL COUNSEL'S FAILURE TO CONFRONT THE EVIDENCE

## 1.   DRUG CONSPIRACY

Mr. Jones' first blunder came in the cross examination of the first witness,

Agent Lisi.  Agent Lisi had pointed out various co-defendants making sales on

videotapes.  He did not show a picture of Jones.  On cross Jones pointed out that

Coates was not doing anything illegal in any of the videos Lisi had shown the

jury. (Tr.012301 am  p.14)    In redirect, the government was permitted to

introduce evidence of a video of a person who Lisi identified as Coates going to

a stash (Tr.012301 p.33-35) Mr. Jones did not cross examine Agent Lisi on the

video.  Therefore, the jury would accept the fact that the video was exactly what

---

[5]      The following Rico Acts were found not proven: 1) Act 1 Cocaine
and PCP; 2) Act 26 AWIMW/A Jermaine Hall and Michael Jones; 3) Act 29 First-
degree Murder Glenn Jenkins; and 4) Act 31 AWIMW/A In Kentucky Courts
neighborhood.

Lisi said it was – a photo of Sean Coates engaged in criminal activity.

Mr. Jones and Sean Coates[6] had previously viewed the videotapes and Coates had informed Jones that the person on the tape was not him. Coates believed that the individual on the tape was Sam Marbury.[7] The face of the person on the tape was not shown. The person on the tape was going over the fence. He was not holding drugs. Jones did not request an opportunity to recross on this new evidence. He did not challenge the identity of the person on the tape. This videotape was the only "hard" evidence that Coates was a part of the drug conspiracy. No drugs were ever seized from him. He did not make any sales to undercover agents. Jones, having "opened the door" for Lisi's identification of Coates failed to challenge the identification and thus conceded his client's presence on the videotape and his strongest argument that he was not a part of the drug dealing conspiracy. [8]

_____

[6]      Mr. Coates sworn statement will follow.

[7]      Sam Marbury is an actual identifiable party and is twice mentioned in the transcript Tr.031901 am p.28; Tr.312101 am p.65; Tr. 050701 am p.25; Tr050801 am p.16; Tr.070201 am.

[8]      Donald Nichols also identified the person on the videotape introduced during Agent Lisi's redirect as being Mr. Coates making a sale in a video. (Tr.01/26/01 am p.11) Counsel has not viewed the videotape because Mr. Jones did not turn over discovery items to appellate counsel. Counsel has not

Ronald Switzer testified that Coates and Vincent Hill were the people out there making big money in 1996 and 1997 (Tr.012501 p.m. p.6 - 9). Mr. Jones, having blundered his cross examination of Agent Lisi, chose not to cross examine Switzer. "I have nothing your honor."  (Tr.013001 am p.18) Thus Switzer's testimony regarding Coates remained uncontradicted.

Donald Nichols "Hard Rock" made an in-court identification of Sean Coates – identifying him by his nickname "Birdy".  Nichols said that he knew Birdy from when he was five or six. (Tr.021401 pm p.81)   Nichols identified Coates as one of the people who would be out selling on a typical day. (Tr.021501 am p.31-32) Jones did not cross examine Nichols. Thus Nichols' testimony remained uncontradicted.  "No questions."  (Tr.02201 pm p.54)

James Montgomery testified that in 1989, Montgomery, Chin, Meechie, Bird, Art, Eric, and Poo Poo were selling drugs around Delaware and 203 P Street. 0301201 p.38.    He denied having any conversation with Vincent Hill about who was permitted to sell drugs in area.  When Montgomery came home in '95, business was bad but Bird still seemed to have money.

"I was coming down K Street.  I caught the subway downthere, and I don't

---

been able to contact Mr. Jones

11

think they knew I was home, and I walked up on them,[9] and I told them that I was -- my words to them was that I'm fucked up, letting them know that I need some money. They told me that you can't -- they said, everybody fucked up. You came home at the wrong time, like that. Q. And what did you interpret that to mean? What did you understand them to mean? *** they didn't have no money to give me." (Tr.031301 pm 15-16)

Q.   Did you notice at that time whether or not Birdy appeared to have any money?

A.   He still had his car. He still had his Q. Then like a few days later -- I had eventually got some money. I borrowed some money from Squirmy, and like a few days later, me and Bird was talking. They was having a -- there's going to be a cabaret somewhere sitting downtown, and Bird had all this Versace stuff in his trunk, and he was showing – *** All this Versace stuff, clothes, like shirts and jeans and stuff like that. So in my mind I was like, man, just the other day you told me you was fucked up, you know, meaning that he was broke. (Tr.031301 pm 16)

Mr. Jones did not cross examine Montgomery on his testimony about Sean "Birdy" Coates being out their selling drug in 1989.  (Tr.043001 am 9-59) Despite Montgomery having handed Jones a motive for him to lie about Sean Coates, Jones never confronted him about it.  He had a perfect line of questioning that could have exploited the fact that Montgomery was not a big time drug dealer.  He was a stick up boy who ran around sticking his gun in people's face and who spent most of the relevant period incarcerated. Now that

---

[9]     Chin, Bird, and Pimp.

his crimes had come back to haunt him, he was trying to implicate Coates to get from under.

Charles Bender "L.A." testified that in 1994 and 1995, to the best of his recollection, He, Vito, Harry O, Dirty Meat, Birdy, Switzer, "Gus," his brother Antoine Bender and Bill Hill were out in the 200 block of K Street SW. (Tr.040401 am p.56) "I have no questions, Your Honor." (Tr.040501 pm p.62)

Ronald Sowells ("Manute")was charged in the L Street case. ( Tr.041701 pm p.5) He started selling marijuana when he came home in 1993. Business was prosperous. Sowells testified that there were 30 or 40 people out there selling marijuana in the alley; including, Hodges, Ben, Morris, Hallman, Birdy, Draper and Chin. (Tr.041701 pm p.25) Sales started to slow down and in '94 or '95, they moved out of the alley to Delaware and K.  Vito, Chin, Draper, Harry O, Bird were selling on K street. (Tr.041701 pm p.31) Vito appeared to be running the strip. When Vito was out there, everyone would let him sell his weed.  When they were selling on K street, they would rotate.  (17 pm 36) Sowells said that he frequently sold with Birdy. (Tr.041701 pm p.40) Jones cross examined Sowells, but he did not question him about his allegations of drug dealing.  (Tr.041801 pm p.30-51)

Paul Franklin "Dirty Meat" testified about marijuana sales in Southeast. He identified Birdy as someone who has known for 15 years and had a "cool" relationship with. (Tr.050101 am, p.53)  Franklin identified Bird as one of the people selling marijuana in the area of the alley, Delaware and K streets.   In addition to the Defendants, he said  that Rock, Switzer and James Montgomery were out there.  (Tr.050101 am p.70) Franklin testified that they sold drugs in "rotation". (01 am p.78)  Franklin also said that he "bagged up" weed at Birdy's Mother house in Kenilworth.  (Tr.050101 am p.81)   In cross examination of Franklin, Jones attempted to show that Coates primary reason for being on K street was to gamble.  When Franklin resisted him, Jones asked Franklin it he had anything to do with the murder of Sibley Hamilton.  Franklin denied it.  Jones rested his cross and the never again visited the issue in the trial.[10]

---

10

Q.   As part of your plea agreement, you were required to inform the government of all of your criminal activities, isn't that correct?

