Copies to: Judge
AUSA – Special Proceedings
Dft.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,  ) | |
| ) | |
| Plaintiff,  ) | Crim. No. 98-329 (~~TPJ~~) 7 F H |
| ) | |
| v.  ) | **FILED** |
| ) | |
| JEROME MARTIN,  ) | FEB 1 8 2008 |
| ) | |
| Defendant  ) | Clerk, U.S. District and Bankruptcy Courts |

### MOTION TO VACATE, SET ASIDE, CORRECT SENTENCE PURSUANT TO 28 U.S.C. SECTION 2255

For the reasons set forth below, defendant Jerome Martin respectfully requests that the court vacate, set aside or correct his sentence. This motion is made pursuant to 28 U.S.C. section 2255.

### FACTS

**A.  Procedural History**

On September 18, 1998, Jerome Martin was charged along with several co-defendants in a multi-count indictment alleging a narcotics conspiracy, racketeering conspiracy, murder and other violent crimes, narcotics trafficking, and weapons offenses. A superseding indictment was filed on March 25, 2999. Trial began on November 15, 2000. A second retyped superseding indictment was filed on July 2, 2001, containing all the counts that were submitted to the jury. In July and August, 2001, the jury returned guilty verdicts against all defendants. Jerome Martin was convicted of Count 1, narcotics conspiracy, Count 2, RICO conspiracy, Count 8, first-degree murder while armed of Anthony Fortune, Count 9, assaulting a police officer with a dangerous weapon, Count 17, assault with intent to kill while armed of James Coulter, Count 18, attempted

murder of James Coulter in aid of racketeering, Count 31, use of firearm during and in relation to attempted murder of James Coulter, Count 42, possession of firearm during crime of violence against James Coulter, and Counts 49, 53, 55, 64, related to marijuana trafficking.

Martin was sentenced under the then-existing mandatory determinate Federal guidelines system. Pursuant to that system the Probation Office calculated a sentencing guideline mandating life imprisonment and Martin was sentenced to that term.

On appeal, the United States Court of Appeals for the District of Columbia Circuit affirmed Martin's convictions. *United States v. Carson, et al.*, 372 U.S. App. D.C. 251, 455 F.3d 336 (2006).

The United States Supreme Court denied Martin's petition for writ of certiorari on February 20, 2007. *Samuel Carson, et al. v. United States,* Docket No. 06-9046.

### B. The Government's Evidence[1]

Martin and others were charged with a large-scale narcotics and RICO conspiracy. In furtherance of the conspiracy, Martin was alleged to have engaged in extensive narcotics trafficking and multiple acts of violence. By way of an overview, it was the prosecution's theory that Martin and the other defendants were lifelong friends who grew up during the 1980s in the Greenleaf Gardens neighborhood in southwest Washington. As they entered their teenage years they began selling drugs. By the early 1990s, the Government claimed, most of them were selling substantial quantities of marijuana, along with less significant quantities of other drugs. Most of the sales were made on the 200 block of K Street, SW, and on the corner of Delaware

---

[1] Only such evidence as is necessary for an understanding of the issues raised in this Motion is recited herein.

Avenue and K Street, SW. The Government charged that Martin and the other defendants ran these locations as cooperative markets in which they rotated serving marijuana to customers driving into the area from the D.C. Metro area. The prosecution depicted Vincent Hill as the leader of this "crew," and Martin as one of its members.

Government law enforcement witnesses testified to sales of marijuana by Martin in 1995 and early 1996 in the 200 block of K Street, SW, some of which were preserved on audio or videotapes. According to cooperating witnesses, Martin sold marijuana on K Street regularly during 1993 and 1994, and 1996 through 1998.

The Government also asserted that Martin and the other defendants engaged in ventures other than drug dealing, both for purposes of self-enrichment and protection. For example, through the testimony of informants and cooperating insiders, evidence was presented that Appellants sometimes committed kidnappings to fund weapons, drugs or living expenses. Witnesses testified that Martin and others were responsible for a number of acts of violence, some planned and others spontaneous. Martin, the other defendants, and their allies, in particular a group from 37th St., SE, which Martin was said to have organized, engaged in frequent confrontations ("beefs") with competing factions. Several witnesses attested to fights, drive-by shootings, and occasional homicides between the K St. And 37th St. members, on the one hand, and groups operating out of Condon Terrace and L St., SW (these being gangs of drug dealers that frequently warred with Martin and the others over control of territory). Other witnesses recounted instances where persons who had disrespected members of the K St. Group, such as the so-called 58th St. crew, were attacked.