A.   Correct.

Q.   Now, did you inform them about a young man by the name of Sibley Hamilton?

A.   Who?

Q.   Sibley Hamilton.

A.   I can't recall if I did.

Q.   Do you know a man by the name of Sibley Hamilton?

A.   Yes.

Q.   As a matter of fact, did you have something to do with his murder?

Demetrius Hunter, from L Street, identified Birdy as someone he knew from Southwest. (Tr.050301 pm p.69) According to him he occasionally sold weed for Birdy and Draper in '94 and '95. (Tr.050301 pm p.77) Jones cross examined Hunter about his drug dealing. He did not challenge Hunter's assertion that he sold weed for Birdy and Draper in '94 and '95.

## 2.    KIDNAPPING OF YUSEF SIMMONS

On January 22, 2001, Mr. Zeidenberg made clear his intent to elicit Yusef Simmons testimony regarding the kidnapping for which Sean Coates had been adjudicated as a juvenile.[11]

---

A.    No, I didn't.
Q.    Back in 1990?
A.    No, I didn't.
Q.    Mr. Jones: The Court's indulgence.
The Court: Sure.
Mr. Jones:  I have no further questions, your honor. (Tr.050101 am p.18)

11

Mr. Zeidenberg:    And the other thing, your honor, is I have trial testimony from a juvenile trial of a witness that we are going to be calling, and I just would ask the court to order that disclosed. It is jencks, however, because it was a juvenile trial. I wanted the court's authority to release it.
The Court:    You may release it. Yes.
Mr. zeidenberg:    Thank you.
Mr. Jones:    I would object to that on behalf of Mr. Coates. I am going to object to any reference to this juvenile proceeding that took place when Mr. Coates was years of age. It violates all of the –

15

Fourteen days later when the Government called Simmons on February 5, 2001, Jones, again, appeared to be caught off guard.

JONES:     Your Honor, on behalf of Mr. Coates, I'm asking the Court to bar this testimony of Mr. Simmons.  It's a matter that occurred when Mr. Coates was 17 years old, some years ago, Your Honor.  It has nothing to do with this conspiracy trial. To let this testimony in –

THE COURT:  I don't know what testimony he's going to give.

JONES:     Well, he's giving testimony about a kidnapping that Mr. Coates was charged with and tried in a juvenile court in the District of Columbia back in 1990, and as far as I'm concerned, Your Honor, it violates all the laws against confidentiality as far as juvenile offenses are concerned.  It's a situation that does not purport to be, as far as I can see from the evidence, it doesn't have anything to do with this case at all, and we would object to the idea.  What it amounts to, Your Honor, is propensity evidence.

THE COURT:  What is its relevance?

MS. CHATURVEDI:     A couple of things, Your Honor. First of all, it's not charged as a substantive count.  It's just a racketeering count.  It's charged in the indictment.  It is part of this conspiracy in that Mr. Simmons was kidnapped, it's our allegation, and Mr. Simmons was a member  of the L Street group.  He was kidnapped by Sean Coates and others who were part of the K Street group.  It goes

---

| | |
|---|---|
| The Court: | It, nevertheless, is *Jencks* material. |
| Mr. Jones: | Well, we object to Mr. Yusef Simmons coming in and testifying at all about that juvenile matter. |
| The Court: | Well, let's deal with the testimony when the testimony is presented. |
| Mr. Jones: | Okay. (Tr. 012201 am p.62) |

16

directly to show the animosity between K Street and L Street, which by our calculation began in 1990. The greater escalation occurred in 1996. But this is one of the events, precipitating events that caused a conflict between K Street and L Street.

THE COURT:     Okay. And Coates was, in fact, 17 at the time?

MS. CHATURVEDI:     That's right, Your Honor. I actually -- Mr. Jones and I have talked about this issue prior to this discussion at the bench, and I've provided him with two cases that discuss the propriety of the --

THE COURT:     I think it's admissible. (Tr.020501 pm p.25-26)

The prosecution began its examination of Simmons by talking about events in 1996 during the war between L Street and K Street.   Jones objected and the Court stated that his objection was frivolous.[12] Thereafter, Jones rarely objected:[13]

---

[12]

Jones:     I object to this line of questioning. Judge, we're talking about 1996 and she is ostensibly bringing this man in to talk about a kidnapping that occurred back in 1990.  I don't know the relevance of this."

Court:     She perhaps has not gotten to the subject of the kidnapping. I don't know.  The witness may have other relevant testimony to offer. What is the nature of your objection?

Jones:     My objection is relevance, Your Honor. We're talking about brothers being murdered.  We are talking about everything other than what she brought him in here to  talk about.

Court:     I don't know what she brought him in here to talk about and either do you.  Your objection is overruled.  It's a frivolous objection and you know it. Now, let's proceed. (Tr.020501 pm p.35-36)

[13]     Jones made one more frivolous objection when Simmons testified that after Coates was no longer on the scene the gunman said "Where's your

During his direct, Simmons provided detailed testimony about his abduction at gunpoint and being put in a car driven by Sean Coates. Simmons was put in another car and never saw Coates after that. The demand for money was made after Coates was no longer there. Despite the prior adjudication and the fact that the police had been called,   Jones began his cross-examination by referring to the "so-called kidnapping back in 1990". Jones got Simmons to admit that in his original statement, he did not name Coates as someone who was involved. Jones did not identify introduce the relevant portion of the statement. (Tr.020601 am p. 70-71) Jones did get Simmons to admit that the kidnapping was just about money.   It had nothing to do with K street. (Tr.020601 am p.71-72)

## 3.   *ATTEMPTED MURDER OF RONALD SOWELLS*

Prior to Sowells taking the witness stand, Detective Robert Mitchell testified that on October 30, 1996, he was called to interview the victim of a shooting at 1100 Howard Rd. Mr. Sowells told him that Bird who hung out in the 200 Blk of Delaware Southwest. "I ask him did he know his real name , and he told me

---

money." His objection was based on hearsay. The statement was clearly part of the *res gestae.* The objection was overruled. (Tr.020601 am p.28)

18

the guy's name was Sean Coates." (Tr.041701 am 38)   Detective Mitchell's

partner went to the hospital with him, but he did not go into the room while the

statement was being taken.     The Detective took notes, but they were not

verbatim.  (Tr.041701 am 40)

Mitchell was asked by Counsel for Carson whether he had sought an arrest

warrant for Coates.  His answer was no.  (Tr.0417 am p.47) Jones had lots of

good fodder for cross. Mitchell had an established crime scene, the forensic

evidence was recovered and he said he had an identification by name.  Under

the circumstances there could not be any rational basis for an identification.

Police officers are required to preserve statements of identification.  Why had

Dectective Mitchell not done so.  Jones did not even inquire whether Mitchell

recorded this information in his police notebook.   As usual, there was no

examination about the crime scene or the witnesses ability to observe the

incident.