Martin and the others were alleged to have resorted to force and violence where believed

3

necessary to prevent rival drug dealers from operating in their territory. Sometimes this extended to acts intended to punish suppliers believed to have knowingly supplied inferior drugs or to have shortchanged some of them in transactions.

The Government claimed that Martin's marijuana selling in the 200 block of K Street, SW was related to several acts of violence occurring on 37th Street, S.E. and 58th Street, N.E., one of which was the killing of Anthony Fortune. Every Government witness who testified about the Fortune killing attributed it to a personal dispute between Martin and Fortune, and most attributed the dispute to Fortune trying to rob or actually robbing Martin at a craps game. Charlene Wilson, the only eyewitness to testify, said that Carson did the shooting, and that Martin drove Carson from the scene. Some cooperating witnesses testified that Carson admitted shooting Fortune, while others claimed that Martin did so. They, too, variously ascribed a singular motive for the shooting: a dispute arising from a crap game.

According to the Government's evidence, the Fortune shooting triggered a dispute between Martin and the 58th Street group. In that dispute, the 58th Street group killed Curtis Buchmon in retaliation for Fortune's killing. Martin and Buchmon were very close, and after his killing, Martin, Carson and Montgomery allegedly went gunning for the 58th Street group. There was a shootout between them and the 58th Street group, during which the police arrived. Martin and his associates exchanged gunfire with the police. Edwards, Burton and Jones came into the 37th Street area in a car with tinted windows, and Martin assumed they were with the 58th Street group. Concerned about a drive-by shooting, he gave Antonio Knight a gun, and Knight shot into the car, killing Edwards and wounding Burton and Jones.

Testimony was presented that accused Martin and the others of involvement in murders

or shootings which supposedly were undertaken to track down or silence persons believed (correctly or otherwise) to be potential Government witnesses in prosecutions or grand jury investigations against members of the organization. One of the persons Martin was accused of shooting was James Coulter. According to the Government, in 1995, Vincent Hill complained to Martin and others that Coulter was "hot," and needed to be killed. On May 30, 1995, Coulter was shot. A cooperating witness was on the corner of Delaware and K Street when he heard Hill and Martin talking about Coulter's shooting. Hill told Martin that Martin should have used two guns, and asked why the gun jammed. Some time later, another cooperating witness overheard Martin talking with Coates and Carson about Coulter's shooting. Martin said that they were trying to say he had something to do with Coulter getting shot but they could not prove it because he had a mask on. Martin complained to another informant that he had tried to shoot Coulter at a crap game but his gun jammed.

After Martin was arrested for Coulter's shooting, he reportedly asked an informant to talk to Coulter and have Coulter give his investigator a statement about the shooting. The informant talked to Coulter twice at Martin's request; Coulter refused to give a statement, but said he was not going to come to court. Martin also asked the informant to contact a witness to the shooting, which the informant did. When neither man would give a statement, at Martin's request the informant showed Martin's uncle where Coulter and the eyewitness lived. Martin also asked an acquaintance who was in jail at the same time as Martin to contact the eyewitness and ask him to say that he did not know who shot Coulter, but that it was someone with a sweatshirt and a pistol at a crap game. Martin said that the eyewitness owed him a favor because his head was in the way when Martin shot Coulter, and if it was not for the witness, Coulter would be dead . Coulter

gave a statement to a former attorney representing Martin that he did not see who shot him.

### C. <u>Constitutional Violations</u>

1. <u>Withholding of Exculpatory Evidence</u>

The centerpiece of the Government's case against Martin was not drug trafficking, but violence - the shooting of Fortune and the 58th Street beef, and the shooting of Coulter as a potential witness. Martin recently located a witness about whom he was unaware at the time of the trial of this case who was an eyewitness to the shooting of Anthony Fortune and who can testify under oath that the Government's twin theories that Martin shot Coulter himself, or that he had Carson do so, are wrong. The witness, Steven Thomas, knows that Martin did not shoot Fortune. He also describes Fortune's shooter as very dark complected, taller than Martin (whom he knows) and heavy set, which would eliminate Carson, who is light-complected, tall and thin, as the shooter. Equally importantly, Steven Thomas was interviewed by police on the very evening of the Fortune shooting, and he told them the description of the man he had seen doing the shooting. The police knew on the eve of the shooting that an eyewitness described the shooter as someone other than Martin or Carson. The defense was never provided Steven Thomas' name, address or the exculpatory information he gave police. The Affidavit of George Steel, the private investigator who interviewed Steven Thomas, is attached hereto as Exhibit A.