Sowells[14] testified that he saw Birdy driving his Q45 in the opposite

---

[14]     According to Sowells although the people from K Street and L Street
did not get along and he was associated with Woozie and L Street, he hung out
with the people from K Street.  It was all a plot to rock them to sleep so they
could kill Vito, Chin, Draper, and Pimp.  (Tr.041701 pm p.51) Woozie and
people from L street thought Vito and Chin had something to do with Patcho
getting killed, Hallman getting killed, Yusef getting kidnapped and Donnell

direction.  He blew his horm and waived.  Birdy saw him and sped off.  He was going to going to tell Birdy to stay out of it and mind his business.  When Birdy sped off, he knew he was scared.  (Tr.011801 am p.13) Sowells went to the barber shop, drove down Pennsylvania Ave and picked up his brother.  He was going to drop his brother off at the Anacostia Metro.  His brother got out of the car.  When he was pulling out, he saw Birdie "pulling up".  "He was at an angle trying to block the car in so I couldn't back out."  The prosecutor asked what happened after Birdie pulled up behind him, The door kind of slid open.  Birdie was in the passenger seat. The car pulled back to the side.  He knew that Birdie was about to shoot.  As Birdie was about to shoot, Sowells sat back and after Birdie shot and got close, he shot back three or four times (Tr.041801 am p,16) Birdie was no longer in the Q45.  He was in something like a Dodge Stratus.  He was shot twice in the arm.  "As he was pulling up some more, he just started shooting."  The car Birdie was in was pulled off.

Although Sowells story provides rich fodder for cross-examination, Jones, as usual did not examine Sowells on his story.  He did not inquire about the

---

Burroughs getting killed.  (Tr.041701 pm p.52) Sowells and Vincent Hill could not stand each other. (Tr.041701 pm p.59)   According to Sowells, when Vito got shot, Price saw a guy hop in his car and he went back and told.  (Tr.041701 pm. p,59).

placement of objects on the crime scene.  He ask nothing about the medical

records even thought there is a glaring disparity between the testimony of Mitchell

and Sowells.  Sowell's story would depend upon a tremendous coincidence.

Coates see him while are driving his Q45.  Sowells picks he brother up and gives

him a ride to the metro.  Thus Sowell was someplace he did not intend to be.

Yet, Coates has changed cars, located him at this coincidental location and come

prepared to ambush him.  That does not make sense.

The government did not present any pictures of Sowells injuries.  There

was no medical testimony about his injury.  As a former prosecutor, Mr. Jones

should know that when the prosecutor leaves out this type of evidence, he is

spinning his facts.

Although there was a glaring disparity between Detective Mitchell's

testimony and Sowell's regarding the interview, Jones never explored that

discrepancy.  Detective Mitchell had said that he waited until after Sowells'

surgery.  Sowells' testified that he did not have surgery – "that they ain't never

take the bullets out." (Tr.041801 pm p.49)   He said that the Detective's

interviewed him while they were doing the x-ray. [15]

---

[15] Further undercutting his credibility, Sowells admitted lying about seeing
who shot Kim Richardson, seeing Kevin Hart get shot, and seeing Joey Simmons

Jones starts his cross-examination (Tr.041801 pm p.30-53)  by asking

about how much money Sowells' made dealing drugs.  Thus, he gave the

impression that he was running away from the witness rather than cross

examining him.  Jones then elicited that at the time of the shooting, Birdy and

Sowells were fine with each other.

Sowell said on direct that you pulled up next to him and started shooting.

Jones got Sowells to say that the first shot came through the back which would

be consistent with the window. (18 pm 37)  Mr, Jones ask Sowells whether he

told FBI agent McCauley that he was not able to identify the two black males that

_____

get killed.   (Tr.041801 am p.22-24) Sowells described an incident where two
guys were squeezing people's marijuana bags and then said that they said that
they did not want to buy this shit.  Chin asked for a gun.  Sowells gave him one.
Chin chased the guy down.  The guy fell.  William Bumbrey ran over and shot
him.  (Tr.041701 pm p.47-49)
    Roland Brown, the man who Sowells testified was shot because he was
squeezing marijuana bags and then did not buy them, testified about the incident.
His version of events was very different from Sowells.  He took a urine by the
tennis courts and then went to buy marijuana.   He was approached by a
gentleman with marijuana who asked him why did he piss on the street.
Somebody said kill them niggers.  His friend told him to run and he ran and a
hail of gunfire let loose.  He got hit between L and M and fell.  Some one with a
coat on ran up behind him and shot him in the shoulder.  He was shot six times
and remained in the hospital 43 days.  (Tr.042401 am p.41-42) Brown did not
know who shot him.  (Tr.042401 am p.48)

were in the car shooting.  He denied saying it.  (18 am 40) Jones did not show him the document to refresh his recollection.[16]

Jones then becomes accusatory and accused Sowells of lying.  He ended his cross-examinationup by saying improperly "I'm not going to waste the juror's time." (18 pm 51)

Montgomery said he loaned Bird his gun so that they could go after Ron Sowells.  Montgomery said Bird gave the gun back after the shooting and Montgomery threw it in the river.  According to Montgomery, Bird told him that Manute was sitting in the Anacostia subway station and Bird pulled up on Manute and blasted him.  Chin later complained because Bird did not finish Manute off. (Tr.031201 pm p.90) Jones not ask the obvious questions to undergird a defense that Montgomery committed the offense.  The weapon was Montgomery.  He was the last person in possession of it.  Montgomery is about the same height and complexion as Coates. [17]

_____

[16]     Counsel anticipates that she will have additional points to make once she obtains the discovery, *Jencks*, and medical records for this incident.

[17]     Lisi also testified regarding the Sowells shooting.  Montgomery took him to the waterfront to find the gun.   He saw the harbor police retrieve the gun. (Tr.041701 am p.15-16)  Joe Welsh from the Harbor Patrol testified that he recovered the .30 carbine from the river.  Jones asked one question – whether Montgomery was there.  (Tr.041701 am p.81-82) The answer was no.

### 4.   KIDNAPING OF ANTHONY "WYSOCKI" PRYOR

Sergeant DeLoatch testified that he was assigned to investigate the kidnapping of Anthony Pryor, "Wysocki". The kidnapping occurred in Oxon Hill. He went to the home of Doreen Key and looked out her window and saw the dumpster in the alley. (Tr.042301 pm p.90-91) Key gave a physical description of Draper, said that she knew him four years and that he cleared his throat a lot. (Tr.042301 pm p.95-98) In cross examination, Kiersh established that Sweeney's fingerprints were not recovered from the car.   (Tr.042401 am 17).   Jones examined DeLoatch about the location of the car.   (24 am 30) In redirect, the prosecutor was permitted over a non specific objection by Jones to elicit that the prints belonged to Sean Coates.   (Discussed further below)

### 5.   MURDER OF ALONZO GASKINS, DARNELL MACK AND MELODY ANDERSON, "THE TRIPLE"

Keith Slaughter testified about the processing of the crime scene for Sowells shooting.  The tan Chevrolet was in front of the metro station.  The rear driver's window was shot out. (Tr.041701 am p.62)   He seized a Taurus handgun, a magazine, (from a Book Bag) 9 mm shell casings and .30 carbine shell casings. (Tr.041701 am p.58-61) The nine millimeters came from inside the car. (Tr.041701 am p.65) The .30 carbine casings were found outside the car. Slaughter did not prepare a crime scene diagram.  One of the 9 millimeters was recovered from the drivers seat.  He does not know where the other's came from. (Tr.041701 am p.67) There were no bullet holes in the body of the car.  The shell casings were within 8 to ten feet of the station wagon. (Tr.041101 am p.69) Chaturvedi showed the witness a photograph with one of the 9 mm.