2. <u>Impeding the Presentation of Martin's Defense</u>

At the trial of this case, counsel for Jerome Martin sought to compel Coulter's attendance at the trial. Based upon the sworn statement Coulter gave a former attorney for Martin, Martin did not shoot Coulter. Counsel had a good-faith basis for believing that Coulter would exonerate Martin if he could be subpoenaed to testify at the trial. The Government represented

6

that it did not know Coulter's whereabouts, or even if he was alive, at the time of the trial. The trial ended with verdicts in July and August, 2001. Just a few months later, sometime before February, 2002, the Government indicted Coulter in a major narcotics conspiracy in this court. Coulter was arrested on February 13, 2002. *United States v. James Christopher Coulter*, 02-mj-00104-AK (2/14/02). On February 14, 2002, the case before the magistrate judge was terminated because it merged into criminal case No. 02-074. Proceedings in the criminal case against Coulter are not available on PACER, and are presumably under seal. Martin intends to file a Motion with this court to unseal the proceedings, because the complaint and indictment in the case will likely reveal that the government was investigating Coulter for the months prior to his arrest in February 13, 2002 and that when the government represented to the trial court that Coulter had disappeared and could be dead, they knew his whereabouts, knew that he was alive and well, and subject to subpoena or writ of habeas corpus ad testificandum. The docket report from 02-mj-00104-AK is attached hereto as Exhibit B.

## ARGUMENT

### INTRODUCTION

A motion filed under 28 U.S.C. section 2255 must allege that (1) the judgment was imposed in violation of the Constitution, or (2) the judgment was imposed by a court lacking jurisdiction, or (3) the sentence imposed exceeded the statutory maximum, or (4) the judgment was otherwise subject to collateral attack. The suppression of evidence favorable to the accused is a ground for relief under the statute; likewise, prosecutorial misconduct is a ground if it violates the accused's right to Due Process of law. *Rafael Moreno-Morales v. United States*, 334 F.3d 140, 148 (1st Cir. 2003).

## I. THE GOVERNMENT VIOLATED MARTIN'S RIGHT TO DUE PROCESS OF LAW BY WITHHOLDING EVIDENCE OF HIS INNOCENCE OF THE ANTHONY FORTUNE MURDER.

Suppression of evidence favorable to an accused and material to guilt or innocence is a violation of Martin's right to due process of law, guaranteed by the Fifth Amendment to the United States Constitution. *Brady v. Maryland*, 373 U.S. 83 (1963). If the evidence suppressed is material, that is, its suppression undermines confidence in the outcome of the trial, a new trial is warranted. *United States v. Bagley*, 473 U.S. 667 (1985). The question is not whether a different verdict would more likely than not have resulted if the suppressed evidence had been available to the defense, but whether in the absence of the evidence, Martin received a fair trial, understood as a trial resulting in a verdict worthy of confidence. *Kyles v. Whitley*, 514 U.S. 419, 4343 (1995). Materiality of evidence is assessed cumulatively, not item by item. *Id.* at 436.

There are three components of a *Brady* violation: (1) the withheld evidence is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the government willfully or inadvertently; and (3) prejudice resulted. *Strickler v. Greene*, 527 U.S. 263 (1999). The government's duty to disclose evidence extends beyond material in the possession of the prosecution. The prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including police. *Kyles v. Whitley*, 514 U.S. at 437.

The petitioner need not show that after discounting inculpatory evidence in light of the undisclosed evidence, there would not be enough evidence to convict. The possibility of acquittal on a criminal charge does not imply an insufficient evidentiary basis for a conviction. The law makes it easier to obtain a new trial where the government engineered an unfair trial by

8

withholding material exculpatory to the accused. *Conley v. United States*, 415 F.3d 183, 188 (1st Cir. 2005), citing *Kyles v. Whitley*, 415 U.S. at 434-35.