24

According to Montgomery, initially Chin did not want Bird on the triple because Bird did not ever want to do anything – he always wants to be the driver. (Tr.031401 am p,17) Chin, Draper and Montgomery had 2 to 4 conversations about doing Lonnie. Montgomery said if we are going to do, this let's do. They did not have any guns. Draper went and got a .40 caliber Glock and a stun gun. After Chin Draper, and Montgomery spent some time looking for Lonnie, they went to get Bird because Bird and Lonnie was cool. (Tr.0314 am p.34) Bird did not know what they had planned when they went to get him. Draper played a joke and pretended to shoot Bird. They told Bird what they were going to do. He does not remember Bird saying anything.   Bird, Chin, Draper, and Montgomery were sitting in the van when Lonnie, Darnell Mack and the 3 girls came out. Mack was a close friend of Vito,  Lonnie, Darnell and the girls got in a car and left.

Montgomery, Chin, Draper and Bird went back to Montgomery's house and Montgomery made 4 masks out of black skull caps, one for each of them. Montgomery and Birdie took a tag off a car and put it on the van. Birdie was supposed to go in, but when it was time to get out of the car, Birdie did not get out of the car. Montgomery and Draper ran up to the people and pushed them in the house. One girl ran upstairs. He did not see what the other one did. (Tr.031401 am p.47-48) Montgomery grabbed Darnell Mack and Draper grabbed Lonnie.   Mack was not resisting.   He said he did not have any money. Montgomery lifted up Mack's jacket so he could stun him and Draper started shooting. He pushed the screen door open with his thumb.   He did not see Draper shoot the girl.   Draper got to the car first and then Montgomery. (Tr.031401 am p.53).

Montgomery testified that he was mad about Draper shooting.   Draper claimed that Lonnie was reaching.   Chin believed that Draper hit Lonnie or Darnell for Boo and Bam, drug dealers.  (Tr.031401 am p.73)

Chin said that Draper told him that the only person that he had told about the murder in Temple Hills (the Triple) was Butchie. Chin said that they had to hit Butchie and that there would be no case.  On July 31, 1997, Montgomery and Chin were arrested for the Temple Hill's murders. The police told them that they definitely had Draper. Montgomery in a hand written statement told the police that Draper was the only person who got out of the car, and that shortly after, they heard gunshots. He said that Bird, Chin, and himself remained in the

car.  He went to the grand jury in PG on August 5, 1997 and testified that the statement he gave the PG police was true.  Montgomery was charged in District of Columbia and Lisi explained to him that they had videotapes of him making drug transactions on K Street.

When he went to the grand jury, he lied about the guns in the 60th and East Capitol shooting. (Tr.031401 pm p, 27) After he pled to the narcotics conspiracy, he was released and the government supported him. (Tr.301401 pm p.28)  Lisi would come to visit Montgomery and Montgomery told him about T.T. and Terita and Chrissy.  He provided more information because he was concerned that if he withheld anything people could snitch on him.  Bird could tell them about the Triple.  Raymond could tell about Maurice and Slick.  He then entered the second plea agreement (14 am 30-33).  He was concern that Poo-poo would say that he was the shooter in Tim-Tim's case so that Poo-poo could get his time back.

In November of 1999, Montgomery told Lisi and Chateverdi that he had not been in the house during the Triple.  He said that Bird went in.  About a month latter, Montgomery called Ziedenburg and told him that he did go in the house. (Tr.031401 pm p.41).   The government again asked to have his release revoked, but Judge Jackson allowed him to remain on release.  Montgomery went into witness protection.  He left witness protection and came back to D.C.  He understood that witness protection was voluntary.  After leaving the program, Montgomery's release was revoked. (Tr.0314101 pm 43)

While Montgomery and Chin were in the cellblock, Chin told him that he knew what Montgomery had told the detectives.   Chin was angry that Montgomery put them on the scene.  Chin said that if he got out, he was going "to hit heads". (Tr.031401 pm p.45)

Mr. Jones began his cross examining Montgomery about Coates' daughter.  He is shut down by the Judge when he says "And you know Birdie is crazy about 'Shanese'." (Tr.032101 am p.25) He brought up the point about Coates having "feminine ways", but that was not meant to suggest that you were homosexual. (Tr.032101 am p.28)   Montgomery said he was not sure whether he told the government that you would snitch.  (Tr.032101 am p.30).

Jones received permission from the Court to go over some things that had Montgomery had already been questioned about.  (Tr.032101 am p.30) So he was not constricted by the Court's earlier rule limiting repetition.  Jones then

repeats the fact that Coates was eligible for the death penalty. (21 am 41) Jones questioned Montgomery about the admitted lie he had told in Maryland – that Coates went into the house with Sweeney and not him.     According to Jones, Chaturvedi had stressed to him "that it didn't matter whether I went in or stayed outside of the house. The point is it happened. I stressed to them that no one was supposed to get killed. So it happened in the commission of another crime. And whether we had guns or not, that all of us was liable to the same degree." (Tr.042101 am p.41)

Jones had Montgomery say again that from his perspective he was not involved in a conspiracy. (Tr.032101 am p.55)  Jones sat down without laying a finger on Montgomery.

## 6.   FEUD WITH CONDON TERRACE

Sean Coates[18] was charged with three racketeering acts related to the feud between Condon Terrace and Southwest:

|  |  |
|---|---|
| Racketeering Act 26: | AWIMW/A  Jermaine Hall and Michael Jones (Not proven) |
| Racketeering Act 27: | Conspiracy to murder Michael Jones from June 20-June 28, 1992 (Proven) |
| Racketeering Act 28: | Assault with Intent to Murder while Armed - Michael Jones on June 28, 1992 |

Several witnesses testified to the feud between Condon Terrace and Southwest.  At least two possible motives were put forward for the feud.[19]  With

---

[18] Coates was the only defendant charged with these offenses.  Thus his counsel could not expect to benefit from spillover from his codefendants' cases.

[19] James Montgomery testified to a fistfight at a club, Cherry's.  A guy threaten to slap Clifton Edwards (Meechie).  Montgomery said that he, "Chin,

respect to the June 20, 1992 shooting of Montgomery testified that Meechie told

him that he had a pistol, Poo-Poo had a pistol and Bird had a machine gun, and

that he was going to kill Bird when he came home because Bird did not shoot.

(Tr.031201 pm p. 75-76)

The government had absolutely no factual basis to infer that Sean Coates

was involved in the January 20 or had a machine gun.    The discovery

documents show that there was never an allegation of anyone having a machine

gun   During direct, Montgomery admitted that he did not want Meechie to pled

guilty because he was a co-defendant with Meechie in another case.[20] (Tr.031201

pm p.77)

---

Bird, Erik, Hard Rock, Morris, Crawford" were the people he remembered being
there.  (Tr.031201 pm p.72-73) Arthur Rice testified that a guy named Motor
from Condon Terrace actually punched Meechie in his face.  Montgomery also
testified about the 1993 murder of Dihru (Wayne Perry's nephew) by Condon
Terrace but this occurred in 1993. (Tr.031201 pm p.74-75)

Eric Gray testified that at the courthouse during a case involving Michael
Jones in the summer of 1992 people from Condon Terrace got into a fight with
Irky Berk, Draper, Skinny Pimp and Sam. (050801 pm p.13-15)

[20]    In addition to pleading to shooting Jermaine Hall, Clifton Edwards
pled guilty to UUV in case number F-6465-92. Edwards admitted that he was
driving a car without the owner's permission which was stopped on November
13, 1991.  Montgomery was in the front passenger seat when the car was
stopped.  (Tr.052593 p.11-13)