The "reasonable probability" standard can be problematic, as noted by our circuit in *United States v. Bowie*, 198 F.3d 905, 908-09 (D.C. Cir. 1999):

> "What is a 'reasonable probability'? Probability is often expressed in terms of percentages, with 100% representing certainty. We know, because the Supreme Court has told us, that a 'reasonable probability' can be less than 50.01%. In other words, to reverse a conviction for a *Brady* violation, it does not have to be more likely than not that the defendant would have been acquitted had the evidence been disclosed. *See Kyles*, 514 U.S. at 434. We are also sure that a 'reasonable probability' is somewhat greater than 1%. How much greater? Enough, the Supreme Court says, to 'undermine confidence in the verdict,' *id. at 435,* which may lead us in a circle: one cannot be confident of the outcome when there is a 'reasonable' probability that it may be wrong, and a 'reasonable' probability is one high enough to undermine confidence in the outcome."

Another circuit explained it thusly: The "sufficient to undermine confidence in the outcome" formula means that reversal will be warranted even if there is less than an even chance that the withheld evidence would produce an acquittal. The petitioner is not required to show that a different outcome is certain with the presentation of the evidence. The value of the withheld evidence is evaluated in context of the entire record to determine materiality. *Conley v. United States*, 415 F.3d at 188. Put another way, the petitioner need only show that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. *United States v. Jernigan*, 492 F.3d 1050, 1054 (9th Cir. 2007) (*en banc*), citing *Kyles v. Whitley*, 514 U.S. at 435.

Once the court finds a *Brady* violation, meaning that non-disclosure of the evidence is so serious that there is a reasonable probability that the suppressed evidence would have produced a

9

different result, the court must grant a new trial.  *Strickler v. Greene*, 527 U.S. 263, 281 (1999); *In re Sealed Case*, 285 F.3d 887, 892 (D.C. Cir.1999).

In the instant case, the only direct evidence linking Martin to the murder of Anthony Fortune came from a witness named Charlene Wilson. Ms. Wilson claimed to be an eyewitness to the shooting, that Sam Carson shot Fortune and that Martin drove Carson from the scene of the murder. Very late in the trial, well after Wilson testified, the defense stumbled on withheld *Brady* material, in the form of the notes of a police officer who had interviewed Wilson right after the shooting. To that officer, Wilson said she heard about the murder later but was not actually present at the scene. The police officer attempted to explain Wilson's contradictory statements by saying that he created a false report to shield Wilson's identity. In addition to Wilson's contradictory versions of events, the government called several informants who claimed that Martin confessed to shooting Fortune, that Carson confessed to shooting Fortune, and that one goaded the other to do the deed.

In Steven Thomas' statement, we have an unrelated eyewitness who exonerates Martin as the shooter and who identifies the perpetrator in a way that eliminates Carson as the shooter. The evidence is clearly material, applying the case law developed by the Supreme Court and by our circuit. According to Thomas, his evidence was made known to the police on the night of the Fortune murder. The evidence was therefore in the government's possession as early as the night of the shooting. The evidence was never made available to the defense. Because the evidence was withheld, Martin was precluded from calling a witness who would have testified that he and Carson were innocent of the shooting. The evidence creates a reasonable probability, a probability sufficient to undermine confidence in the verdict, that a different result

10

would have obtained at trial had the evidence been available. The government used the Anthony Fortune shooting as evidence of Martin's participation in the marijuana conspiracy and the RICO conspiracy. Had evidence of Martin's innocence of the Fortune shooting been available to the jury, the result of the entire proceedings, not just the count involving Fortune, would have been different. Martin is entitled to a new trial.