Arthur Rice was not sure when the incident happened, but after the incident Meechie got locked up.   He said that he spoke to Meechie and Birdy about a shooting at a Exxon station on South Capital – said some dudes was up there in a Accura and either Meechie or Birdy chased them, one of there guns jammed, but the guys got away.  (Tr.042501 pm 47-49)

Arthur Rice testified about Michael Jones being shot on June 28, 1992. According to him, after the June 20th incident, Meechie call and spoke with Birdy and himself.  Meechie said that a dude name Michael Jones is testifying against him.  Rice testified that Birdy knew where to go.  They went somewhere around Condon Terrace.[21]   According to Rice, Birdy and Gus walked up to Michael Jones. They shot at him.  Without objection, the government elicited from Rice that after Mike survived, Meechie pled guilty.  (Tr.042401 pm p.55)

Also without a hearsay or confrontation clause objection, the Government admitted Edward's plea (Ex M78) proffer into evidence without objection.  The Government deleted a portion of the proffer as agreed to by Edwards which

---

[21]    Actually Michael Jones was shot in Congress Heights at 10th Place and 4th Street.

would strongly suggest only one person was involved in the June 20 shooting. [22]

(Tr.043001 pm p.23-24)

Mr. Jones entire cross-examination regarding Arthur Rice's testimony about the Condon Terrace shootings was as follows:

BY MR. JONES:

Q.   Good morning, Mr. Rice.
A.   Good morning.
Q.   My name is Jones.  I represent "Birdie."
A.   All right.
Q.   Sean Coates.
A.   Yes.
Q.   Now, Mr. Rice, you have talked a lot about -- well, you mentioned a few incidents in which you observed "Birdie," and one of them which sticks in my mind is the incident involving Mike -- this guy named Mike?
A.   Yes, sir.
Q.   Now, in what neighborhood did that shooting take place?
A.   Southeast.
Q.   Southeast.  There is no other -- you can't break it down any further than that?
A.   Over there towards Condon terrace, over there by fourth street and 10th Place.  That area over there.
Q.   Now, you said you posted up at some street?
A.   Yes.
Q.   What street did you post up at?
A.   I can't recall.
Q.   You don't recall?
A.   No, sir.

---

[22]   Mr. Kiresh (Sweeney's lawyer) objected because he thought that Edwards was a member of L street.  He was confusing Clifton Edwards with Demetrius Hunter also nicknamed Meechie.  (Tr.043001 pm 21)

Q.   Now, you indicated, sir, that you saw "Birdie", Sean Coates, stand over top of this man named Mike and pump bullets into him?

A.   Yes, sir.

Q.   Now, that, sir, is a lie, isn't that correct?

A.   No, sir. (Tr.043001 am p.9-10)

Also Agent Lisi testified to the following statement made by Co-Defendant

Sweeney to Michael "Butchie" Smith.

Q.   Did Mr. Smith tell you about conversations he had with Mr. Sweeney involving the shooting of an individual by the name of Michael Jones?

A.   Yes, but he didn't know the name Michael Jones.  What he told me was that, he said that back in 1992, Meechie, and that's just the name he gave me, Meechie was charged with shooting somebody from Condon Terrace.

Q.   Let me just stop you for a second.  When you say he told you, this is what Mr. Smith told you? (Tr.052901 pm p.29-30)

A.   Yes, ma'am.

Q.   And the source of his knowledge was what?

A.   Mr. Sweeney.

Q.   All right.  I'm sorry to interrupt.

A.   That's okay.  So Mr. Smith is telling me that Mr. Sweeney told him that Meechie got charged with shooting a person from Condon Terrace, and that one of the persons or the victims was cooperating against Mr. -- was cooperating against Meechie.  So that Mr. Sweeney went to an area in Southeast near Mississippi Avenue to kill the person who was testifying or who was going to testify against Meechie.  And Mr. Smith was under the impression that the person did die, that there actually was a murder.  And he said that Mr. Sweeney went down there, chased a person through the alley and it was some place near Mississippi Avenue, caught up with him, shot him, and stood over him and shot him some more.  And it was Mr. Smith's understanding that the person died. And I tried going back and finding this crime, and this is an example of where I'd call him and ask him a question, and I'm trying to find -- I said, hey, you know, tell me about that again.  And then he told me that, yeah, he said, it was Draper or Shorty are the words he used and Birdy and he knew Birdy. He said Birdy

was with Draper when they went down there, and he said Birdy also shot somebody during the same event.  So we looked back through and based on what he had told us, it matched up exactly with the shooting of Michael Jones.  However, Michael Jones did not die.  Let me back up.  Match exactly. (Tr.052901 pm p.29-30)

Although not a single question had been asked about Condon Terrace, Mr. Jones when asked whether he had cross, responded: "Your honor, most of the questions have been asked.  At this point, I don't think I am going to have any questions." (TR053001 am p.89)[23]

---

[23] Mr. Jones did call a witness, a police officer who testified that Michael Jones said that Wayne Perry shot him. (Tr.061401 pm p.22-23)

### III.   COUNSEL'S OTHER FAILURES

### 1.   Opening Statement

Mr. Jones' opening statement is obviously off the cuff.  It is less than seven transcript pages. (Tr.010901 pm p.10-16)   The first three pages are just generalized statements that do nothing to refute the charges.  Jones explicitly states "... there's not going to be any physical evidence linking [Sean Coates] to any crime." (p.11)

Jones then implied that he will present an alibi defense for the triple.  "The evidence will show that Sean Coates wasn't even there."[24]  Jones said he is going to cross examine Mr. Montgomery.  (p.14) With respect to Michael Jones, Mr. Jones informs the jury that they will hear that Michael Jones said that William Perry shot him. (p.4) He makes no mention of the other Condon Terrace shooting.  Jones told the jury that they would hear about a gun that Coates pled to years ago.  "And you will hear another set of facts describing the incident when he was a juvenile." (p.14 ) Jones does not mention the marijuana or RICO conspiracies.  Jones did not mention the shooting of Ronald Sowells or the kidnapping of Anthony Pryor.

_____

[24]     Jones did intend to present an alibi witness, Coates' sister, but he did not.

**2.    *Jones Trial Preparation and Representation of Mr. Coates at Trial***

Current Counsel does not have Mr. Jones' files to access his trial preparation. Further, as set forth above, Counsel does not currently have access to Mr. Jones.    There is, however, information in the record which points to the paucity of Jones preparation.   First there is the issue of his failure to make discovery request.  Perhaps he anticipated that with so many lawyers, it would not be necessary.

The problem with that thought process is illustrated by the Condon Terrace allegations. Defendant Coates was the only defendant who had to defend against the Condon Terrace allegations.  The Bates Stamp numbered discovery related to Condon Terrace is 900215-900353.  That discovery relates solely to the June 20, 1992 shooting of Michael Jones.  There was no discovery related to the June 28, 1992, the Racketeering Act that was found proven.  In trial, Jones did not mention the June 28, 1992 shooting in his opening.  He obviously did not have a plan for cross examination and simply had Rice repeat his testimony without challenging it.