## II. THE GOVERNMENT IMPEDED THE PRESENTATION OF MARTIN'S DEFENSE ON THE CHARGE OF SHOOTING JAMES COULTER.

The government violated Martin's right to Due Process of law when it impeded his counsel from procuring the testimony of James Coulter at the trial of this case. Defense counsel could not locate Coulter to subpoena him to trial, and petitioned the trial court for assistance in securing his presence. The government claimed to have no knowledge of Coulter's whereabouts. The government even suggested to the trial court that Coulter was deceased. On information and belief, around the time the government was making these representations to the court and counsel, Coulter was the subject of a prosecution by the United States Attorney's Office, and a federal Grand Jury investigation into narcotics trafficking. He was indicted for narcotics trafficking and arrested on February 13, 2002, six months after verdicts in the case. *See, United States v. James C. Coulter*, 02-mj-00104-AK, consolidated with Criminal Number 02-074. According to the docket sheet in 02-mj-00104-AK, the government sought detention after Coulter's arrest on February 13, to "permit revocation of conditional release, deportation or exclusion." Since there is no evidence that Coulter is an alien, in his case the revocation would have been based on the fact that he was on conditional release. The government would necessarily have known of the case in which he was on conditional release, since the government

11

would be the prosecuting authority in that case.[2]

Because the representations of the government at the trial of the instant case that it lacked knowledge of Coulter's whereabouts, and that he could be deceased, were false, and because the government's conduct prevented petitioner from securing Coulter's testimony at trial, the govern-ment violated petitioner's Due Process rights. Prosecutorial misconduct is a ground for relief under 28 U.S.C. section 2255 if it violates the accused's right to Due Process of law. *Rafael Moreno-Morales v. United States*, 334 F.3d 140, 148 (1st Cir. 2003).

Coulter gave petitioner's counsel a signed, witnessed statement that Martin did not shoot him. Based upon that statement, Martin would have called Coulter to testify in his defense if he could have located him and placed him under subpoena, or if he was incarcerated, petitioned the court for a writ of habeas corpus ad testificandum. The government's conduct prevented Martin from presenting exculpatory evidence. If that evidence had been available, it is unlikely the jury would have convicted Martin of the four counts in the indictment related to Coulter. As with the Anthony Fortune shooting, the government used the Coulter shooting as evidence of Martin's participation in the marijuana conspiracy and the RICO conspiracy. Had evidence of Martin's innocence of the Coulter shooting been available to the jury, the result of the entire proceedings would have been different. Martin is entitled to a new trial as a result of the government's conduct which deprived him of Due Process of law.

## **CONCLUSION**

For all the above reasons, and any others that may appear to the court at a hearing on this

---

[2] A check of PACER reveals that the criminal case with which the magistrate case was consolidated is not available for public inspection. Petitioner will seek discovery, including an Order from this court unsealing the court records to permit the full development of this claim.

Motion, petitioner respectfully requests, pursuant to 28 U.S.C. section 2255, that the court vacate, set aside or correct his sentence and grant him a new trial.

Respectfully submitted,

Jerome Martin, *Pro Se*
Federal Register Number 18894-083
USP Hazelton
PO Box 2000
Bruceton Mills, WV   26525

### CERTIFICATE OF SERVICE

I, Jerome Martin, appearing *pro se* in the instant case, DO HEREBY CERTIFY that I have this day served a copy of the foregoing Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. section 2255, by depositing a copy in the United States Mail, postage prepaid, addressed to Jeffrey Taylor, United States Attorney, 555 4th Street, NW, Washington, DC 20530, this the — day of February, 2008.

Jerome Martin, *Pro Se*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Crim. No. 98-329 (TPJ) |
| v. | ) | |
| | ) | |
| JEROME MARTIN, | ) | |
| | ) | |
| Defendant | ) | |

## AFFIDAVIT

I, George Steel, do hereby aver and say, upon penalty of perjury, that:

1. My name is George Steel. I reside in Frederick, Maryland. I am a private investigator and I work in the District of Columbia on cases where I am retained by the parties and on cases where I am appointed by the courts.

2. I am a former detective with the Metropolitan Police Department of the District of Columbia.

3. I was retained to conduct a post-conviction investigation in the case of *United States v. Jerome Martin*.

4. In the course of my investigation, I interviewed Steven Thomas, who resides in Maryland.

5. Mr. Thomas advised me of the following:

a. He knows Jerome Martin and knew Anthony Fortune.

b. In August 1991, he was present on 58th Street in Washington, D.C. when Anthony Fortune was shot and killed.

c. He saw the person who shot Anthony Fortune. He knows Jerome Martin and knows that Jerome Martin was not the person who shot Fortune.

d. The person who shot Fortune was very dark-complected, stocky and taller than Jerome Martin.

e. On the evening of the Fortune shooting, police officers interviewed him as an

eyewitness to the shooting. He described the shooter to the officers and gave them the same information about the shooter that he gave to me. He was never called by the government to testify about Fortune's killing.