Likewise with Ronald "Manute" Sowells. Jones did not mention this crime in his opening statement.  Sowells was potentially the most dangerous witness

34

against Mr. Coates.  AUSA Zeidenberg said in opening statement:

> "Well, you know what's going to happen to Ronald Sowells.  On October
> 30, 1996, Sean Coates and Sam Carson find out Ronald Sowells is in the
> neighborhood at the Anacostia Metro.  They go back to Southwest, get a
> gun. Carson is driving.  Coates is in the passenger seat,  pulls up alongside
> the car where Ronald Sowells is, blasts Ronald Sowells from right next
> door, shoots him in his side. He lives, and he will come in, and he will
> testify, **as will other witnesses**, that the shooter was Sean Coates, and
> it was Sam Carson that was with him. (Tr.010801 pm p.24-25)"

The discovery documents that are available to Current Counsel do not

include any documents regarding Sowells.  Defendant Coates joined motion

previously filed by his codefendants including their motion for pretrial

identification procedures. (Docket Entry 313 06/06/2000) The government did

not present any evidence regarding a pretrial identification of Coates by Sowells.

Mr. Zeidenberg did not mention that Sowells had made an identification of

Coates to Detective Mitchell.  When Mitchell took the stand and testified to the

identification, Mr. Jones did not make any objection.  More importantly, Mr.

Jones apparently failed to notice that the Government did not move Sowells

medical records into evidence.  That should have been a red flag.  Generally, the

Government will want the jury to know how badly the complainant was injured.

When these records are not produced, it is a red flag for the defense.  Even when

they are produced, many defense counsel routinely obtain their own copies of

these records to make sure nothing has been omitted.   Even if he did not receive

the records in discovery, after the conflict between Sowells and Detective

Mitchell's testimony regarding the circumstances of the identifical became clear,

Jones should have immediately ask the Court to execute a subpoena for the

medical records.[25]   Counsel for Carson later introduced the records in his case.

(Tr.062501 am p.39)[26]

    Mr. Jones most egregious error of pretrial preparation was going to trial

unaware of the fact that the Government claimed to have matched his client's

fingerprint to a print taken from the car that Anthony "Wysocki" Pryor had been

kidnapped.   Surely, he was unaware because he told the jury in opening that

there would be no physical evidence linking his client to any of the crimes.

---

[25]   There is an indication in the record that the Government was in possession of these records.   Counsel for Proctor requested medical records which he did not receive from his predecessor.   Mr. Zeidenberg responded:

> "We literally have a dozen binders of the materials that were turned over two years ago.   And, since that time, we have a box, for instance, of medical records that are probably several thousand pages. *** he can come over to our office and review the discovery binders, and if there is something specific that he sees that he doesn't have, obviously, we'll make a copy." (Tr.092700 p.165)

[26]   Carson put on a very agrressive defense to this Racketeering Action and it was found not proven.

Discovery Document 300475 disclosed to the defense that a Brown 1983 Cadillac, license number unknown, VIN 1 G6AD698D9214743 was towed to a Prince Georges County Impound at 7600 Barlowe Rd.  Landover. The report says that the owner of the victim is unknown.

Document 300484 and 300485 relate to the fingerprint examination of the Cadillac.   Document Number 300484 is a Prince Georges County Police Department Evidence Report which states that of the Cadillac "...which had previously been fumed for latent fingerprints utilizing cyanocrylate ester pm 10/22/93, was fumed for the presence of any developed latents with none of value being obtained.

Document 300485 is a mostly illegible copy of the Request for Latent Fingerprints.  Coates name can barely be made out in the report section but whether or not there was a match is illegible.  In redirect examination of Sargeant Deloatch, found an opportunistic moment to elicit the following.

Q.    Sergeant Deloatch, you were asked about some fingerprints that were taken -- latent prints that were taken from the car compared to known prints.

A.    Yes.

Q.    Do you recall being asked about that?

A.    Yes.

Q.    Do you recall whose known prints were found on the car?

37

Mr. Jones: Objection, your honor.

The Court: Overruled.

The witness: Coates.

Mr. Zeidenberg: Sean Coates'?

The witness: Yes.

Mr. Zeidenberg: No further questions, your honor.(Tr.042401 am 30-31)

Mr. Jones did not make a proper objection, hearsay and no foundation.
Indeed despite the criticality of this evidence, he did not even asks to approach
the bench to explain his objection.   Here is on of those examples where it is clear
that Mr. Jones is winging it – not acting with the skill and knowledge that would
be expected of a lawyer trying a case of this magnitude. The court inquires
whether there is anything further.  Rather than approach the bench and ask the
Court to strike that evidence if the Government does not produce the
foundational evidence, Mr. Jones proceeds to reinforce the notion that this is his
client's finger print:

Mr. Jones:

Q.    You have indicated that it's your understanding that Mr. Coates' prints were
      found on the car?
A.    Yes.
Q.    Those prints were found on the outside of that automobile, isn't that

38

correct?
A.     I'm not sure.
Q.     Isn't it a fact that those prints were found on the right rear taillight?
A.     Now, that you mention that, yes.  Yes, it is. (Tr.042401 am p.31)

At this point, Mr. Jones has not only failed his duty as an advocate.  He has

become his client nemesis.   Rather than making proper objections, he is

supplying information to affirm the Government's case against his client.

In his cross examination of Sergeant DeLoacth about the ownership of the

Cadillac and where was it, Jones elicited clearly false testimony from Deloatch

and made no effort to correct DeLoatch's suggestion that the Cadillac was given

back to the owner was clearly false and unsupported by the evidence.

By Mr. Jones:

Q.     Good morning, Mr. Deloatch, or Sergeant.
A.     Good morning.
Q.     Sergeant, where is that car, the Cadillac?
A.     Where is it now?
Q.     Yes.
A.     ***It was probably given back to the owner.  I know we impound it
       and we take it to the impound lot.***  And the officer that was involved
       in the case back in '93 should have contacted the owner so the owner
       could pick the car up.  Where it is now, I couldn't tell you.
Q.     Have you ever seen the car?
A.     No.
Mr. Jones:  I have no further questions. (Tr.042401 am p.30)

According to the incident report, the owner of the vehicle was unknown.

39

No record of the car being returned to its owner was produced in discovery. [27]

Finally, Jones did not participate in the discussion of jury instructions.

## 3.   *Michael "Butchie" Smith*

Agent Lisi's rendition of Michael Butchie Smith statements was obviously prejudicial to Mr. Coates.  Since Coates was not alleged to have any involvement in the death of Butchie, the question as to him was whether his conduct resulted in a waiver.  Smith's motion merely rehashed what the Government and the other defendants had said.  He did not look at the issue from the perspective of his Client's rights.  The question for Mr. Coates was whether he had made a waiver.  The law from the Supreme Court is quite clear.   "There is a presumption against the waiver of constitutional rights. . . and for a waiver to be effective it must be clearly established that there was `an intentional relinquishment or abandonment of a known right or privilege.' *Johnson v. Zerbst,* 304 U.S. 458, 464."  Jones did not cite or argue *Johnson*' applicability.

As the transcript further establishes Mr. Jones, as usual, misunderstood the nature of the evidence that the government intended to present.

_____

[27] The points made herein about Mr. Jones disastrous trial preparation and performance are meant to be representational and not exclusive.

40

Mr. Jones:   But in their statements, your honor, they list Coates as a participant in the triple homicide. and I just want to know what he is going to say before he gets up there and says it.  I mean if he says that Sweeney told him that Coates was part of that -- in the 302 it says James Montgomery and Draper and Others.  And that's always been what we have been under the impression of.  "And others."  This is page 3 of the 302's, your honor.