    I swear upon penalty of perjury that the foregoing information is true and accurate to the best of my knowledge.

This the 18th day of February, 2008.

_____
George Steel

District of Columbia live database
Case 1:98-cr-00329-RCL   Document 1021   Filed 02/18/08   Page 16 of 17
Page 1 of 2

CLOSED

# U.S. District Court
## District of Columbia (Washington, DC)
### CRIMINAL DOCKET FOR CASE #: 1:02-mj-00104-AK-1

Case title: USA v. COULTER                     Date Filed: 02/14/2002

Assigned to: Magistrate Judge Alan Kay

**Defendant (1)**
**JAMES CHRISTOPHER COULTER**
*TERMINATED: 02/14/2002*

| **Pending Counts** | **Disposition** |
|---|---|
| None | |

| **Highest Offense Level (Opening)** | |
|---|---|
| None | |

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

| **Highest Offense Level (Terminated)** | |
|---|---|
| None | |

| **Complaints** | **Disposition** |
|---|---|
| Complaint filed in violation of 21:841(a)(1) | |

**Plaintiff**
**UNITED STATES OF AMERICA**

| Date Filed | # | Docket Text |
|---|---|---|
| 02/13/2002 | | DEFENDANT JAMES CHRISTOPHER COULTER arrested. (jdc) (Entered: 02/15/2002) |
| 02/14/2002 | 1 | MAGISTRATE COMPLAINT and Affidavit filed against JAMES CHRISTOPHER COULTER in violation of 21:841(a)(1). (jdc) (Entered: 02/15/2002) |
| 02/14/2002 | | PDID AND DATE OF BIRTH for JAMES CHRISTOPHER COULTER : PDID #: 386-197 DOB: 1/10/69 (jdc) (Entered: 02/15/2002) |

| | | |
|---|---|---|
| 02/14/2002 | | Prison Registration Number for JAMES CHRISTOPHER COULTER : Reg.#: 24717-016. (jdc) (Entered: 02/15/2002) |
| 02/14/2002 | | INITIAL APPEARANCE on magis complaint for JAMES CHRISTOPHER COULTER held before Magistrate Judge Alan Kay : Attorney appearance for JAMES CHRISTOPHER COULTER by Tony Axam. Detention hearing set for 9:30 2/15/02 for JAMES CHRISTOPHER COULTER ., Defendant committed/commitment issued. Pro-typist, Inc.; Tape & Lines: Courtroom 7) (jdc) (Entered: 02/15/2002) |
| 02/14/2002 | | DEFENDANT(S) JAMES CHRISTOPHER COULTER ordered held without bond by Magistrate Judge Alan Kay . (jdc) (Entered: 02/15/2002) |
| 02/14/2002 | 2 | ORDER by Magistrate Judge Alan Kay as to JAMES CHRISTOPHER COULTER : of temporary detention pending hearing pursuant to Bail Reform Act (N) (jdc) (Entered: 02/15/2002) |
| 02/14/2002 | 3 | ORDER by Magistrate Judge Alan Kay as to JAMES CHRISTOPHER COULTER : of temporary detention to permit revocation of conditional release, deportation or exclusion (N) (jdc) (Entered: 02/15/2002) |
| 02/14/2002 | | Magistrate case closed as to JAMES CHRISTOPHER COULTER. Merged into criminal case no. 02-074. (erd) (Entered: 02/19/2002) |
| 02/15/2002 | | DETENTION HEARING before Magistrate Judge Alan Kay as to JAMES CHRISTOPHER COULTER : Bond set to HWOB. Criminal indictment has been filed against the defendant and assigned to Judge Robertson. Defendant committed/commitment issued. Court Reporter: Courtroom 7 (jdc) (Entered: 02/15/2002) |
| 02/15/2002 | 4 | ORDER by Magistrate Judge Alan Kay as to JAMES CHRISTOPHER COULTER : committing defendant to the custody of the U.S. Attorney General. (N) (jdc) (Entered: 02/15/2002) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 02 18 2008 12 31 32 | | | |
| PACER Login: | jh0114 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1 02-mj-00104-AK |
| Billable Pages: | 1 | Cost: | 0.08 |