The Court: that's fine.  Ask him about his 302's and what is the explanation for this glaring omission.   A set forth above, Agent Lisi testified to something different.   Mr. Jones did not cross examine the glaring omission or admit the statement in evidence.  Jones said that most of his questions have been asked. He does not think he will asks any questions.  (Tr.052901 pm. p.89  During closing argument Mr. Jones did not mentioned Butchie.

## 4.   *Failure to Object to Continuous Hearsay Solicitation by Government*

Trial counsel continuously failed to object to hearsay solicitations by the

Government.  For example, to bolster its case about the feud between Condon

Terrace and K Street, the Government elicited this hearsay testimony about the

murder of Wayne Perry's nephew from James Montgomery.

By Mr. Ziedenberg:

Q.    Okay.  Now, are you familiar with someone named Dihru?
A.    Yes.
Q.    Who is Dihru?
A.    Dihru is Darryl Young.
Q.    And was he a friend of -- where was he from?
A.    Southwest.
Q.    Was he related to someone else from Southwest?
A.    Yeah.

41

Q.    Who was he related to?
A.    Wayne.
Q.    Wayne Perry?
A.    Yes.
Q.    Now, directing your attention to around 1993, was Dihru killed?
A.    To my knowledge.  I was locked up.
Q.    What was your understanding of who was responsible – what part of the city was responsible for his murder?
A.    Condon Terrace.
Q.    Now, you said you were incarcerated in 1993?
A.    Yes.
Q.    How long had you been incarcerated, was that since November of '91?
A.    Yes." (Tr.031201 pm p.74-75)

Without objection, the plea of Clifton "Meechie" Edwards was admitted into evidence.    Even before **Crawford v. Washington,** competent lawyers in theDistrict of Columbia routinely made hearsay objections to these plea proffers.[28]

As another example, the prosecutor asked Sowells what was his understanding of where Joey Simmons got killed and whether Simmons was armed.  Without objection Sowells testified behind Harry's O's house and he was armed. There was absolutely no foundation laid for Sowell's having personal knowledge of this fact or having even learned it from a co-conspirator. (Tr.041701 p.79)

---

[28]    See for example **Morten v. United States**, 856 A.2d 595 (D.C. 2004)

### 5.    *Closing Argument*

Having consistently failed to challenge the evidence against Coates at trial,

Jones gave a rambling closing statement in which much of what he had to say

barely passed the giggle test given the seriousness of the allegations.    He

suggested that Montgomery's testimony against Coates was motivated by

Montgomery's perception that Coates had "feminine ways" Tr.070301 am p.19)

He adopted the argument put forward by codefendants that special agent Lisi

driving through the K street area and, "lo and behold, Vincent Hill and some

others have the nerve to talk to them.  They have the nerve to be argumentative

and nasty with them.  They didn't show them the proper respect."(Tr.070301 am

p.11)

As to the Triple, Jones argued:

"Well, he figures that out by saying, well, yeah, as a matter of fact, he
helped me change the tags.  We went and stole some tags from a car and
put it on the van. That, you see, gets him involved.  Aiding and abetting.
That's it.  He takes a part in the actual crime itself. But, look, did anybody
bring anybody in here to  tell you about a police report filed for a missing
tag or stolen tag?  No.  Nothing.  Just Montgomery."

There was an obvious defense to Montgomery's pointing the finger at

Coates.   Montgomery's fingerprints were at the crime scene.   He was death

penalty eligible.  The only way for Montgomery to improve his situation was to

43

point the finger at someone who was not placed at the scene by incriminating physical evidence. By the time that Montgomery told his story, it is impossible to corroborate or disprove the underlying details – such as the car.

Montgomery's allegations against Coates on the Triple were not compelling. He could not even say with certainty that Coates knew what the plan was.

As to Butchie, there was reasonable doubt that he actually did point the finger at Coates. After Michael Smith cooperated, Sweeney and Montgomery were initial charged with the Triple, not Coates. More importantly, Coates was not allege to be involved in the hunt for Smith. If Coates was involved in the Triple, he would have had a motive to be involved in the hunt for Smith. More importantly, Montgomery had an enormous reason to eliminate Smith. Revenge. These, and many other inferences favorable to Coates, could have been drawn by any lawyer of reasonable competence.

Having failed to make a proper argument to the Court for exclusion of the fingerprint, Jones then argued to the jury that the fingerprint should not have been admitted. In making his argument, he improved the government's evidence.

44

"...then they talk about a fingerprint that is supposed to be on Sean Coates' own car -- on the outside of the car. But who did you hear that from? The **crime scene search officer**. You didn't hear it from the fingerprint expert. The fingerprint expert from Maryland didn't come in here and tell you anything about any fingerprint. And I objected to the fact that they tried to elicit this information from the crime scene search officer. **He has no business testifying about a fingerprint**. But that's what you got."[29]

The fingerprint evidence came from Sgt. Deloatch, the detective investigating the kidnapping of Wysocki, not a crime scene officer.

## IV.   INEFFECTIVENESS OF APPELLATE COUNSEL

### 1.   Failure to Appeal Admission of Fingerprint by Hearsay Evidence without foundation

Although, the admission of the fingerprint was readily recognizable as rank hearsay that did not fit within any exception of the hearsay rule, Appellate Counsel did not appeal the overruling of the objection on appeal.

### 2.   Failure to Obey Court's Order Related to Sealed Portions of Transcript

In the Court of Appeals, Defendants' moved to review the sealed portions of the record in order to mount a challenge to the District's Court's *Brady* rulings. By order dated 28, 2003, the Court entered an order denying their request and directing them to:

---

[29]   Here again, these examples are representative.

"...identify the specific rulings that they believe are erroneous, and if they present a colorable claim, this court may review the sealed material *in camera* to determine whether a *Brady* or *Jencks* act violation has in fact occurred.\*\*\*Any future arguments concerning the district court's application of *Brady* and or the *Jencks* Act should be presented in appellant's brief, rather than by motion."

Rather than comply with the Court's order, Appellate Counsel included a section in its Brief titled "The Court's response to *Brady* and *Jencks* Request was Lackadaisical."

## 3.   *Failure to Raise Issue of Ineffectiveness on Appeal*

On appeal, Appellate Counsel relied on structural issues (except the issues related to Robert Smith) that had almost no chance of success and were indeed dismissed *per curiam*. Appellate Counsel chose to attack the Court as biased but failed to address the glowing deficiencies of trial counsel that were obvious in the record. Jones failure to move to strike the fingerprint identification as rank hearsay was obviously deficient performance, but Appellate Counsel failed to address it. With respect to the issues regarding Robert Smith, Appellate Counsel cited ***Johnson v. Zerbst*, *supra***, but did not assert that the Court below rendered its opinion without argument on its applicability because the Trial Counsel failed to raise the issue.

## V.   INEFFECTIVENESS BY TRIAL AND APPELLATE COUNSEL

Coates was convicted of three counts of Use of firearm During and in Relation to a Crime of Violence or Drug Trafficking on or about November 17, 1996 (Count's 34, 35, and 36).  He was sentenced to 240 months on counts to be served consecutive to each other and all other counts.  Although it is uniformly held that gun possession that is uninterupted merges, Trial Counsel did not raise this issue at sentencing or file a motion to correct the sentence. Matthews v. United States, No. 03-CF-432 (D.C. 2006); *Bruce v. United States,* 471 A.2d 1005 (DC 1984); *Monroe v. United States,* 600 A.2d 98 (DC 1991); *United States v Chalan* 812 F2d 1302 (1987, 10th Cir.).   Appellate Counsel did not seek remand to merge the counts.

## VI.   PROSECUTORIAL MISCONDUCT

In reviewing the files and records that are currently available Counsel for Coates believes that the prosecutors engaged in deliberate misrepresentations and other misconduct but needs further investigation and a complete set of discovery, *Giglio, Jencks* and the sealed 302s. For example, the prosecution had asked Coates to stipulate to the fingerprints in reference to Anthony Pryor.  In light of the earlier report saying no fingerprints of value and the claim that the car

had been disposed of, it is not surprising that the Government was concerned about getting the fingerprint admitted. When Coates refused to stipulate, it purposefully violated the rules of evidence and admitted the fingerprint identification as pure rank hearsay with no intention to later lay the foundation.

Counsel believes the Government made deliberate misrepresentations regarding the Condon Terrace counts.  For example the Government put on evidence regarding a fight between Condon Terrace and Southeast in summer of 1992 while Michael Jones was there for a court hearing in June of 1992. [30] It

---

30

| | |
|---|---|
| Q. | Was there a time in the summer of 1992, Mr. Gray, when you were down at the court building, D.C. Superior Court, in  connection with the case involving a friend of yours by the name of Mike? |
| A. | Yes. |
| Q. | Do you know Mike's full name? |
| A. | Michael Jones. |
| Q. | And what neighborhood was Michael Jones from? |
| A. | Condon Terrace. |
| Q. | When you went to the court building in Superior Court, did you go there by yourself or with other people? |
| A. | With other people. |
| Q. | The other people that went with you, what neighborhood were they all from? |
| A. | Condon Terrace. |
| Q. | When you got down there, did you see any people from Southwest? |
| A. | Couple. |
| Q. | Got to keep your voice up. |
| A. | A couple of them. |
| Q. | Okay.  Did anything happen between you and the peoplethat you were |

should be noted that it was Ms. Chaterverdi who supplied the date in her question.   Counsel has reviewed the Superior Court records.   According to Superior Court records, Michael Jones had a case pending in 1992, but that case was disposed of on March 20, 1992.

Counsel also notes that there was not one scintilla of evidence pointing to Coates involvement in the June 20, 1992 shooting or that Michael Jones was shot at.   The Government asserted that Michael Jones was a victim in order to bolster its case for the shooting on June 28, 1992. Knowing that Michael Jones had said that Wayne Perry had shot him, the government sought to connect Coates to a non-existent earlier attempt on Jones life.   Counsel also wants to investigate whether Mr. Ziedenberg had a good faith basis for his representation that Michael Jones told the police in the hospital that it was one of Wayne Perry's boys and Wayne Perry who shot Michael Jones.

The testimony of Detective Mitchell that Sowells named Coates on the date

---

with versus the people that were from Southwest?
A.     We was about to get in a beef. ***
A.     I say, we was about to get in a beef.
Q.     What was about to happen?  What was happening?
A.     A lot of arguments, this and that, and before, you know, we got into it, there, you know, police got involved with it.
(Tr.050801 p,9-10)

of the shooting as his assailant makes absolutely no sense and Counsel intends to further investigate this as an instance of misconduct.

Finally, James Montgomery had told the Government that Sam Carson had killed Paul Ridley. Another man Steven R. DeWitt had been convicted of this murder and been incarcerated for 10 years. The fact that Montgomery was accusing Carson of a murder for which someone else had been convicted had the potential to seriously undermine Montgomery's credibility and the Government's. Although this was clearly *Brady,* the government elected to withhold this information until after the conviction of Coates.

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION PURSUANT TO 28 U.S.C. § 2255 TO VACATE, SET ASIDE OR CORRECT SENTENCE

Mr. Coates was charged with the most serious offenses possible, four murders, two kidnappings, several shootings, RICO conspiracy and a Marijuana Conspiracy. He did not select his counsel. His counsel was appointed by the Court and clearly here, Counsel did not function in the manner required by the Sixth Amendment right to Counsel.

*"Thus, a fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding.* The right to counsel plays a crucial role in the adversarial system embodied in the Sixth

Amendment, since access to counsel's skill and knowledge is necessary to accord defendants   the "ample opportunity to meet the case of the prosecution" to which they are entitled. *Adams v. United States ex rel. McCann,* 317 U.S. 269, 275, 276 (1942); see *Powell v. Alabama, supra,* at 68-69.***

The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.***

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a  trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a  breakdown in the adversary process that renders the result unreliable.*** When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective  standard of reasonableness.*** The proper measure of attorney performance remains simply reasonableness under  prevailing professional norms.  Counsel also has a duty to bring to bear such skill and knowledge as will render the trial    a reliable adversarial testing process. *See Powell v. Alabama,* 287 U.S.,  at 68-69. *** Moreover, the purpose of the effective assistance guarantee of the Sixth  Amendment is ***simply to ensure that criminal defendants receive a fair trial." **Strickland v. Washington**, 466 U.S. 668, ___ 1984)

Appellate Counsel was likewise ineffective for failure to raise on appeal

clear errors in the proceedings below. ***Cirilo-Munoz v. United States*** 404 F.3d

51

527 (1st Cir. 2005); *United States v. Reinhart*, 357 F.3d 521 (5th Cir. 2004);

*United States v. Skurdal*, 341 F.3d 921 (9th Cir. 2003); *Brown v. United*

*States*, 167 F.3d 109 (2nd Cir. 1999); *Jackson v. Leonardo,* 162 F.3d 81

(2nd Cir. 1998); and *Roe v. Delo*, 160 F.3d 416 (8th Cir. 1998)

Mr. Coates further asserts that the government breached its obligation to

the truth under *Mooney v Holohan* 294 U.S. 103 (1935); failed to disclose

exculpatory information of *Kyles v. Whitley*, 115 S.Ct. 1555 (1995), *Brady v.*

*Maryland,* 373 U.S. 83 (1963), *United States v. Agurs*, 427 U.S. 971 (1976),

United States v. Bagley, 473 U.S. 667 (1985); *Strickler v. Greene*, 527 U.S.

263, 119  S.Ct. 1936, 144 L.Ed.2d 286 (1999)  and deliberately engaged in

misconduct.

## *CONCLUSION*

For the foregoing reasons and for such other reasons as should appear

from supplementation of the record, that this Court should grant a hearing,

vacate Mr. Coates  convictions on each and every count and vacate his sentence.

Respectfully submitted,

/s/

Veronice A. Holt, Esq. 183756
W111 3003 Van Ness, NW
Washington, D.C. 20008
(202) 244 - 2659      52

202-244-2659 tel
202-244-6242 fax
veroniceholt@msn.com


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 19 , 2008, a copy of the foregoing Motion Pursuant To 28 U.S.C. § 2255 To Vacate, Set Aside Or Correct Sentence wash and delivered to the office of Assistant United States Attorney Robert D. Okun, Chief, Special Proceedings Division, Room 10-836, 555 4th Street, N.W., Washington, D.C.  20530.


_____
VERONICE A. HOLT