## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA      :

           v.                  :         Criminal. No. 98-CR-00329-4 (RCL)

WILLIAM KYLE SWEENEY,      :

        Defendant.        :

## SUPPLEMENTAL MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 USC §2255 AND INCORPORATED MEMORANDUM OF FACTS AND LAW

Petitioner William Sweeney, ("Sweeney") a prisoner in federal custody, by his attorneys Eric H. Kirchman and Shana Madigan, respectfully supplements his motion, pursuant to 28 U.S.C. §2255, to vacate, set aside, or correct the sentence he received in this case.  As grounds for his Motion, Sweeney states as follows:

This motion is based upon all files, records and proceedings in this case.

On September 18, 1998, an indictment was returned against Sweeney and his codefendants.  On March 25, 1999, a 101-count superseding indictment was filed, charging Sweeney and his codefendants with violations of 21 U.S.C. §846, Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances ("Narcotics Conspiracy"); 18 U.S.C. §1962(d), Conspiracy to Participate in a Racketeer Influenced Corrupt Organization ("RICO Conspiracy"); 22 D.C. Code §§2401 and 3202, First Degree Murder While Armed; 22 D.C. Code §§501 and 3202, Assault with Intent to Kill While Armed; 18 U.S.C. §1959, Violent Crime in Aid of Racketeering Activity; 22 D.C. Code §§2101 and 3202, Kidnapping While Armed; 22 D.C. Code §505(b), Assaulting a Police Officer; 18 U.S.C. §924(c)(1), Use of a Firearm; 22 D.C. Code §3204(b), Possession of a Firearm During a Crime of Violence; 21 U.S.C. §841(a)(1), Possession

with Intent to Distribute and Distribution of Controlled Substances; 22 D.C. Code §105, Aiding and Abetting; and, 18 U.S.C. §2, Aiding and Abetting.[1]

On August 15, 2001, after a seven-month trial, Sweeney was convicted of conspiracy to possess with intent to distribute and distribution of controlled substances, conspiracy to participate in the affairs of a racketeer influenced and corrupt organization, attempted murder in aid of racketeering, first degree murder while armed (for the murder of Donnell Whitfield), four counts of murder in aid of racketeering (for the murder of Donnell Whitfield, and the triple-murder of Alonzo Gaskins, Darnell Mack, and Melody Anderson), five counts of use of a firearm, and possession of a firearm during a crime of violence. Petitioner Sweeney was found not guilty as to the charge of first-degree murder while armed of Glenn Jenkins, and related offenses.

On February 5, 2002, the Court sentenced Sweeney as follows:

Six concurrent terms of life imprisonment were imposed on the Narcotics Conspiracy count, the RICO Conspiracy count, and the four counts of murder. A supervised release period of five years was imposed on each of those counts, to run concurrently, along with a fine of $500,000.00 and a special assessment of $600.00.

As to Count 35[2] (Use of a Firearm in the RICO Assault of Anthony Pryor), a term of five years incarceration was imposed, to run consecutively to all other counts, and to be followed by five years of supervised release to run concurrently with all other counts. A special assessment of $100.00 was also imposed as to this count.

---

[1] A Retyped Indictment was filed on January 4, 2001. All count numbers referred to in this motion shall refer to the counts as numbered in the Retyped Indictment.
[2] This charge is listed as "Count 28" on the jury's verdict form, as well as on the ECF docket.

As to each of Counts 40, 45, 46, and 47[3] (Use of a Firearm in the RICO Murders of Donnell Whitfield, Alonzo Gaskins, Darnell Mack, and Melody Anderson), Sweeney was sentenced to 20 years incarceration, to run consecutively to each other and to all other counts.  A five-year period of supervised release was imposed on each count, to run concurrently with all other counts, and a special assessment of $100.00 was imposed on each count.

On July 21, 2006, the United States Court of Appeals for the District of Columbia Circuit affirmed Sweeney's conviction.  *United States v. Carson, et al*, 455 F.3d 336 (D.C. Cir. July 21, 2006), *petition for rehearing and rehearing en bank denied*, 2006 U.S. App. LEXIS 26335 (D.C. Cir. Oct. 23, 2006).

On February 20, 2007, the Supreme Court denied Sweeney's petition for writ of certiorari.  *Carson, et al v. United States*, 127 S. Ct. 1351 (2007).

On February 19, 2008, Sweeney timely filed his original Motion to Vacate, Set Aside or Correct Sentence, pursuant to 28 U.S.C. §2255.  At the time the motion was filed, significant portions of the trial and appellate records were unavailable to counsel appointed to investigate and litigate matters in Sweeney's §2255 proceeding, which hampered counsel's ability to effectively litigate the issues.  Sweeney sought leave of the Court to supplement his original §2255 motion, as additional material was made available.  This is that supplement.[4]

---

[3] The verdict form and ECF docket list these charges as "Counts 30, 35, 36, and 37," respectively.
[4] Counsel incorporates by reference the claims raised in Mr. Sweeney's original §2255 motion, as well as the claims raised by Mr. Sweeney's codefendants in their post-conviction petitions (original and supplemental).  Because this case was tried in a group prosecution, actions and inactions by other counsel affected the case against and defense of Mr. Sweeney.

For the reasons set forth below, Petitioner Sweeney prays that this Court set aside his convictions and sentence in this case.[5]

## MEMORANDUM OF FACTS AND LAW

Sweeney moves the Court to vacate his convictions and sentences on all counts on the grounds that they were obtained by denial of, and in violation of his Constitutional rights. The ultimate legal standard for motions brought pursuant to §2255 is prescribed by statute:

> If the court finds that . . . the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate. 28 U.S.C. §2255.

## BACKGROUND

In this case, Sweeney, along with his codefendants, was charged with a large-scale narcotics and RICO conspiracy. It was the prosecution's theory that Sweeney, along with his codefendants were a group of lifelong friends who grew up in the Greenleaf Gardens neighborhood of Southwest Washington, D.C. The Government alleged that as Sweeney, and his codefendants entered their teenage years, they began selling drugs. By the early 1990's, the Government alleged that a large-scale drug operation had been developed in the neighborhood, through which Sweeney, and his codefendants were selling substantial quantities of marijuana. The government also alleged that Sweeney, and his codefendants engaged in acts of violence, both for

---

[5] Pursuant to the pertinent instructions accompanying the Model Form for Motions Under 28 U.S.C. §2255, prescribed by the Rules Governing Section 2255 Cases in the United States District Courts, we have set forth in our memorandum the pertinent facts and applicable law in support of our motion. However, in discussing the facts relating to our legal claims, we do not mean to suggest that an evidentiary hearing on these claims is unnecessary. To the contrary, because our allegations involve factual, as well as legal issues, a full hearing on this motion is required.

purposes of self-enrichment and self-preservation (to protect themselves from both rival

drug dealers and prosecution by the Government).

The bulk of the Government's evidence against Sweeney was supplied by the

testimony of Government cooperators and jailhouse informants – in pursuit of substantial

assistance and other relief from the consequences of their own criminal acts.  The self-

interested and often conflicting testimony of these witnesses was suspect at best.[6]  As an

example of the quality of these witnesses is Donald Nichols, a jailhouse informant and a

witness who provided some of the Government's only evidence of Sweeney's

involvement in drug dealing.  At trial Nichols admitted that on previous occasions he had

lied in order to gain his freedom.  (Tr. 2/26/01 (AM) at p. 63).

The key part of the Government's case against Sweeney came from the admission

of substantial hearsay statements made by Robert "Butchie" Smith.  These statements of

Smith were introduced, pursuant to Federal Rule of Evidence 804(b)(6).  The

Government called James Montgomery (a cooperating witness) and Federal Bureau of

Investigation ("FBI") Agent Vincent Lisi (the Case Agent who lead the FBI's

investigation) to testify as to statements allegedly made by Smith which statements

incriminated Sweeney.

The Government alleged in its case that Smith was a relative of Sweeney, and was

leading a double life as a drug dealer and Government informant.  According to the

---

[6] The majority of these witnesses testified that prior to trial they gave false testimony under oath, or false statements to law enforcement, on numerous occasions.  *See* Testimony of Reginald Switzer, Trial Tr. 1/25/01 (AM) at pp. 40-1, 62-4; Trial Tr. 1/30/01 (AM) at pp. 75-6; Testimony of James Montgomery, Trial Tr. 3/12/01 (PM) at pp. 27-30; Trial Tr. 3/15/01 (AM) at pp. 53-58; Trial Tr. 3/15/01 (PM) at pp. 3-33; Testimony of Charles Bender, Trial Tr. 4/4/01 (PM) at pp. 33-4; Testimony of Ronald Sowells, Trial Tr. 4/18/01 (AM) at pp. 30-2, 83-5; Testimony of Arthur Rice, Trial Tr. 4/25/01 (PM) at pp. 30:25, 31-33; Testimony of Paul Franklin, Trial Tr. 5/1/01 (PM) at p. 31, 65-6; Testimony of Demetrius Hunter, Trial Tr. 5/7/01 (PM) at pp. 57-9; Testimony of John Venable, Trial Tr. 5/14/01 (PM) at p. 7.

Government, Smith implicated Sweeney in the triple murder in Temple Hills, Maryland, as well as in the murder of Donnell "Robocop" Whitfield.

These hearsay statements of Smith, a substantial number of which were testified to through the bolstering voice of an FBI Agent and were the keystone of the Government's case against Sweeney.  Smith's hearsay statements were relied upon heavily by the Government in its closing argument, and to bring about the conviction of Sweeney in this case.[7]

Apart from the testimony of cooperating criminals seeking favors from the Government in exchange for their testimony, and the hearsay statements of Robert Smith, the Government's case against Sweeney was weak.

With regard to the triple murder in Temple Hills, the only physical evidence linking Sweeney to the house in which the crime was committed was a palm print on the front door of the home.  While this piece of evidence might, at first appear to hurt Sweeney's case on closer examination the print was explained.  The Government's fingerprint expert testified that there is no way to date prints, and stated that Sweeney's print could have been left on the door at any time. (Tr. 4/2/01 (PM) at pp. 72-3).  More importantly it was made clear at trial that the house at which the murders occurred was used as a gambling house, and Sweeney had visited the house a number of times in order to gamble.  (Tr. 6/6/01 (PM) at pp. 48-61).

Moreover, Shaheem Johnson, testified at trial that he had seen Sweeney in the house on a previous occasion  (Johnson testified that he did not know Sweeney at the

_____

[7] *See* Government's Closing Argument, Tr. 6/26/01 (AM) at pp. 24-5, 48; Tr. 6/26/01 (PM) at pp. 18, 24, 44, 62-64; Tr. 6/27/01 (PM) at pp. 6-10, 25-7, 40.

time, but that Sweeney had stood out and could be identified as a result of his Tourette Syndrome). (Tr. 6/12/01 (PM) at pp. 86:9-14, 87:15-21).

In addition the testimony of Cinama Hawkins, the Government's eyewitness and the sole survivor of the triple murder, was impeached at trial by the testimony of Prince George's County Police Officer Robert Taylor, the first person that Hawkins came into contact with after fleeing the Temple Hills house once the killers had left. Officer Taylor testified that when he interviewed Ms. Hawkins at the scene, with the facts and circumstances of the events that evening still fresh in her mind, described both of the murders as being six (6) feet tall. (Tr. 6/12/01 at pp. 59-68). Sweeney could never have been mistaken as six feet tall.

James Montgomery was used by the Government to implicate Sweeney in the triple murder. Montgomery testified that he was there with Sweeny on the night of the murders and was a participant in the crime, yet he was never able to provide a consistent statement of the events of the crime he claimed to have participated in. Montgomery's testimony at trial was inconsistent with prior statements that he had given to law enforcement and with his grand jury testimony. (Tr. 3/14/02 (AM) at pp. 51-3; 3/15/01 (PM) at pp. 16-32; 6/27/01 (PM) at pp. 22-23).

Turning now to the Government's case against Sweeney for the murder of Donnell Whitfield. The Government's case on this charge was also weak, as it relied mainly on the testimony of John Venable, whose credibility was impeached by his conflicting grand jury testimony. (Tr. 5/14/01 (PM) at pp. 9-18, 28-9, 34-5).

As will be demonstrated herein, the Government's case against Sweeney was weak. This combined with the ineffective assistance of counsel that Sweeney received at

both trial and on appeal, the trial court's errors and the misconduct of the Government, there is a reasonable probability that the outcome of the proceedings would have been different. Sweeney was convicted, and sentenced to multiple life sentences, at a trial and in appeal that was fundamentally unfair. Accordingly, relief must be granted.

## GROUNDS FOR RELIEF

### A. *BRADY* AND *GIGLIO* MATERIAL WAS SUPPRESSED IN VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS[8]

The discovery obligations of federal prosecutors are generally established by Federal Rules of Criminal Procedure 16 and 26.2, 18 U.S.C. §3500 (the Jencks Act), *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). In addition, the United States Attorney's Criminal Resource Manual ("USAM") describes the Department's policy for disclosure of exculpatory and impeachment information. *See, e.g.* USAM §9-5.001.

Prior to trial in this case, the parties conducted extensive discovery. In addition to all material subject to disclosure under Federal Rule of Criminal Procedure 16, Sweeney requested that the government produce all material in its possession to which he was entitled under *Brady*, the Jencks Act, and *Giglio*.[9]

---

[8] The withholding of this material at trial was the result of both prosecutorial misconduct and error by the trial court. Petitioner Sweeney challenges his convictions on both of those grounds with respect to the suppressed material.

[9] In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court of the United States held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution." Application of the *Brady* doctrine was extended to testimonial impeachment in *Giglio v. United States*, 405 U.S. 150 (1972). In holding that favorable evidence is material if there is a reasonable probability that had the evidence been disclosed to the defense the result of the proceeding would have been different, the Supreme Court in *United States v. Bagley*, 473 U.S. 667 (1985), disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes. Accordingly, Petitioner refers to such evidence collectively as "*Brady* material" throughout this brief. The Jencks Act, 18 U.S.C. § 3500 ("Jencks Act"), provides that after a government witness testifies at trial the government must produce, on request, any previously made statements by that witness which relate to the witness's

Prior to and during trial, the Government repeatedly assured the Court and the defendants that it had fulfilled all of its discovery obligations, and that all discoverable material had been provided to the defense. *See e.g.*, Oral Argument Transcript, 9/27/00 at p. 130:17-20. Evidence that was not turned over to Sweeny before or during the trial, or during the time that Sweeny's appeal was pending, reveals that the Government's repeated assurances were wrong. The suppressed evidence contains a substantial amount of *Brady* material all of which was withheld from the defense throughout the course of the trial and appeal in this case. This systematic withholding of favorable evidence material to the defense violated Sweeney's right to due process, and rendered the entire proceeding unfair and Sweeney's convictions unreliable.

## 1. PETITIONER HAS CAUSE FOR RAISING THE SUPPRESSED *BRADY* EVIDENCE ISSUE IN HIS §2255 MOTION

Throughout trial in this case, the Government maintained a practice of submitting material to the Court *ex parte* and under seal. The justification offered by the Government for doing so was most often "security concerns." As a result, there is a large amount of material to which the defense never had access, and consequently, never had the benefit of using to challenge the Government's case at trial or on appeal.

It was not until one week prior to the running of the statute of limitations on Sweeney's filing his post-conviction motion, when Sweeney was granted access to all of the material that had been suppressed by the Government and the trial court. On February 13, 2008, prior *habeas* counsel for Sweeney filed an Emergency Motion for Access to the Entire Court Docket [#1015]. In the motion, counsel requested the Court to

---

testimony on direct examination. 18 U.S.C. § 3500(b). If the government fails to produce such statements, the court is required to strike the testimony of the witness. 18 U.S.C. § 3500(d).

order that all papers and proceedings in this matter be unsealed and that counsel be provided with a copy thereof.

On February 15, 2008, the Court granted that motion, and ordered the Clerk to provide copies of any necessary sealed pleadings in this case to counsel for Sweeney. Order, dated February 15, 2008 (TFH) [#1016].

On February 19, 2008, counsel filed Sweeney's Motion to Vacate under 28 U.S.C. § 2255, in order to preserve his claims, without having had the benefit of time to review the large volume of material that had been unsealed by the Court's order.

On December 20, 2012, undersigned counsel was appointed to represent Sweeney in this matter. Upon joining the case, undersigned counsel obtained approximately 15 boxes of material related to this matter from prior counsel. The boxes contained, *inter alia*, material from trial counsel, transcripts, and some of the previously sealed material from the case that had been obtained pursuant to the Court's February 15, 2008, Order. The documents in the boxes were not indexed, organized, or labeled in any discernable fashion. Undersigned counsel has undertaken a lengthy review of the material contained in the boxes, and discovered a trove of suppressed *Brady* material.

In *Strickler v. Greene*, 527 U.S. 263 (1999), based on facts very similar to those here, the Supreme Court found that the petitioner had demonstrated cause for his procedural default of a *Brady* claim. In *Strickler*, after exhausting both his direct and collateral state appeals, the petitioner discovered exculpatory material that had been suppressed by the government pursuant to the federal *habeas* court's order granting petitioner access to all of the police and prosecutions files in the case. *Id.* at 278. The Court held that the petitioner had established cause for failing to raise his *Brady* claim

earlier, because prior to the federal *habeas* court's order, the prosecution had represented that petitioner had already received all discoverable material and the petitioner had no access to the material. *Id.* at 289. Here, given the facts that (1) the Government repeatedly represented at trial that it had fulfilled all of its discovery obligations, and that all discoverable material had been provided to the defense; (2) notwithstanding those representations, discoverable *Brady* material was withheld from Petitioners and placed under seal by the trial court; and (3) Petitioner Sweeney only obtained access to the material by court order unsealing the record in this case after all direct appeals had been exhausted, Petitioner Sweeney has clearly established cause for failing to raise his *Brady* claim prior to his *habeas* proceeding. *See id.*

## 2. FAVORABLE EVIDENCE WAS SUPPRESSED IN VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS

A thorough review of the previously sealed material revealed that throughout the course of trial in this case, the Government repeatedly withheld exculpatory, impeachment, and bias evidence from the defense, in violation of Petitioner Sweeney's right to due process and a fair trial. This systematic withholding of favorable evidence by the Government, with the consent of the trial court, is more than enough to significantly "undermine[] confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (internal quotation marks omitted). Accordingly, the interests of justice warrant relief, and vacate Sweeney's convictions.

## 3. SUPPRESSED EVIDENCE RELATING TO THEODORE WATSON

Theodore Watson was a key witness for the Government, having implicated Sweeney, and his codefendants in a number of crimes. Watson was one of several cooperating witnesses presented by the government.

Watson was a defendant in a criminal case in the United States District Court of Maryland, located in Greenbelt, Maryland. As a result of this charge Watson was being held at the Northern Neck Regional Jail at the same time that Sweeney was also being held there. During this time Watson claimed, and testified at Sweeney's trial, that Sweeney told him about his involvement, among other things, in kidnapping, murder and drugs and he further wanted to have Montgomery killed for cooperating with the Government. (Trans 2-8-01, P.M. page 45 to 70) As such Watson's creditability became a central issue for the defense at trial.

Watson in order to reduce the sentence for the crime he had been charged with in Maryland and to obtain a § 5K1.1 recommendation from the Government entered into an agreement with the U.S. Attorney's Office in Greenbelt. This was done pursuant to a plea agreement in *United States v. Theodore Watson*, No. 99-069 (PJM), in the District of Maryland, Watson was obligated to fulfill certain cooperation requirements in exchange for the possibility of receiving a § 5K1.1 recommendation from the Government. *See* Ex. 1 (Watson Plea Agreement, pp. 5-6 at ¶ 6).

Watson cooperated with the Government in Greenbelt but at his sentencing, on February 4, 2000, the Government refused to file a § 5K1.1 letter on Watson's behalf or request a reduction in his sentence, despite Watson's fervent argument that a § 5K1.1 letter and reduction in his sentence was merited given his extensive cooperation with the Government. The court unmoved by Watson's protests, imposed a sentence of 105-months on Watson.

At trial in Sweeney's case, following Watson's testimony on direct examination, the defense, naturally cross-examined Watson as to why the U.S. Attorney's Office in

Greenbelt had refused to file a §5K1.1 letter on his behalf when he had cooperated with

that office.  Watson attempted to explain the U.S. Attorney's Office   refusal as being the

result of Ms. Wilkinson, the Assistant U.S. Attorney assigned to his case, simply not

liking him.

> As is shown by the following colloquy on cross-examination:
>
> Q.  You have already told us that you met with Ms. Wilkinson, correct?
> A.  Correct.
> Q.  And that you gave her your information, correct?
> A.  Correct.
> Q.  And you did not get the 5K1 letter for substantial assistance, correct?
> A.  Correct.
> Q.  Okay.  My question is do you know why you did not get the 5K1 letter from Ms. Wilkinson?
> A.  Yes.
> Q.  What was the reason?
> A.  She made it very clear she did not like me and she didn't want to give me anything.
> THE COURT:  I am sorry?
> THE WITNESS:  She made it very clear that she did not like me and she did not want to give me anything.
> BY MR. KIERSH:
> Q.  Okay.  And when you tell us that she made it very clear that she did not like you, what did she say that led you to formulate the belief that she did not like you?
> A.  Number one was her attitude toward me, and my attorneys had told me, "Ms. Wilkinson doesn't like you, and she doesn't want to give you anything.  She doesn't want to hear anything from you.  She doesn't want to talk to you about anything.  The only time she wants to see you is at trial."

(Tr. 2/12/01 (AM) at pp. 19-21).

> Watson, later attempted to provide a reason why Wilkinson might not like him

tried to make it appear that Wilkinson was angry with him as a result of him having made

her look bad in front of another Assistant U.S. Attorney, as shown by the following

exchange:

> BY MR. KIERSH:
> Q.  Sir, what was the substance of the conversation that day?

13

**A.**   Well, Ms. Barbara Skyler, one of the prosecutors for the District Court in Greenbelt – she wanted some information that one of my attorneys had passed on to Ms. Wilkinson, which Ms. Wilkinson had passed on to Ms. Skyler.   Sandra Wilkinson was the district attorney who was prosecuting my case.   When I first came in, Ms. Wilkinson told me, you know, "You're not on our team, and you're not likely to be on our team.   And I want you to answer all the questions that Ms. Skyler asks you truthfully and honestly."   And I explained to her some things that happened in her case – two of the cases she was prosecuting.   And when I finished talking with her, she made a statement – and this can be verified – she said, "Why didn't I hear about this before I gave all these lenient pleas out?"   And I looked at Ms. Wilkinson and I looked at my attorney.   I said, "I told you this months ago before you did that."   She just looked at Ms. Wilkinson, and that was the end of it.

(Tr. 2/12/01 (AM) at p. 44).

At the conclusion of the court proceedings on February 12, 2001, the defense

made the following request:

> **MR. DAVIS**:   And I would ask that the United States Attorney's Office review that file.
> **THE COURT**:   If they have not done that, and I would ask that they call the prosecutor's office in Greenbelt to find out whether or not there is anything that could be characterized as, quote, Brady material in their file.   Other than that --
> **MR. DAVIS**:   Thank you, your Honor.
> **THE COURT**:   -- that's the extent of the government's obligation.   Okay?

(Tr. 2/12/01 (AM) at p. 78).

The following day the Government obtained Watson's file from the U.S.

Attorney's Office in Greenbelt, and the following exchanges occurred:

> **MR. ZEIDENBERG (AUSA)**: I believe we are, your Honor.   Just on a matter left over from yesterday, pursuant to the Court's instruction, we contacted the U.S. Attorney's Office in Greenbelt.   We retrieved their file yesterday evening and have reviewed it.   There is nothing, in our view, that suggests any Brady or Jencks material in the file.   The Assistant U.S. Attorney out there indicates in one letter that the reason that Mr. Watson did not get a 5K letter was simply because she didn't believe his cooperation was of a significant enough nature to qualify.   **There was nothing to suggest that it was not worthy of belief or it was incredible.   There was nothing of that nature**.   Detective Norris – we spoke with him briefly yesterday.   And he had called – we tried to get in touch with him – and he indicated similarly that Mr. Watson had never provided him with information that he felt was untrustworthy of any kind.   Nevertheless, we do have

the file, and I don't know if the Court wishes to have it to peruse.  There are letters --

**THE COURT**:  You mean the file from Greenbelt?

**MR. ZEIDENBERG**:  Yes.  There are letters from Mr. Watson to the prosecutor, as he describes – several lengthy letters, talking about a variety of matters, including his own case and other cases that he knows about and things of that nature.

**THE COURT**: Do you want to have it made part of the court record?

**MR. KIERSH**:  Yes, your Honor.

**THE COURT**:  All right.

**MR. KIERSH**:  I ask that it be placed under seal and made a part of the record.

**\*\*\***

**THE COURT**:  Number 5.  All right.  Number 5.  **I do not intend to review it in camera.**

**MR. ZUCKER**:  That would be my request.

(Tr. 2/13/01 (AM) at pp. 6-7) (emphasis added).

Despite the Government's assurances, the material contained within the Greenbelt file goes directly to the credibility of Watson as a witness.  The prosecutor, in this case, after having reviewed Watson's Greenbelt file, told the trial court that the reason that Watson had not been given a §5K1.1 letter by Ms. Wilkinson, ". . . was simply because she didn't believe his cooperation was of a significant enough nature to qualify.  There was nothing to suggest that it was not worthy of belief or it was incredible.  There was nothing of that nature."  (Tr. 2/13/01 (AM) at p. 6).  The prosecutor's statement that there was nothing in the Greenbelt file to suggest that Watson was not worthy of belief or incredible was at best an error in judgment, and at worst, a calculated lie.

The Greenbelt file was included in the material obtained by counsel when the record was unsealed in this case.  A review of that file revealed that it indeed contains a copious amount of evidence that Watson chronically lied and schemed in pursuit of a departure, and contrary to the representations of the Government at trial, that the Government was well aware of his untrustworthy nature.  The file contains several

lengthy letters, from Watson to the AUSA in Greenbelt, which detail the many occasions

on which he lied to investigators.  For example, in one letter, Watson states:

> This letter is to sincerely thank you for allowing me a "second
> opportunity" to cooperate and help myself.  I abysmally apologize for the
> asinine [sic] way I conducted myself when the option was presented to
> me.  Had I just simply complied and told you the truth at our initial
> meeting, I would have avoided the unnecessary mental anguish that
> entailed… There is no denying that during my 30 years in the system, I
> have lied [,] connived and schemed to get things done."

*See* Ex. 2 (Greenbelt file, Letter from Watson, dated August 19, 1999, at pp. 1, 4).

Another letter reveals that not only was the Greenbelt AUSA (Ms. Wilkerson) well aware

that Watson was a liar, but also that she hesitated to continue cooperation with him due to

his untrustworthy nature:

> I would like to touch lightly on your harshness towards me as a liar at the
> first conference and thereafter.  Ms. Wilkerson, again I apologize and
> confess that at our first conference, I lied and somewhat distorted the truth
> regardless of my reasoning… Before I attempt to put the matter in its real
> perspective and sequence, again I would like to touch briefly on your view
> towards me as a liar… I believe that I have stated to you that "yes," I have
> lied [,] schemed and connived at times to obtain my way or freedom… In
> reference to me attempting to secure assistance on my own in an effort to
> help myself, Ms. Wilkerson, you advised [my attorneys] that you did not
> want to hear or discuss anything for or about me, and you did not want to
> see me until trial.

*See id.* (Greenbelt File, undated 17-page letter, at pp. 1, 2, and 12).     A third letter,

written just after his sentencing hearing, at which the Government declined to file a

departure letter and he was sentenced to 105 months incarceration, reveals Watson's

desperation and willingness to do anything in pursuit of a reduction in sentence:

> I could have made a lot of cases from the street, but that was not to be.
> But with your blessings, I wish to try to do as much as possible from
> within.  I do have pertinent information for other prosecutors at the
> moment.  One case involving a multi-kilo drug dealer and "hit man."  *I
> will cooperate and do exactly as you say.*  I just hope and pray that I do
> and give enough to be afforded a sizable downward departure.

*See id.* (Greenbelt File, Letter dated February 4, 2000, at pp. 5-6) (emphasis added).

Further, Ms. Wilkinson, the Greenbelt AUSA, wrote a letter on February 21, 2000, to the court in Greenbelt concerning Watson, in which, among other things, she stated, "Finally, please be advised that, since Mr. Watson's sentencing, he mailed me a second lengthy letter regarding the information he believes he has – despite my specific directions to not contact me directly. **Mr. Watson continues to undermine his own credibility** as well as his ability to follow directions from the government." *See id.* (Greenbelt File, Ms. Wilkinson's letter, dated February 21, 2000) (emphasis added).

The refusal of the Government to give Watson a §5K1.1 letter and the statement that Mr. Watson continues to undermine his own credibility is explained by the next letter in the Greenbelt file, which is a 15 page handwritten letter from Watson to Ms. Wilkerson.  In this letter Watson writes, "I would like to touch briefly on your harshness towards me as a liar at the first conference and thereafter.  Ms. Wilkerson, again, I apologize and **confess that at our first conference, I lied** and somewhat distorted the truth regardless of my reasoning." *See id.* (Greenbelt File, 15 page Watson Letter at p. 1) (emphasis added).  Watson, in the same letter, again addressing the point that Ms. Wilkerson thinks he is a liar, writes:

> ". . . again I would like to touch briefly on your view towards me as a liar
> 1) I believe that I have stated to you that "yes", I have lied schemed and
> connived at times to obtain my way or freedom. * * * I also stated this to
> an F.B.I. agent from the D.C. office when interviewed twice on an
> unrelated matter, his response to me was. "we all lie."  Even though I
> knew this from personal experience, I was very surprised to hear a F.B.I.
> agent make that statement.
> 2) The majority of political are noted liars.  There are the top heads of our
> states and county who were proven wrong doers and liars, Vice Pres. Spiro
> Agnew, President Richard Nixon, and President William Clinton, just to

name a few.  There is no way I am comparing myself with these figures
other than a liar is liar regardless of who they are.
3) Ms. Wilkerson, perhaps you have not experienced it, but I am sure that
you have heard of agents and or government witnesses testifying falsely
under oath, and the misconduct of prosecutors.") * * *  (page 2)
4)  * * * I cannot say whether or not you have ever lied in your life, and if
you have not, then you are truly blessed.  And, if not, then there is some
discrepancy and contradiction in the Bible because God says in Romans
3:4  . . . .God is true even though every human being is a liar . . . . * * *
5) Again, human beings by nature instinctively lie to avoid prosecution,
loss of life, freedom, bodily harm, harm to love ones, to acquire or
maintain jobs or status, embarrassment and etc.  Please, Ms. Wilkerson,
ask yourself if you would lie under these or any other adverse conditions?
Heads and leaders of our country have. (Page 4-5)

*See id.* at pp. 1-2, 4-5.  Watson's admission that he lied to Ms. Wilkinson and his further

statements that lying is an instinctive part of human nature, and is understood by God,

goes to and impeaches his credibility and reliability as a witness.

The jury should have heard that the reason that Ms. Wilkinson did not like

Watson, and the reason, that she did not want to give him anything and the reason he did

not get the 5K letter is that Watson lied to her in the first meeting that he had with her.

This is the only inference that one can take from Watson's handwritten letter in which he

admits he lied to her and his lies are the reason for Ms. Wilkerson not liking Watson.

Once the Government had reviewed Watson's Greenbelt file, it should have taken

steps to correct the testimony of Watson as to the reason he was not given a §5K1.1 letter

in Greenbelt.  It was not because Ms. Wilkinson did not like him (I am sure she does not

like many of the people to whom she had given §5K1.1 letters) and it was not because

Watson had made Ms. Wilkinson look bad in front of another AUSA, but was in fact the

result of Watson lying to her and that Watson wrote letters in which he states that he sees

nothing wrong with lying to help himself out of a tight spot.  Watson even went so far as

to quote the Bible to justify his having lied to Ms. Wilkinson.

Instead of doing this, the Government simply told the trial court and the defense that there was "nothing to suggest that it was not worthy of belief or it was incredible. Nothing of that nature." (Tr. 2/13/01 (AM) at p. 6). In order to make such a statement the Government had to ignore the facts that Ms. Wilkinson wrote to the court in Greenbelt that Watson continues to undermine his own credibility and that Watson admitted that he had lied to Ms. Wilkinson.

The principle that the Government may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.

As the Supreme Court has made clear:

> It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth. . . . That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair.

*Napue v. Illinois,* 360 U.S. 264, 269 (1959) (*quoting People v. Savvides,* 136 N. E. 2d 853, 854-855 (N.Y. Ct. App. 1956)).

In *Brady,* 373 U.S. at 87, the Supreme Court held that suppression of material evidence justifies a new trial "irrespective of the good faith or bad faith of the prosecution." *See also* Ex. 3 (American Bar Association, Project on Standards for

Criminal Justice, Prosecution Function and the Defense Function § 3-3.11(a)).  When the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure of evidence affecting credibility falls within this general rule.  *Napue,* 360 U.S. at 269.

When as in this case " . . . the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury.[7]  In a series of subsequent cases, the Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair,[8] and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103-104 (1976)

Here, the Government's good faith is even in doubt as the Government suppressed Watson's Greenbelt file by misrepresenting the contents of the file to both the trial court and to the defense.  Had the Government accurately reported to both the court and the defense, that Ms. Wilkinson had written to the court in Greenbelt that Watson continued to undermine his own credibility, and that Watson admitted that he had lied to her, and that Watson viewed lying as a natural and justifiable method to get out of trouble, the trial court would have ordered the file to be disclosed to the defense.  Once the file was disclosed to the defense Watson would have been cross-examined as to the contents of his letters, his views on telling lies, and the true reason he was not given a §5K1.1 letter in Greenbelt.[10]

---

[10] It would have been better had the Government just produced the Greenbelt file to the court and remained silent as to its contents and allowed the court to make its own determination as to the significance of the file.  The reliance of the court as to the truth of the representations made by the Government, concerning

The reliance of the court, as to the truth of the representations made by the Government, concerning the contents of the Greenbelt file is made clear by the trial court stating that, "I do not intend to review it in camera."

Further, the Government should have turned the Greenbelt file over to the defense as *Brady* material after it had reviewed it, because the material contained therein went directly to Watson's credibility as a witness.  The course of action pursued by the Government can have only one explanation, that the Government did not want the file disclosed to the defendant because it did not want the jury to hear that Watson lied to the U.S. Attorney's Office in Greenbelt – and the Government did not want the jury to hear Watson's views on lying.

As the Supreme Court held in *Brady*:

> We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. The principle of *Mooney v. Holohan* is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: "The United States wins its point whenever justice is done its citizens in the courts."  A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice…

*Brady,* 373 U.S. at 87-88 (internal citations omitted).

Watson's testimony in this case was of great importance to the Government.  Not only did Watson claim that Sweeney had confessed to him his participation in a number

---

the contents of the Greenbelt file is made clear by the trial court stating that, "I do not intend to review it in camera."  (Tr. 2/13/01 (AM) at pp. 6-7).

of crimes, but more importantly Watson's testimony lends creditability to the testimony

of James Montgomery.  Montgomery's testimony might have been some of the most

damaging evidence introduced against Sweeney at this trial.

Montgomery was a cooperating witness that had lied to the Government,

misrepresented his involvement in crimes to the Government and was otherwise a witness

unworthy of belief.

Montgomery's conduct, character and background made it important for the

Government to find evidence with which to bolster the credibility of Montgomery.

This the Government did by having Watson testify as follows:

> **Q.**  What was Mr. Sweeney's response when you said that?
> **A.**  You know, I still don't think they have anything on me, you know.
> **Q.**  Did he tell you what his concerns were about the case against him?
> **A.**  Yes.
> **Q.**  What was that?
> **A.**  A certain fellow by the name of James Montgomery.
> **Q.**  What did he tell you about James Montgomery?
> **A.**  That he had brought him into the organization and sort of groomed him and brought him along and then the guy turned on him.
> **Q.**  If you could just fill in the he there and tell us that again, Mr. Watson.  In other words, when he said he brought him into the organization –
> **A.**  Mr. Sweeney brought Mr. Montgomery into the organization.  Is that okay?
> **A.**  Yes, thank you.  And what did Mr. Sweeney say about that?
> **A.**  Well, he was somewhat disappointed because Mr. Montgomery had been on several murders with him and did as much as he had done and now he is flipping the script.  Because he got busted on something else, now he is flipping on him to save himself.
> **Q.**  Who is flipping on --
> **A.**  Mr. Montgomery is turning on Mr. Sweeney to save himself.
> **Q.**  Did Mr. Sweeney ask you any advice about that?
> **A.**  Yes.

**Q.** What did Mr. Sweeney ask you about that?
**A.** He asked me if he could prove that Mr. Montgomery was in on the killings and did as much killing as he did that would they, the jury or whatever, try to work in his favor. I told him no, I didn't think so because it doesn't usually work like that. I said usually the first person that testifies is usually what they go with. And if they got you targeted as the ring leader then that makes the difference.
**Q.** What was Mr. Sweeney's response?
**A.** Yeah, I figured as much.
**THE COURT**: I'm sorry?
**THE WITNESS**: Yes, I figured as much.
**BY MR. ZEIDENBERG**:
**Q.** Now, did Mr. Sweeney talk to you about what role Mr. Montgomery was to play in this case?
**A.** He was suppose to testify against him.
**Q.** Did you have any conversation about that fact?
**A.** Yes. He was talking that Montgomery is going to testify against him. And I said, well, if you got all this muscle and all this gun power and everything, I said, why don't you just kill him, you know. And he said, we been trying to get to that mother fucker but the feds got him hid away too well.
**Q.** Did he say where they had been looking for him?
**A.** No.
(Trans 2-8-01, pm, pages 61-64)

The effect of this evidence on the jury would have been to lend credibility to Montgomery as a witness against Sweeney. As the only reason that Sweeny would want to have a witness killed would be if that witness's testimony was accurate and it would hurt Sweeney at trial.

The evidence in the Greenbelt file overwhelmingly demonstrates that Watson was known by prosecutors to be dishonest, and had a powerful self-interest to do or say anything the Government wanted in his pursuit of a reduced sentence. The Government's claim to the Court that the Greenbelt file contained nothing to indicate Watson's untrustworthiness was a misrepresentation of the highest order. The failure to provide the contents of the Greenbelt file to the defense was plainly violative of the Government's discovery obligations, and Petitioner Sweeney's right to a fair trial.

Had this information been turned over to the defense there is a reasonable probability that the results of the proceedings would have been different.

### 4. SUPPRESSED EVIDENCE RELATING TO JAMES MONTGOMERY

James Montgomery was an essential witness for the Government. His testimony implicated the defendants in a number of criminal acts. Again, as with the majority of the Government's witnesses, the defense questioned Montgomery's credibility. Montgomery himself had admitted to, been implicated in, or been convicted of a number of violent crimes. These crimes included assault with a deadly weapon, numerous murders, and assault on a police officer while armed. The Government had promised Montgomery leniency in exchange for his testimony; in fact, Montgomery ultimately received a five (5) year sentence for committing seven (7) murders.

On March 7, 2001, trial counsel requested Agent Lisi's notes related to his interviews of James Montgomery. (Tr. 3/7/01 at p. 52). The trial court ruled that Agent Lisi's notes did not contain *Brady* material. *Id.* at p. 91. The recently unsealed material revealed Agent Lisi's notes regarding Montgomery. The notes contain valuable impeachment evidence as to Montgomery. Specifically, the notes reveal that Montgomery lied to Agent Lisi in his interview with regard to the murder of Timothy Benton. Maurice Proctor and James Montgomery were charged with Benton's murder. Agent Lisi's notes reveal that Montgomery lied, and substituted Carson for himself as one of the perpetrators of the Benton murder. This valuable impeachment evidence could have been used by the defense to further discredit Montgomery by demonstrating his proclivity for lying to protect himself from criminal prosecution, through the false incrimination of others. The suppression of the favorable evidence contained in Agent

Lisi's notes, which as discussed, *infra*, was material to Petitioner Sweeney's guilt and violated Petitioner Sweeney's due process rights.  *Brady*, 373 U.S. at 83; *Giglio*, 405 U.S. at 150.

Assuming arguendo that the failure of the Government to turn this *Brady* material over to the defense is excused by having the trial court review the material, then the trial court abused its discretion in not ordering this information to be turned over to the defense.  This failure deprived Sweeney of due process as the information was material to Sweeney's guilt and the creditability of the Government's witnesses.

Had this information been turned over to the defense there is a reasonable probability that the results of the proceedings would have been different.

### 5. SUPPRESSED EVIDENCE RELATING TO CHARLES BENDER

On February 5, 2001, trial counsel for the defense asked the court to review the FBI's 302 reports generated from the FBI's interviews with one of the Government's witnesses, Charles "L.A." Bender.  Trial counsel wanted to know whether Bender's testimony on the stand was consistent with the statements he gave to the Government. (Tr. 2/5/01 (A.M.) at p. 84).  The trial court ruled that Bender's testimony was consistent with the information in the 302 reports, and denied the defense access to that material. The newly unsealed record reveals, however, that the Bender 302 reports contained *Brady* material, which was unconstitutionally withheld from Petitioners at trial.  Indeed, in one of the Bender 302 reports, Bender stated that codefendant Jerome Martin confessed to Bender that he (Martin) killed Anthony Fortune.  *See* Ex. 4 (Bender 302 Report).  As an initial matter, this report was exculpatory *Brady* material as to codefendant Carson, who was charged with the murder of Fortune.  This was significant

to Petitioner Sweeney as well, as the Government's theory tied Sweeney to Carson in several murders.  Further, the 302 report was valuable impeachment evidence, as it contradicted the Government's theory of the prosecution and could have been used to impeach Bender's testimony at trial. The suppression of the exculpatory and impeachment evidence contained in the Bender 302 report, which as discussed, *infra*, was material to Petitioner Sweeney's guilt, violated Petitioner Sweeney's due process rights. *Brady*, 373 U.S. at 83; *Giglio*, 405 U.S. at 150.

Assuming arguendo that the failure of the Government to turn this *Brady* material over to the defense is excused by having the trial court review the material, then the trial court abused its discretion in not ordering this information to be turned over to the defense.  This failure deprived Sweeney of due process as the information was material to Sweeney's guilt and the creditability of the Government's witnesses.

Had this information been turned over to the defense there is a reasonable probability that the results of the proceedings would have been different.

### 6. SUPPRESSED EVIDENCE RELATING TO ARTHUR RICE

On April 24, 2001, trial counsel requested the FBI 302 reports generated from the interview of Government witness Arthur Rice.  (Tr. 4/24/01 (PM) at p. 3).  Arthur Rice was a jailhouse informant, whom the Government alleged was an associate of Petitioners. The trial court reviewed the FBI 302, dated January 26, 1999, and ruled that it contained no *Brady* material.  *Id.*  The recently unsealed material reveals that the opposite is true. Rice's 302 reveals that he told Case Agent Lisi and Agent Kevin White, in the presence of AUSA Kenneth Wainstein, that defendant Martin, along with Carson, killed Leonard "Slick" Hyson and Maurice Hallman.  In fact, Rice told the investigators that he was

present at the time of the murder, heard the gunshots, and then observed Martin and

Carson fleeing the scene.  *See* Ex. 5 (Arthur Rice 302 Report).  This evidence is favorable

to the defense because it contradicts the Government's theory of the case, which was that

it was James Montgomery who participated in the Hallman/Hyson murders with Carson.

The evidence could have been used to impeach Montgomery, who testified that he was

one of the killers of Hallman and Hyson.  (Tr. 3/12/01 (AM) at pp. 55-62).  The Rice 302

report was favorable to the defense, as it was both exculpatory and impeached the

credibility of the Government's witnesses; thus, as discussed *infra*, because it was also

material, the suppression of this evidence violated Petitioner Sweeney's right to a fair

trial.  *Brady*, 373 U.S. at 83; *Giglio*, 405 U.S. at 150.

Assuming arguendo that the failure of the Government to turn this *Brady* material

over to the defense is excused by having the trial court review the material, then the trial

court abused its discretion in not ordering this information to be turned over to the

defense.  This failure deprived Sweeney of due process as the information was material to

Sweeney's guilt and the creditability of the Government's witnesses.

Had this information been turned over to the defense there is a reasonable

probability that the results of the proceedings would have been different.

### 7. SUPPRESSED EVIDENCE RELATING TO ANDRE MURRAY

On February 1, 2001, trial counsel requested material from the Government relating

to Andre Murray, a cooperating witness for the Government, with whom the Detective had a

long history of dealings.  (Tr. 2/1/01 (AM) at p. 65-66).  The trial court ruled that the defense

was not entitled to the evidence under the Jencks Act.  *Id.*  The unsealed record, however,

exposed the fact that a Government Agent's notes also contained *Brady* material.

Specifically, the Government Agent's notes reveal that Andre Murray told the Government

that Petey Johnson ("Fat Petey") killed Robert Smith to get back at Sweeney, allegedly for killing Petey Johnson's brother, Keith Johnson. Sweeney was charged with the murder of Keith Johnson. The Government Agent's notes contained evidence that someone other than Sweeney was responsible for Robert Smith's death; therefore, the notes should have been produced as *Brady* evidence.

Assuming arguendo that the failure of the Government to turn this *Brady* material over to the defense is excused by having the trial court review the material, then the trial court abused its discretion in not ordering this information to be turned over to the defense. This failure deprived Sweeney of due process as the information was material to Sweeney's guilt and the creditability of the Government's witnesses.

Had this information been turned over to the defense there is a reasonable probability that the results of the proceedings would have been different.

### 8. SUPPRESSED EVIDENCE RELATING TO THE MURDER OF ROBERT "BUTCHIE" SMITH AND THE GOVERNMENTS' FEDERAL RULE OF EVIDENCE 804(B)(6) MOTION.

The cornerstone of the Government's theory of Petitioner Sweeney's purported liability in the conspiracy came from the admission of hearsay statements made by Robert "Butchie" Smith, which were introduced through FBI Agent Vincent Lisi (the Case Agent who lead the FBI's investigation).[11] The Government alleged that Robert "Butchie" Smith was a relative of Petitioner Sweeney, and was leading a double life as a drug dealer and informant. According to the prosecution, Smith implicated Petitioner

---

[11] As stated earlier, Petitioner Sweeney was convicted at trial of, *inter alia*, Count 2 in the indictment, the "RICO Conspiracy." Petitioner Sweeney received a life sentence for this conviction. In convicting Petitioner Sweeney of the RICO conspiracy count, the jury found Racketeering Act 50, the conspiracy to commit murder of Robert Smith a/k/a "Butchie," between on or about April 1997 and on or about June 17, 1997, to have been proven.

Sweeney in the triple murder in Temple Hills, Maryland, as well as in the murder of Donnell "Robocop" Whitfield.

At trial, the court allowed the admission of Smith's hearsay statements under Federal Rule of Evidence 804(b)(6), holding that through the murder of Smith, the defendants had forfeited their Sixth Amendment Confrontation Clause rights.  Without having the opportunity to cross-examine Smith, his testimony, much of which was delivered through the bolstering voice of an FBI Agent, was the linchpin of the Government's case against Petitioner Sweeney.  Indeed, this testimony was relied upon heavily by the Government in closing argument, and used to seal the Government's case.[12]

At the time of Robert Smith's murder, Petitioner Sweeney was in custody at the Prince George's County Detention Center.  The Government's theory was that Petitioner Sweeney arranged for the murder of Robert Smith, a paid government informant, because he suspected that Smith was providing information to the police about criminal activity involving Petitioner Sweeney.

In addition to a multitude of requests in various forms, prior to and since, Petitioner Sweeney's Third Motion to Compel Discovery [#340], filed July 17, 2000, and specifically sought the information pertaining to Robert Smith to which he was entitled under *Brady*.

The Government sought, and was granted permission, pursuant to Federal Rule of Evidence 804(b)(6) to have FBI Special Agent Lisi, testify to certain incriminating statements allegedly made by Sweeney to his uncle Robert "Butchie" Smith.

---

[12] See Government's Closing Argument, Tr. 6/26/01 (AM) at pp. 24-5, 48; Tr. 6/26/01 (PM) at pp. 18, 24, 44, 62-64; Tr. 6/27/01 (PM) at pp. 6-10, 25-7, 40.

Rule 804(b)(6) provides that, "(6) *Statement Offered Against a Party That Wrongfully Caused the Declarant's Unavailability*. A statement offered against a party that wrongfully caused — or acquiesced in wrongfully causing — the declarant's unavailability as a witness, and did so intending that result."

It was the Government's contention that Carson had killed Smith after meeting with Sweeney in the Prince George's County Detention Center and being told by Sweeney that Smith had implicated Sweeney, Carson and Montgomery in the triple murder in Temple Hills, Maryland, in statements that he had made to Smith.

At the first hearing on the Government's motion, held on September 27, 2000, the defense wanted the Government to produce any evidence that it had about any other people that might have wanted to kill Smith.

The Government, in response to the request of the defense, made it clear, to both the trial court and to the defendants, that the Government had no information that anyone other than the defendants in this case wanted Smith dead, as is shown by the following:

**MS. CHATURVEDI**:  Certainly, your honor.  If I could just address this briefly. Again, it is sort of a leap of faith.  If the other people who Mr. Smith implicated -- if they knew that he was cooperating with law enforcement, perhaps they had a motive.  That is one leap of faith.

**THE COURT**:  Sure.

**MS. CHATURVEDI**:  And the second one is is there any evidence to suggest any of those people, assuming they did know about the cooperation, took any steps to harm Mr. Smith.  There is no such evidence.  If the defense is trying to raise third-party culpability, there has to be more than mere speculation.

Mr. Kiersh cited to the *Brown Beale* case from the D.C. Court of Appeals.  The *Winfield* case, which is the most most recent case on that point, says you can't just draw a blank.  You can't just pull at straws speculating that someone else may have wanted to have this person killed and we should be entitled to know that.  I will provide --

**THE COURT**:  I Agree.  There has to be some evidence that there were others who had a reason to – that there was a motive for committing the homicide known to those who were in a position to effect it.

**MS. CHATURVEDI**:  Right.  And we don't have any such information.  And we recognize that if we did have such information and that steps had been taken to give that, that would be Brady information.  That would have been disclosed as Brady information.

**THE COURT**:  Yes.

(Trans. 9-27-00, pp. 200-202).

Ms. Chaturvedi's statement that the Government had no information that someone other than the defendants in this case had been implicated in the murder of Smith was incorrect.

The Government was aware, as early as April 2, 1999, that Andre Chappell and Anthony Ricardo Hawkins might have been involved in the murder of Smith.

One of the previously sealed documents in this case is the Government's *Ex Parte* Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants, dated April 2, 1999, which was placed under seal by Judge Jackson on April 6, 1999.[13]  *See* Ex. 6 (Government's *Ex Parte* Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants).  The *ex parte* pleading addressed safety concerns alleged by the government as the basis for moving defendants Hill, Martin, Carson, Sweeney, and Proctor from their pretrial confinement at the D.C. Jail to the Northern Neck Regional Jail on or about March 9, 1999.

In the *Ex Parte* Notice, the government states, "Investigation of [the Robert Smith] murder has identified Andre Chappell and Anthony Ricardo Hawkins, a known associate of Samuel Carson, as having murdered Smith."  *See* Ex. 6 at p. 12.[14]

---

[13] None of the material obtained pursuant to the Court's Order to unseal appear on the docket sheet in the above-captioned matter.

[14] The Government's motion does not elaborate on the evidence in its possession that led to the identification of these to individuals as those responsible for Smith's murder.  Accordingly, Mr. Sweeney requests additional discovery and an evidentiary hearing with regard to this issue, as the evidence on which the Government based its statement would clearly be discoverable under *Brady*, and likely provide further evidence that the Government's misrepresentations and

The defense was not aware of this information and was unable to investigate it or advance this in opposition to the Government's motion to admit the statements of Smith.

The Government further suppressed the information contained within the material admitted at trial *ex parte* and under seal, and marked "Court Exhibit No. 4," namely the hand written notes relating to an interview of Andre Murray (who testified for the Government at trial) in which Murray discussed with law enforcement the murder of Keith Johnson.  *See* Ex. 7 (Handwritten Andre Murray Interview Notes).

The notes of that interview state, in part:

> "Wit. Heard Gooch telling Draper to kill Keith [Keith was Petey Johnson's brother]  Wit. did not hear Draper return to advise Gooch he had killed Keith.  He just heard Gooch give the order.
> The word is that Fat Petey started messing with Butchie – killed Butchie to get back at Draper -→ mere rumor."

Ex. 6.

The theory being that Petey Johnson had killed Smith to punish Sweeney for having killed his brother Keith.

This information was never provided to the defense despite the defense's requests for such information and the Government's assurance to the trial court and the defense that if it had such information it would turn it over to the defendants.

---

discovery violations resulted in a trial, and subsequent appeal, that were constitutionally unsound. Mr. Sweeney hereby requests any and all files containing information about Andre Chappell and Anthony Ricardo Hawkins, relating to the murder of Robert Smith.  The facts as alleged above provide "good cause" to allow discovery of the requested material.  *See Bracy v. Gramley*, 520 U.S. 899, 908-09 ("Good cause" is shown "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.")  The facts above demonstrate that "good cause" has been shown; therefore, discovery is warranted.  *Bracy* at 908-09.

The significance of the Government's suppression of the motive of Petey Johnson to kill Smith becomes more significant when one looks to the testimony of Agent Lisi, in the following exchange:

> A. I will tell you right now, I never after "Butchie's" murder, picked up Michael Farrar and interviewed him.
> Q. How about Petey Johnson? Did you pick him up?
> A. Yes, sir, because it was believed he was a witness.
> Q. To Robert Smith's murder?
> A. Yes, sir.
> Q. Okay.  And you questioned him not just as a witness, but as a possible suspect?
> A. I would say as a witness and maybe somebody – it was just a hunch that he was there and then he walked away, we believed, at the time "Butchie" was killed.  So he may have called somebody to alert them that "Butchie" was there.  (Trans. 5-30-01 (AM), pages 19-20).

The Government withheld from the defense evidence that Petey Johnson, a person the Government believed was present at the time of Smith's murder and might have had some role in Smith's murder; Johnson also had a motive to kill Smith which he might have told others about.

The defense was deprived, by the actions of the Government, of an opportunity to investigate the issue of Petey Johnson's motive to kill Smith and the involvement of Andre Chappell and Anthony Ricardo Hawkins in Smith's murder.

Once again had the Government disclosed the information in its possession, that Petey Johnson wanted to kill Smith in revenge for Sweeney allegedly killing his brother, Keith, Agent Lisi could have been cross examined on this point.

The Government's insistence on limiting the defense inquiry into others that might have wanted to kill Smith is further shown when during cross-examination of Agent Lisi by defense counsel, the Government objected when Agent Lisi was asked whether any suspects other than Sweeney had been developed as leads in Robert Smith's

murder.  (Tr. 5/30/01 (AM), pp. 45-49).  At sidebar, the Government argued, "The only

suspect – if Mr. Kiersh wants to hear it again – the only suspect in Agent Lisi's mind that

ordered that murder was William Sweeney.  If Mr. Kiersh wants him to repeat it, that is

fine."  *Id.* at pp. 47-48.

The Government was quite sure that the defense would be unable to confront

Agent Lisi with questions about Petey Johnson's motive to kill Smith or the evidence that

implicated Andre Chappell and Anthony Ricardo Hawkins in Smith's murder as this

material had not been turned over to the defense.

The defense was deprived of the opportunity to investigate this information or to

attempt to use it in opposition to the Government's motion to admit the statements of

Smith.

The Government through its action in keeping this information from the defense

put the defense in the position of having no evidence whatsoever to counter the

Government's argument that no one other than the defendants in this case had any reason

to kill Smith.

The defense being unable to present any serious opposition to the Government's

motion to admit the statements of Smith, the trial court granted the motion.

The Government's need to withhold evidence that could implicate others in the

murder of Smith is further shown by the weakness of the Government's evidence

implicating the defendants in that murder.

The evidence relied upon, by the Government, in support of its motion to admit

the statements of Smith was the testimony of Montgomery, as follows:

The Government first had Montgomery testify as to what he knew about the

murder of Smith which went as follows:

A.   Chin [defendant Carson] told me that Draper [defendant Sweeney] wanted me and him to come to see him.  So I told him -- I told Chin that I wasn't going to see him, and I didn't have proper ID.  I had an ID with my proper information on it, but it wouldn't have been accepted by -- probably by that jail thing.

Q.   So did you go to see Draper at the jail?

A.   No.

Q.   Did Chin go?

A.   Yes.

Q.   And after he went, did he tell you about his conversation with Draper?

A.   Chin say that him and Draper father went to see him, and --

THE COURT:  Him and Draper what?

THE WITNESS:  Him and Draper father.  Chin and Draper's father went to see Draper.

THE COURT:  Oh, I see.  Draper's father.  All right.

THE WITNESS:  And said that he asked Draper distinctively who did you tell anybody about what had happened?  And he said that Draper admitted to him that he told Butchie, and that Butchie was cooperating with the Feds.

BY MR. ZEIDENBERG:

Q.   Did Chin say what had to be done or what should be done about Butchie?

A.   So Chin told me that if they had no Butchie -- without Butchie, they don't have no case.  They wouldn't have no case.

Q.   And when you were talking about a case, what case was it that you were all concerned about?

A.   The triple murder.

Q.   Now, did you and Chin make attempts together to find and kill Butchie?

A.   Yes.

Q.   Can you tell the ladies and gentlemen about that?

A.   Sometimes when we used to -- when we would go to this carry-out, Leo's --

Q.   Where is that located?

A.   It's on N Street.

Q.   I'm sorry?

A.   South Capitol and N.

* * *

A.   That's near the area where Butchie would more than likely be, as far as when he was in Southwest.  So sometimes when we walked to Leo's we would -- we would already be going to Leo's anyhow, but we would try to see if we see Butchie out there as we are going or coming from there, and sometimes we would drive through, through there.

Q.   What were you going to do if you saw Butchie?

A.   Well, we saw him numerous amount of times, but we couldn't do nothing to him in front of like everybody just like that, do you know what I mean.  We're from

Southwest and he is -- he knowed the same people we know, so we couldn't just walk right up to him just like that and do anything to him.

Q. What were you hoping to find? What were you hoping to do?

A. To catch him in a nice position.

Q. What is a nice position?

A. To catch him in a position where we could get up on him without a person knowing who we are or without him seeing us coming.

Q. Now, was there an occasion when you and Chin were in a car and you happened to see Butchie?

A. We was in my car.

Q. Can you tell us about that?

A. We rode through housing -- I mean, through Half Street, and Butchie was out there. He was sitting on the steps that lead to Syphax playground. So we hurried up and went to Chin house, I stayed in the car. And he got out and he went and got his sweatsuit, and the gun, and his gut-buster.

Q. What's a gut-buster?

A. Like elastic velcro, like a waistband.

Q. And what's the purpose of that?

A. To hold the gun.

Q. What did Chin do with his sweatsuit -- what kind of a sweatsuit did he get?

A. It was a black sweatsuit.

Q. What did he do with it?

A. He was putting in on while I was driving.

Q. Where was he putting it on?

A. In the car.

Q. What car did you have?

A. Oldsmobile 98.

Q. Where did you go once Chin got back in the car with his gun and his sweatsuit?

A. We went down Canal Street, and then got on -- got onto First Street, and then hit M Street, and then hit South Capitol Street. And I pulled on -- he told me to pull on the side -- on the side of -- like the sidewalk. It's like a little car dealership thing right there. So I stayed right there, and Chin got out to go -- to go through the alley to try to catch him from behind.

Q. Now, was there a discussion between you and Chin about an escape route you were going to take?

A. When he came back to the car then I was suppose to pull straight over the curb and go straight across South Capitol Street Bridge so he could throw the pistol out while we were going over the river, and go around 37th. And that was going to be our alibi.

Q. And that was a plan you discussed before Chin got out of the car?

A. Right.

Q. And again, the purpose in going up and ending up at 37th Place was going to be what?

A. Our alibi.

Q. What happened when Chin got out of the car?

A.  He went around there, and he came back, and he said that Butchie was gone. When he got back in the car the first thing I said, I said, what happened?  Because I didn't hear the gunshots or nothing.  So I said, what happened?  And he said that Butchie wasn't there, that he was gone, he said he left that quick.

Q.  Now, I want to talk to you about the day that Butchie was actually killed, do you remember that day?

A.  Yes.

Q.  Where were you the day that Butchie was killed, starting in the afternoon?

A.  On Second Street.

Q.  Second Street, Southwest?

A.  Yes.

Q.  And what were you doing there?

A.  Selling weed.

THE COURT:  What was the date?

MR. ZEIDENBERG:  I'm sorry?

THE COURT:  What was the date?

MR. ZEIDENBERG:  I didn't refer to the date.  It is June 16, 1997.

THE COURT:  June 16th?

MR. ZEIDENBERG:  Yes.

THE COURT:  All right.  Go ahead.  I'm sorry.

BY MR. ZEIDENBERG:

Q.  Where were you -- you were on Second Street?

A.  Yes.

Q.  And what were you doing?

A. Selling weed.

Q.  Now, at some point did you see Chin?

A.  Chin came out of his house and came and got my car keys.

Q.  Did you give it to him?

A.  Yes.

Q.  Did you ask him why he needed your car?

A.  No.

Q.  Was it uncommon for Chin to come by and take your car?

A.  No.  I mean, he would get it all the time, whenever.

Q.  Now, did he tell you where he was going?

A.  No.

Q.  Now, sometime later, after Chin -- did he leave with your car?

A.  Yes.

Q.  Okay.  Sometime later did you come to find out that there had been a shooting over on Half Street?

A.  Yes.

Q.  And at some point did you learn that that was Butchie?

A.  Yes.

Q.  What did you do when you found out that Butchie had been killed?

A.  I got somebody's -- I got a bicycle from somebody and I rode up there, I rode the bicycle up there.

Q.  And where did you ride to?

A.   To the corner of Half and O Street.

Q.   What did you see when you got there?

A.   There was a lot of marked and unmarked police cars and a lot of people was out there.

Q.   Was Butchie's body still on the ground?

A.   I didn't see his body.  I seen like the crime scene tape and stuff like that.  I didn't go all the way down there because it was a lot of polices down there.

Q.   I take it you heard -- you had heard from people out there that it had been Butchie that was killed?

A.   Yes.

Q.   How did you feel when you heard that Butchie was killed?

A.   I was happy.

Q.   How concerned were you, prior to Butchie being killed, how concerned were you about the fact that he was still alive?

A.   It was of great concern.

Q.   Why is that?

A.   Because Draper had told him about what had happened, and I knew that if they pick us up for it that he could be a witness as to what Draper told him.

Q.   Now, after you went to the scene did you return back to Second Street?

A.   Yes.

Q.   And at some point later that evening did Chin return?

A.   Yes.

Q.   Can you tell us about that?

A.   He came -- I was standing on the corner of Second and P Street and he came from the direction -- I'm not sure if he came straight down P Street or if he turned off of First Street, but I seen him on P Street turning into the alley where I normally -- where I had my car parked at at first. So when I seen him going into the alley, so I was walking down -- I was walking down towards that direction.  So no soon as I seen him, so I told him, I said, you know them peoples got hit.

Q.   Your term was what?

A.   I said, you know them peoples got hit.

Q.   You used the term peoples?

A.   That's what I said.  I said, you know them peoples got hit.  He was like, yeah, I know.  So he was like, we're all right.  So I said, yeah.  He said, -- so I said, you know who I'm talking about?  He was like, yeah.  He said, man, trust me, we're all right, just like that.  And then he was like, oh, here are your keys, and gave me my keys.

Q.   Did he seem at all surprised when you told him about that?

A.   No.  And he told me to stay from up Half Street with my car and not to drive it if I didn't have to.

Q.   I'm sorry?

A.   He told me to stay from up Half Street with my car and to not drive it that much if I didn't have to.

Q.   Now, had there been a previous occasion when Mr. Carson, Chin, took your car and then later told you not to drive it in a particular neighborhood?

A.   Yes.

Q.   Can you tell us about that?

A.   In '94, when I had my Caddie, I let Chin keep it, him and Poo-Poo had it, and they shot at Craig out of my car at Capers.

Q.   How do you know that?

A.   Because Chin told me.  He told me to stay from up Capers in my car, and he told me that they had took my car to get it washed and wiped down because they had shot out of it.

Q.   Talking about in 1994 now, did Chin tell you why it was that you should not drive your car up to Capers?

A.   No, that was all he said.

Q.   What did you understand that to mean, why you shouldn't go up to Capers?

A.   My knowledge would be that Craig might be able to   identify my car and may think that I was the person who was shooting at him and shoot at me, or somebody else might have seen it and be able to identify my car, and they might not have known who was shooting out of it and may have been thinking that I was the one who was shooting or whatever.

Q.   Mr. Montgomery, after you had learned that Butchie had been killed what did you think -- how were you feeling in terms about that triple murder and your possibly being implicated in it?

A.   Would you repeat your question?

Q.   After you learned that Butchie had been killed how were you feeling about the fact about your chances of being implicated in the triple murder?

A.   I was feeling good pretty much.  To a certain extent I was feeling good.

Q.   Did you think you were in the clear?

A.   To a certain extent I felt as though I was in the clear.

MR. ZEIDENBERG:  I have no further questions, Your Honor.

(5-23-01, p.m., pages 22-33)

It is interesting to note that when Montgomery was with Carson, and according to Montgomery, with the express purpose of killing Smith that they did not do so as there were people around.  Montgomery's testimony is that on the day that Smith was killed Carson did not ask him to go with him on this mission, as he had before, but according to Montgomery, he went on his own.  Moreover Montgomery was not with Carson when Carson allegedly killed Smith.

Most surprising of all of Montgomery's claims is that after Carson allegedly killed Smith, Carson did not tell Montgomery he had done so.  In fact, according to Montgomery, Montgomery brought it up to Carson that Smith had been killed, in the following exchange:

[Montgomery] A.   I said, you know them peoples got hit.
Q.   You used the term peoples?
A.   That's what I said.  I said, you know them peoples got hit.  [Carson] was like, yeah, I know.  So he was like, we're all right.  So I said, yeah.  He said, -- so I said, you know who I'm talking about?  He was like, yeah.  He said, man, trust me, we're all right, just like that.  And then he was like, oh, here are your keys, and gave me my keys.

If in fact Carson had killed Smith, why was he unwilling to tell Montgomery he had done so?  Especially when they had, if Montgomery is to be believed, hunted Smith on numerous occasions, planned how Smith would be approached, where the car would be stopped, an escape route and a place to get rid of the gun, and they were always together when they allegedly went to kill Smith.

This all changes when Smith is killed -- Carson suddenly goes out alone, and never tells Montgomery that he killed Smith.  Instead, Montgomery brings up the subject of Smith's murder to Carson.

Moreover, if Montgomery is telling the truth about the statements allegedly made by Carson after Smith's death, that "trust me, we're all right," that would be true no matter who killed Smith.

While the evidence withheld by the Government from the defense appears not be admissible in its own right there is still a *Brady* violation in this case.

> The circuits are split on whether a petitioner can have a viable *Brady* claim if the withheld evidence itself is inadmissible. Most circuits addressing the issue have said yes if the withheld evidence would have led directly to material admissible evidence.  We have never squarely ruled on this question, *but cf. United States v. Hemmer,* 729 F.2d 10, 16n. 3 (1st Cir.) *cert. denied,* 467 U.S. 1218, 104 S.Ct. 2666, 81 L.Ed.2d 371 (1984); *United States v. Ranney,* 719 F.2d 1183, 1190 (1st Cir. 1983) yet given the policy underlying *Brady,* we think it plain that evidence itself inadmissible *could* be so promising a lead to strong exculpatory evidence that there could be no justification for withholding it. *Wood v. Bartholomew,* 516 U.S. 1, 6-8, 116 S.Ct. 7, 133 L.Ed2d 1 (1995) implicitly assumes this is so.

Whether the intake note at issue in this case undermines confidence
in the verdict is a more difficult question. The clear implication of
Jan Smith's note is that someone where Matthew made the prior
allegations, told her that the allegations were false. If the defense
had known about the note before trial, it presumably could have
traced those who could testify as to the circumstances of the
allegations and the basis for believing them to be false. Whether the
evidence would convincingly establish that Matthew had lied is hard
to know but surely the episode most likely would have been
investigated and the implication that someone at Hampstead
believed it false is strong.

If strong evidence of a prior false accusation exists, it would be very
powerful. could easily have created the reasonable doubt necessary
to acquit Ellsworth in what was otherwise largely a credibility
contest. The lack of any significant corroborating evidence makes
this case unusual and heightens the concern about any *Brady*
violation. Nevertheless, it would be very odd for us to require a new
trial because of a wrongly withheld lead unless the lead would, or
would likely, have led to valuable new evidence which was itself
arguably admissible. However unlikely it might be after eight years,
the state would be entitled to retry Ellsworth if the writ were
granted; yet such a remedy would be incongruous unless evidence
existed that might alter the result at such a trial. Habeas doctrine is
flexible enough for us to condition a grant of the writ on the
outcome of a further inquiry into where the lead, even though
wrongly withheld, would have taken Ellsworth. *Cf. Manko v. United
States,* 87 F.3d 50, 55 (2nd Cir. 1996); Stewart v. Coalter, 48 F.3d
610, 617 (1st Cir.) *cert. denied,* 516 U.S. 853, 116 S.Ct. 153, 133
L.Ed.2d 97 (1995).

If there exists admissible evidence that Matthew made demonstrably
false accusations and Ellsworth was not otherwise aware of these
allegations at the time of the first trial, a new trial is required. If
admissible evidence of false accusations never existed, the writ
should be denied. If it did or may well have existed but has been lost
because of the *Brady* violation and the ensuing delay in discovery of
this fact, Ellsworth may have a good claim to a new trial, *cf.
California v. Trombetta,* 467 U.S., 486-88, 104 S.Ct. 2528, 81
L.Ed.2d 413 (1984).

*Ellsworth v. Warden,* 333 F3d 1, 5-6 (1st Cir. 2003).

As a result of the court sealing the information relating to others implicated in the

murder of Smith from counsel, there was never an opportunity for the defense to

challenge the government's Rule 804(b)(6) motion, investigate the matter of Andre

Chappell and Anthony Ricardo Hawkins, or their relation to Carson or any of the other codefendants.

Furthermore, the Government at trial stopped short of explaining or putting on evidence as to how, or who actually killed Mr. Smith. Andre Chappell or Anthony Ricardo Hawkins was not mentioned at all during trial, either by the agents, the prosecutors, or any Witness. *See* Ex. 8 (Affidavit of William Sweeney).

In light of the evidence put forward by the Government at trial for the murder of Smith, for all that is known the evidence that Andre Chappell or Anthony Ricardo Hawkins killed Smith could have been just as strong as the evidence that implicated the defendants.

This is simply another reason that the court should require the Government to produce the evidence that it has linking Andre Chappell or Anthony Ricardo Hawkins to the murder of Smith and then conduct a full evidentiary hearing on this issue.

As a result of the actions of the Government in withholding the evidence in its possession, the Government should be required to turn over to the defense all evidence in its possession related to its investigation into the murder of Smith, and into Petey Johnson relating to the murder of Smith. In addition, the Government should have to turn over to the defense all evidence that relates to the evidence that implicated Andre Chappell and Anthony Ricardo Hawkins in Smith's murder.

Once the Government has done so, and the defense has had an opportunity to investigate the information a hearing should be held.

Moreover, the granting of the Government's motion to admit the statements of Smith also precluded the defense from offering evidence that implicated Smith in the Triple murder in Prince George's County.

The defense had a witness, Wesley Smith, who would have testified that Robert Smith told him that he, Robert Smith, had been cheated out of $60,000.00, while gambling at the house in Temple Hills where the triple murder occurred, and that he was going back there to take care of the "guys in the house," meaning Gaskin and Mack.

Robert Smith told Wesley Smith, a week after the triple murder occurred that, "I took care of Darnell Mack and those guys." (Tr. 6/6/2001 (AM), pp. 26-34; Tr. 6/11/2001 (PM), 9-27; Tr. 6/13/2001 (AM), pp. 72-77).

This evidence would have contradicted Montgomery version of the triple murder and would have further impeached Montgomery's credibility.

It also would have been a defense in this case.

Petitioner Sweeney has demonstrated that the evidence concerning Andre Murray's statement that Petey Johnson wanted to kill Smith, combined with his presence at the time and place of the murder of Smith and the information linking Andre Chappell or Anthony Ricardo Hawkins to the murder of Smith, is all evidence that would be material to the determination of the Government's motion, pursuant to Rule 804(b)(6), to admit the statements of Smith through Agent Lisi.

"Once a defendant demonstrates that a witness can provide testimony material to his defense, then the government's interest in its evidentiary privilege must give way. The proper course in that case 'is for the district court to order production of the evidence or the witness and leave to the Government the choice of whether to comply with that

order.' *United States v. Moussaoui,* 382 F.3d 453, 474 (2004).  "If the government

refuses to produce the information at issue—as it may properly do—the result is

ordinarily dismissal." *United States v. Rivera,* 412 F.3d 562, 569 (4th Cir. 2005)(internal

citation omitted).

This should be the procedure that should be followed in this case.  It cannot be

disputed that evidence which inculpated individuals unrelated to Petitioner Sweeney in

the murder of Robert Smith was favorable to the defense; thus, the material should have

been turned over to the defense.  As discussed, *infra*, this evidence was material to

Petitioner Sweeney's guilt; therefore, the suppression of the material violated his right to

due process.  *Brady*, 373 U.S. at 87.

Assuming arguendo that the failure of the Government to turn this *Brady* material

over to the defense is excused by having the trial court review the material, then the trial

court abused its discretion in not ordering this information to be turned over to the

defense.  This failure deprived Sweeney of due process as the information was material to

Sweeney's guilt, would have been used by the defense in opposition to the Government's

motion to admit the hearsay statements of Smith and the creditability of the

Government's witnesses.

Had this information been turned over to the defense there is a reasonable

probability that the results of the proceedings would have been different.

## 9. THE *BRADY* EVIDENCE WAS MATERIAL TO PETITIONER'S GUILT, AND PETITIONERS WERE PREJUDICED BY ITS SUPPRESSION

The standards for establishing materiality and prejudice are interchangeable as

applied to a *Brady* claim.  *See Strickler*, 527 U.S. at 289-90 (prejudice); *Kyles*, 514 U.S.

at 434 (materiality).  To establish materiality and prejudice, Petitioner Sweeney need not

show that he would more likely than not have received a different verdict with the benefit

of the suppressed evidence; the question is rather, whether in its absence he received a

fair trial, understood as a trial resulting in a verdict worthy of confidence.  *See Strickler*,

527 U.S. at 289-90 (*quoting Kyles*, 514 U.S. at 434).  The suppressed evidence should be

considered collectively, not item by item.  *See Kyles*, 514 U.S. at 434.   Here, the

cumulative impact of the pervasive suppression of *Brady* material renders the verdict

unworthy of confidence – simply put, Petitioner Sweeney did not receive a fair trial.

As the Supreme Court has long recognized, "[t]he use of informers, accessories,

accomplices, false friends, or any of the other betrayals which are 'dirty business' may

raise serious questions of credibility.  To the extent that they do, a defendant is entitled to

broad latitude to probe credibility by cross-examination…"  *Lee v. United States*, 343

U.S. 747, 757 (1952).  At trial, the central theme of the defense was the lack of credibility

of the Government's witnesses.  Accordingly, the suppressed evidence as detailed above,

taken collectively, could have been used to cast doubt upon the credibility of several of

the Government's key witnesses – delivering death by a thousand cuts to the

Government's case.

Further, the suppression of the newly discovered evidence relating to Robert

Smith prejudiced Petitioner Sweeney in particular, as it could have been used to defeat

the Government's motion to admit Smith's hearsay statements through Agent Lisi's

testimony.  At trial, the court had allowed the admission of Smith's hearsay statements

under Federal Rule of Evidence 804(b)(6), holding that through the murder of Smith, the

defendants had forfeited their Sixth Amendment Confrontation Clause rights.[15]

---

[15] Federal Rule of Evidence 804(b)(6) provides, "*Statement Offered Against a Party That Wrongfully
Caused the Declarant's Unavailability*. A statement offered against a party that wrongfully caused — or

The "Greenbelt File" related to Theodore Watson was also material, and its suppression likewise prejudiced Petitioner Sweeney.  Like Agent Lisi's testimony and Robert Smith's statements, Watson's testimony in this case was of great importance to the Government, as he claimed that Petitioner Sweeney had confessed to him participation in a number of crimes.  The letters contained in the file could have been used by the defense to seriously undermine Watson's credibility as a witness at trial, exposed his bias and the powerful influence of the Government, by using his very own words against him.  The materiality of the "Greenbelt File," and the prejudice caused by its suppression, are demonstrated by the fact that it could have been used as a powerful discrediting of Watson as a key witness.

As shown above, the Government's withholding of several of the examples of newly discovered evidence, even taken alone, would be sufficient to vacate Sweeney's conviction.  Together, there can be no doubt that the suppressed *Brady* evidence rendered Petitioner Sweeney's trial fundamentally unfair, and produced a verdict that is no longer worthy of confidence.  Accordingly, relief must be granted.

**10. THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO ORDER THE GOVERNMENT TO PRODUCE TO THE DEFENSE THE INFORMATION CONTAINED WITHIN, AND THE INFORMATION THAT SUPPORTED THE GOVERNMENT'S CONCLUSIONS IN ITS *EX PARTE* NOTICE TO THE COURT REGARDING CHANGE IN LOCATION OF CONFINEMENT OF ABOVE-NAMED DEFENDANTS, DATED APRIL 2, 1999, AND THE INFORMATION CONTAINED WITHIN COURT EXHIBIT NUMBER 4.**

The trial court abused its discretion in sealing material relating to others that had motive to kill Robert "Butchie" Smith.  The Government was granted permission by the trial court, pursuant to Federal Rule of Evidence 804(b)(6), to have FBI Special Agent

acquiesced in wrongfully causing — the declarant's unavailability as a witness, and did so intending that result."

Lisi testify to certain incriminating statements allegedly made by Sweeney to his uncle, Robert "Butchie" Smith.

Rule 804(b)(6) provides that, "(6) *Statement Offered Against a Party That Wrongfully Caused the Declarant's Unavailability*. A statement offered against a party that wrongfully caused — or acquiesced in wrongfully causing — the declarant's unavailability as a witness, and did so intending that result."

It was the Government's contention that Carson had killed Smith after meeting with Sweeney in the Prince George's County jail and being told by Sweeney that Smith had implicated Sweeney, Carson and Montgomery in the triple murder in Temple Hills, Maryland, in statements that he had made to Smith.

At the first hearing on the Government's motion, held on September 27, 2000, the defense wanted the Government to produce any evidence that it had about any other people that might have wanted to kill Smith.

The Government, in response to the request of the defense, made it clear, to both the trial court and to the defendants, that the Government had no information that anyone other than the defendants in this case wanted Smith dead, as is shown by the following:

**THE COURT**: I AGREE. THERE HAS TO BE SOME EVIDENCE THAT THERE WERE OTHERS WHO HAD A REASON TO – THAT THERE WAS A MOTIVE FOR COMMITTING THE HOMICIDE KNOWN TO THOSE WHO WERE IN A POSITION TO EFFECT IT.

**MS. CHATURVEDI**: RIGHT. AND WE DON'T HAVE ANY SUCH INFORMATION. AND WE RECOGNIZE THAT IF WE DID HAVE SUCH INFORMATION AND THAT STEPS HAD BEEN TAKEN TO GIVE THAT, THAT WOULD BE BRADY INFORMATION. THAT WOULD HAVE BEEN DISCLOSED AS BRADY INFORMATION.

**THE COURT**: YES.

(Trans. 9-27-00, pages 200-202).

However, as argued herein, the Government knew that its statement that there was no information that others had motive to kill Smith was not true.  The trial court also had been provided information that there were others that had motive to kill Smith and did not order the Government to provide this information to the defense.

One of the previously sealed documents in this case is the Government's *Ex Parte* Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants, dated April 2, 1999, which was placed under seal by the trial court on April 6, 1999.  *See* Ex. 7.  The *ex parte* pleading addressed safety concerns alleged by the government as the basis for moving defendants Hill, Martin, Carson, Sweeney, and Proctor from their pretrial confinement at the D.C. Jail to the Northern Neck Regional Jail on or about March 9, 1999.  The Government alleged in the *Ex Parte* Notice that the, "Investigation of [the Robert Smith] murder has identified Andre Chappell and Anthony Ricardo Hawkins, a known associate of Samuel Carson, as having murdered Smith." Government's *Ex Parte* Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants.

As the trial court recognized in its exchange with the Government on September 27, 2000, this information would be material that must be provided to the defense pursuant to *Brady.*  Yet, the trial court after having recognized that the information concerning others, not only having a motive to murder Smith, but information that Chappell and Hawkins had in fact murdered Smith did not require the Government to turn this information over to the defense.  This was an abuse of discretion on the part of the trial court.  This information directly contradicted the theory upon which the

Government relied upon in its motion to admit, pursuant to Federal Rule of Evidence 804(b)(6) the statements of Smith.

It was the Government's theory that Carson had murdered Smith at the request of Sweeney.  Yet the information in possession of the trial court was that the Government believed that Chappell and Hawkins had murdered Smith and Carson had not murdered Smith.

Moreover the Government's belief that Chappell and Hawkins had killed Smith directly contradicts Montgomery who testified at trial that Carson had murdered Smith.

The trial court when addressing the defendants' lawyers' concerns about the change of the locations of the defendants, stated, in part, that "I have reviewed the Government's *in camera* submission as to the reasons for the dispersions of the defendants to various points of detention, and I am satisfied that the order was eminently justified." (Trans. 5-21-99, page 8)  The trial court went on the state that "Their conditions of detention they largely brought on themselves." (Trans. 5-21-99, page 9)

It seems strange that this information, which the trial court found sufficient to ratify the Government's decision to move the defendants, it did not find important enough to order the Government to turn over to the defense.  The only explanation is that the trial court abused its discretion by failing to order that this information be produced to the defense as required by *Brady.*  The defense was not aware of this information and was unable to investigate it or advance this in opposition to the Government's motion to admit the statements of Smith.

In addition, the Government submitted to the trial court, for *in camera* review, a detective's handwritten notes relating to an interview of Andre Murray (who testified for

the Government at trial) in which Murray discussed with law enforcement the murder of

Keith Johnson.  *See* Ex. 6.

As described earlier, the notes of that interview state, in part:

 "Wit. Heard Gooch telling Draper to kill Keith [Keith was Petey Johnson's brother]   Wit. did not hear Draper return to advise Gooch he had killed Keith.  He just heard Gooch give the order.
The word is that Fat Petey started messing with Butchie – killed Butchie to get back at Draper -→ mere rumor."
Ex. 6.

The theory being that Petey Johnson had killed Smith to punish Sweeney for

having killed his brother.  Once more the trial court did not order this information to be

turned over to the defense after the trial court had reviewed it *in camera.*

As argued herein, the trial court recognized that information that people other

than the defendants in this case had a motive to kill Smith was *Brady* and as such had to

be turned over to the defense, yet when the trial court was presented this information,

instead of ordering the government to provide it to the defense, the Court simply had it

marked as Court Exhibit number 4 and made part of the record under seal.

The significance of trial court's failure to order the Government to produce this

material, detailing the motive of Petey Johnson to kill Smith becomes more significant

when on looks to the testimony of Agent Lisi, in the following exchange:

A. I will tell you right now, I never after "Butchie's" murder, picked up Michael Farrar and interviewed him.
Q. How about Petey Johnson? Did you pick him up?
A. Yes, sir, because it was believed he was a witness.
Q. To Robert Smith's murder?
A. Yes, sir.
Q. Okay.  And you questioned him not just as a witness, but also as a possible suspect?
A. I would say as a witness and maybe somebody – it was just a hunch that he was there and then he walked away, we believed, at the time "Butchie" was killed.  So he may have called

somebody to alert them that "Butchie" was there.  (Tr. 5-30-01
(AM), pages 19-20).

The abuse of discretion on the part of the trial court deprived the defense of

evidence that Petey Johnson, a person the Government believed was present at the time

of Smith's murder and might have had some role in Smith's murder, also had a motive to

kill Smith which he might have told others about.

The defense was deprived, by the actions of the trial court, an opportunity to

investigate the issue of Petey Johnson's motive to kill Smith and the involvement of

Andre Chappell and Anthony Ricardo Hawkins in Smith's murder.

Once again, had the trial court ordered the Government disclosed the information

in its possession that Petey Johnson wanted to kill Smith in revenge for Sweeney

allegedly killing his brother, Keith, Agent Lisi could have been cross examined on this

point.

Moreover, the information contained within this material would have also refuted

any inference or suggestion that Petey Johnson had contacted Carson and told him where

Smith was so that Carson could murder Smith.  It seems unlikely that Petey Johnson

would have assisted Carson and Sweeney in killing Smith when Petey Johnson believed

that Sweeney had killed his brother.

This is the impression the Government attempted to create when Agent Lisi

testified that "So [Petey Johnson] may have called somebody to alert them that "Butchie"

was there."

The information contained within the detective's notes could have been used to

cross-examine Agent Lisi that Johnson, who was present at the time and place that Smith

was murdered, would have been unlikely to assist Sweeney and Carson in killing Smith since Johnson had his own motive to want to kill Smith.

The trial court abused its discretion in this case by failing to order the Government to produce the information, which the trial court had already concluded would constitute information required to be produced to the defense under *Brady,* contained within the detective's notes, and Government's *Ex Parte* Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants, dated April 2, 1999.   If the defense had had this information it could have used it in its opposition to the Government's motion to admit Smith's statement pursuant to Federal Rule of Evidence 804(b)(6), to contradict the testimony of Montgomery and Agent Lisi.

Had this information been turned over to the defense there is a reasonable probability that the results of the proceedings would have been different.

### 11. THE CUMULATIVE EFFECT OF DEPRIVING SWEENEY OF ACCESS TO *BRADY, GIGLIO,* AND THE JENCKS ACT MATERIAL REQUIRES SWEENEY'S CONVICTIONS BE VACATED

As argued herein, Sweeney was deprived of access to materials to which he was entitled pursuant to *Brady, Giglio,* and the Jencks Act.

To show that one is entitled to relief for such depravation:

"A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict.  The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict.  One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."

*Kyles v. Whitley***,** 514 U.S. 419, 435 (1995).

Had Sweeney been able to present to the jury and to investigate the *Brady, Giglio*, and the Jencks Act material that was withheld from him, the Government's theory of the case would have been undermined, and some of its important witnesses impeached.  In addition, the defense would have had arguments with which to oppose the Government's motion to admit Robert "Butchie" Smith's statements through Agent Lisi and Montgomery.

Further, the nondisclosure to the defendant of all the suppressed information, to which he was entitled, including the information contained within the sealed court exhibits concerning statements made by the Government's witnesses as set forth herein, could have been used by the defense to demonstrate that the Government's agents were so intent on building a case against the trial defendants that the Government agents communicated this, either consciously or unconsciously, to the people that they were interviewing resulting in statements incriminating the trial defendants.  The defense could have argued to the jury that this resulted in those being interviewed changing the facts and the participants in crimes in order to implicate the trial defendants in crimes and thereby please the Government.

**12**. **THE CUMULATIVE EFFECT OF DEPRIVING SWEENEY OF ACCESS TO *BRADY* AND THE GOVERNMENT'S *NAPUE* VIOLATION REQUIRES SWEENEY'S CONVICTION BE VACATED**

As argued herein Sweeny was deprived of information that should have been turned over to the defense as *Brady* material.  The Government, with regard to Watson, was guilty of a *Napue* violation as argued above.  Assuming arguendo that each of the violations standing alone is not sufficient to grant Sweeney relief the violations taken together do require that Sweeny's convictions be vacated.

The court should take the following approach in dealing with these violations:

> The materiality analysis proceeds differently for *Brady* and *Napue* claims. Whereas a *Brady* violation is material when "there is a reasonable probability that . . . the result of the proceeding *would* have been different," *Bagley,* 473 U.S. at 682 (emphasis added), a *Napue* violation requires that the conviction be set aside whenever there is "*any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *Hayes v. Brown,* 399 F.3d 972, 985 (9th Cir. 2005) (internal quotation marks omitted).[12] We have gone so far as to say that "`if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic.'" *Id* at 978 (quoting *United States v. Wallach,* 935 f.2d 445, 456 (2nd Cir. 1991)). Nonetheless, *Napue* does not create a "*per se* rule of reversal." *Id.* at 984.
> Although we must analyze *Brady* and *Napue* violations "collectively," the difference in the materiality standards poses an analytical challenge.  The *Napue* and *Brady* errors cannot all be collectively analyzed under *Napue*'s "reasonable likelihood" standard, as that would overweight the *Brady* violations. On the other hand, they cannot be considered in two separate groups, as that would fail to capture their combined effect on our confidence in the jury's decision. To resolve this conflict, we first consider the *Napue* violations collectively and ask whether there is "any reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *Hayes,* 399 F.3d at 985 (emphasis added). If so, habeas relief must be granted. However, if the *Napue* errors are not material standing alone, we consider all of the *Napue* and *Brady* violations collectively and ask whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding *would* have been different." *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375 (emphasis added) (internal quotation marks omitted); *United States v. Zuno-Arce,* 25 F.Supp.2d 1087, 1117 (C.D. Cal. 1998) (applying a two-step materiality analysis to combined *Brady* and *Napue* claims), *aff'd,* 339 F.3d 886 (9th Cir. 2003). At both stages, we must ask whether the defendant "received . . . a trial resulting in a verdict worthy of confidence." *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555.
> *Jackson v. Brown,* 513 F.3d 1057, 1076 (9th Cir. 2008)

As has been argued herein Sweeney was deprived of substantial *Brady*

material all of which was material to his guilt and he was also subject to a *Napu* violation.

The inability of the defense to attack Watson's credibility had a direct effect on the

verdict in this case.  Had this information been turned over to the defense there is a

reasonable probability that the results of the proceedings would have been different.

### B. SIXTH AMENDMENT INEFFECTIVE ASSISTANCE OF COUNSEL

A defendant has been deprived of his Sixth Amendment right to effective

assistance if "counsel's representation fell below an objective standard of

reasonableness" and the deficient performance prejudiced the defense.  *Strickland v.*

*Washington*, 466 U.S. 668, 687-88 (1984).  Under *Strickland*, a defendant "need not

show that counsel's deficient conduct more likely than not altered the outcome of the

case;" rather, "the defendant must show that there is a reasonable probability that, but for

counsel's unprofessional errors, the results of the proceeding would have been different."

*Id.* at 693.  A reasonable probability is a probability sufficient to undermine confidence in

the outcome."  *Id.* at 694.  Thus, "[w]hen a defendant challenges a conviction; the

question is whether there is a reasonable probability that, absent the errors, the fact finder

would have had a reasonable doubt respecting guilt."  *Id.* at 695.  As detailed below,

counsel was constitutionally ineffective at various stages of trial, as well as on appeal,

and in various ways when representing Petitioner Sweeney.[16]

### 1. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO CHALLENGE ON APPEAL THE TRIAL COURT'S *BRADY, GIGLIO*, AND JENCKS ACT RULINGS WITH REGARD TO SPECIFIC PORTIONS OF THE SEALED RECORD

On May 29, 2003, appellate counsel Steven R. Kiersh, Esq. ("Kiersh"), along with

counsel for Petitioner Sweeney's fellow appellants, filed a Motion to Allow Counsel to

Review Specific Sealed Portions of the Trial Record [Case No. 02-3015, ECF No.

751872].  In their motion, counsel sought access to sealed portions of the trial record in

---

[16] Mr.  Sweeney was represented both at trial and on appeal, by Steven R. Kiersh, Esq.

order to mount a challenge to the trial court's rulings under *Brady v. Maryland*, 373 U.S.

83 (1963), and the Jencks Act, 18 U.S.C. § 3500.  The United States Court of Appeals for

the District of Columbia Circuit ("D.C. Cir.") denied the motion, instructing counsel that

they must identify the specific rulings believed to be erroneous, and present the issue in

the appellants' brief, rather than by motion.  *See* Order dated 8/28/2003 [Case No. 02-

3015, ECF No. 769196].

Here, prejudice from the failure to pursue this claim on direct appeal is presumed

because of the Government and the trial court's interference by placing the material

under seal.  *See Strickland*, 466 U.S. at 692 ("In certain Sixth Amendment contexts,

prejudice is presumed… [including] various kinds of state interference with counsel's

assistance"); *United States v. Cronic*, 466 U.S. 648, 659 and n.25 (1984).  Counsel was

unable to adequately challenge the suppression of the sealed material on appeal because

counsel needed access to the sealed portion of the trial record in order to establish the

materiality of the undisclosed evidence – an essential element of the prospective claim on

appeal.  *See Brady*, 373 U.S. at 87.

Even if a showing of prejudice were required in this case, Petitioner Sweeney's

claim still prevails, as the prejudice here is clear.  Had appellate counsel raised this

critical issue on appeal, the Court of Appeals would have reviewed the material *in*

*camera* and found that *Brady* and Jencks Act violations had indeed occurred, and were

widespread.  *See* Order dated 8/28/2003 [Case No. 02-3015, ECF No. 769196]

("appellants must identify [in their appellate brief] the specific rulings that they believe

are erroneous, and if they present a colorable claim, this court may review the sealed

material *in camera* to determine whether a *Brady* or Jencks Act violation has in fact

occurred."); 18 U.S.C. § 3500(c); *United States v. Williams-Davis*, 90 F.3d 490, 514 (D.C. Cir. 1996); *United States v. Brooks*, 966 F.2d 1500, 1505 (D.C. Cir. 1992).  As detailed *supra* in Ground One, Petitioners had more than a colorable claim with regard to the erroneous rulings.   Had the Court of Appeals reviewed the material, and discovered the pattern of *Brady* and Jencks violations that pervaded the record at trial, the error was more likely than not to result in reversal on appeal.  Appellate counsel's failure to challenge this critical issue on appeal was deficient, and that deficiency prejudiced Petitioner Sweeney; therefore, his appellate assistance was unconstitutionally ineffective. *See Strickland*, 466 U.S. at 687.[17]

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

## 2. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO SEEK REVIEW BY THE TRIAL COURT OF THEODORE WATSON'S GREENBELT FILE.

Assuming arguendo that the Government did not improperly suppress Watson's Greenbelt file, Sweeney's trial counsel was constitutionally deficient in failing to ask the court to review said file.

During the cross examination of Watson, Kiersh attempted to impeach Watson by attempting to discover the reasons why the Government failed to a give Watson a §5K1.1 letter.  Watson explained the failure of the government to provide him with a §5K1.1

---

[17] Further, counsel was ineffective for not challenging on appeal the trial court's improper *in camera* procedure used with respect to the sealed material.  Although the trial court viewed the evidence *in camera*, the court failed to keep a transcribed record of the *in camera* proceedings, and failed to articulate a compelling interest for reviewing the *Brady* material *in camera* and subsequently sealing the material.  No findings were made regarding the requested material, and no record was released to the defense indexing the material presented to the court.  Accordingly, the trial court failed to follow the proper procedure in regard to *in camera* review of *Brady* material.  *See In re Sealed Case*, 151 F.2d 1059 (D.C. Cir. 1998).  The court's improper procedure with regard to the sealed material compounded the error in suppressing *Brady* evidence, and rendered the trial fundamentally unfair.

letter by stating that Ms. Wilkerson, the Assistant U.S. Attorney assigned to his case, simply did not like him.  (Tr. 2-12-01 (AM), pp. 19-21).

Pressed further on this point Watson explained that Ms. Wilkerson's disliked him because he had pointed out, in front of another U.S. Attorney, that Wilkerson had failed to advise another Assistant U.S. Attorney about information that Watson had, which failure by Wilkerson had caused that other U.S. Attorney to offer lenient plea deals to the defendants in that case. (Tr. 2-12-01 (AM), p. 44).

Kiersh, and for that matter the defense as a whole, lacking any information with which to contradict Watson, during cross-examination was forced to accept Watson's answers to his questions on cross-examination.

A co-defendant's attorney apparently dissatisfied with the cross-examination of Watson, at the conclusion of the testimony on February 12, 2001, asked that the Government review Watson's Greenbelt file to determine if there was any discoverable material contained within said file concerning Watson, as set forth below.

> **MR. DAVIS**:  AND I WOULD ASK THAT THE UNITED STATES ATTORNEY'S OFFICE REVIEW THAT FILE.
>
> **THE COURT**:  IF THEY HAVE NOT DONE THAT, AND I WOULD ASK THAT THEY CALL THE PROSECUTOR'S OFFICE IN GREENBELT TO FIND OUT WHETHER OR NOT THERE IS ANYTHING THAT COULD BE CHARACTERIZED AS, QUOTE, *BRADY* MATERIAL IN THEIR FILE. OTHER THAN THAT --
>
> **MR. DAVIS**:  THANK YOU, YOUR HONOR.
>
> **THE COURT**:  -- THAT'S THE EXTENT OF THE GOVERNMENT'S OBLIGATION.  OKAY?

(Tr. 2-12-01 (AM), p. 78).

In response to the court's direction, the Government not only called the U.S. Attorney's office in Greenbelt, the Government obtained and reviewed Watson's Greenbelt file.

The Government brought Watson's Greenbelt file to court and represented to both the court and the defense, that Watson's Greenbelt file did not contain anything that even " . . . suggests any *Brady* or Jencks material in the file." Following the Government's representations the following took place:

> **THE COURT**:  YOU MEAN THE FILE FROM GREENBELT?
>
> * * *
>
> **THE COURT**:  DO YOU WANT TO HAVE IT MADE PART OF THE COURT RECORD?
>
> **MR. KIERSH**:  YES, YOUR HONOR.
>
> **THE COURT**:  ALL RIGHT.
>
> **MR. KIERSH**:  I ASK THAT IT BE PLACED UNDER SEAL AND MADE A PART OF THE RECORD.
>
> **THE COURT**:  WE WILL PLACE IT UNDER SEAL AND MARK IT AS COURT EXHIBIT, I BELIEVE, NUMBER 3.  IS THAT CORRECT, MR. WEST?
>
> **THE DEPUTY CLERK**:  I BELIEVE SO, YOUR HONOR.
>
> **MR. ZUCKER**:  YOUR HONOR, I CONCUR IN THAT, BUT I'D ALSO ASK THAT THE COURT --
>
> **THE COURT**:  WAIT A MINUTE.
>
> **THE DEPUTY CLERK**:  NUMBER 5, YOUR HONOR.
>
> **THE COURT**:  NUMBER 5.  ALL RIGHT.  NUMBER 5.  **I DO NOT INTEND TO REVIEW IT IN CAMERA.**

**MR. ZUCKER**:  THAT WOULD BE MY REQUEST.

**THE COURT**:  ALL RIGHT.  ARE WE READY FOR THE JURY?

(Tr. 2-13-01(AM), pp. 6-7).

Kiersh, instead of asking the trial court to review the Greenbelt file to determine if it contained any *Brady, Giglio* or *Jencks* material just asked that the file be made part of the record and placed under seal.  One wonders what was the point of having Watson's file made part of the record in the case if no one, other than the Government, was going to review the file.

The Government's production of Watson's Greenbelt file is, in and of its self, curious as the court simply asked the Government to call the U.S. Attorney's office in Greenbelt to determine if the filed contained anything that might be characterized as *Brady.*  The court further stated that this was the extant of the Government's obligation.

The only reason for the Government to have produced Watson's Greenbelt file would be if the Government were unsure if the file contained *Brady* material.

Another case discussing the obligations of the Government to produce material to the defense stated:

> Although the notes are not subject to disclosure under the Jencks Act, fundamentals of due process require the government to produce them if the evidence they contain is exculpatory or would be of value in impeaching government witnesses. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194 (1963). Uncertain whether the notes were exculpatory or of impeachment value, the government properly submitted them to the district court for *in camera* inspection. *Pennsylvania v. Ritchie,* 480 U.S. 39, 58-62, 107 S.Ct. 989, 1002-03, 94 L.Ed.2d 40 (1987). *United States v. Mora,* 994 F.2d 1129, 1139 (5th Cir. 1993).

Therefore the only reason for the Government would have produced Watson's Greenbelt file, to the court, was if the Government was uncertain whether or not it contained *Brady* or *Giglio*.  But there was no way the Government could have been uncertain as the information was without doubt *Brady* and *Giglio*.

As argued herein, Watson's Greenbelt file contained *Brady* and *Giglio* material.

Sweeney suffered prejudice as a direct result of his trial counsel failing to request that the trial court review Watson's Greenbelt file.

The material contained within Watson's Greenbelt file would have directly contradicted Watson's claims that the reason he was not given a §5K1.1 letter was the result of personal animus on the part of the Assistant U.S. Attorney and would have shown instead that it was the result of Watson lying to the Government.

Defense counsel's failure to seek review by the trial court of the Greenbelt file, which review would have resulted in the *Brady* and *Giglio* material contained therein being disclosed to the defense, permitted Watson to maintain his version of events during cross examination.  As a result of defense counsel not having the material in the Greenbelt file, the jury instead of seeing Watson impeached as a liar, willing to say anything to help himself, the jury saw Watson maintain his version of events, and his credibility, in the face of cross-examination by several lawyers unable to contradict his claims.

Moreover, defense counsel, by failing to request that the trial court review Watson's Greenbelt file foreclosed the possibility of having the file reviewed on appeal, as defense counsel agreed with the trial court that Watson's Greenbelt file did not need to be reviewed by the court.

Tacit recognition of the inability to obtain appellate review of the Greenbelt file is in the omission of any reference to Watson, much less Watson's Greenbelt file, in the Appellate brief filed in this case.

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

### 3. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO CHALLENGE ON APPEAL THE TRIAL COURT'S *BRADY, GIGLIO,* AND JENCKS ACT RULINGS WITH REGARD TO SPECIFIC PORTIONS OF THE SEALED RECORD

On May 29, 2003, appellate counsel Steven R. Kiersh, Esq. ("Kiersh"), along with counsel for Petitioner Sweeney's fellow appellants, filed a Motion to Allow Counsel to Review Specific Sealed Portions of the Trial Record [Case No. 02-3015, ECF No. 751872].  In their motion, counsel sought access to sealed portions of the trial record in order to mount a challenge to the trial court's rulings under *Brady v. Maryland*, 373 U.S. 83 (1963), and the Jencks Act, 18 U.S.C. § 3500.  The United States Court of Appeals for the District of Columbia Circuit ("D.C. Cir.") denied the motion, instructing counsel that they must identify the specific rulings believed to be erroneous, and present the issue in the appellants' brief, rather than by motion.  *See* Order dated 8/28/2003 [Case No. 02-3015, ECF No. 769196].

Here, prejudice from the failure to pursue this claim on direct appeal is presumed because of the Government and the trial court's interference by placing the material under seal.  *See Strickland,* 466 U.S. at 692 ("In certain Sixth Amendment contexts, prejudice is presumed… [including] various kinds of state interference with counsel's assistance");   *United States v. Cronic*, 466 U.S. 648, 659 and n.25 (1984).  Counsel was unable to adequately challenge the suppression of the sealed material on appeal because

counsel needed access to the sealed portion of the trial record in order to establish the materiality of the undisclosed evidence – an essential element of the prospective claim on appeal. *See Brady*, 373 U.S. at 87.

Even if a showing of prejudice were required in this case, Petitioner Sweeney's claim still prevails, as the prejudice here is clear. Had appellate counsel raised this critical issue on appeal, the Court of Appeals would have reviewed the material *in camera* and found that *Brady* and Jencks Act violations had occurred, and were widespread. *See* Order dated 8/28/2003 [Case No. 02-3015, ECF No. 769196] ("appellants must identify [in their appellate brief] the specific rulings that they believe are erroneous, and if they present a colorable claim, this court may review the sealed material *in camera* to determine whether a *Brady* or Jencks Act violation has in fact occurred."); 18 U.S.C. § 3500(c); *United States v.  v. Williams-Davis,* 90 F.3d 490, 514 (D.C. Cir. 1996); *United States v. Brooks,* 966 F.2d 1500, 1505 (D.C. Cir. 1992). As detailed *supra* in Ground One, Petitioners had more than a colorable claim with regard to the erroneous rulings.  Had the Court of Appeals reviewed the material, and discovered the pattern of *Brady* and Jencks violations that pervaded the record at trial, the error would have resulted in reversal on appeal.  Appellate counsel's failure to challenge this critical issue on appeal was deficient, and that deficiency prejudiced Petitioner Sweeney; therefore, his appellate assistance was unconstitutionally ineffective. *See Strickland*, 466 U.S. at 687.[18]

---

[18] Further, counsel was ineffective for not challenging on appeal the trial court's improper *in camera* procedure used with respect to the sealed material.  Although the trial court viewed the evidence *in camera*, the court failed to keep a transcribed record of the in camera proceedings, and failed to articulate a compelling interest for reviewing the *Brady* material *in camera* and subsequently sealing the material.  No findings were made regarding the requested material, and no record was released to the defense indexing the material presented to the court.  Accordingly,

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

### 4. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO SEEK APPELLATE REVIEW OF COURT'S RULING WITH REGARD TO SEALED MATERIAL RELATING TO JAMES MONTGOMERY

In § 10, of pages 13-15, of appellate counsel's Motion to Allow Counsel to Review Specific Sealed Portions of the Trial Record, which was denied by the D.C. Circuit, counsel argued that the trial court's ruling was erroneous with regard to the material the court sealed relating to Montgomery. The motion argued that the trial court's ruling that the material it sealed was not *Brady, Giglio*, or Jencks material was erroneous. Appellate counsel further argued that F.B.I. Special Agent Lisi's notes contained *Brady* or Jencks material.

Now that Petitioner Sweeney has access to the material that the trial court sealed with regard to James Montgomery, he is able to use that material to demonstrate the prejudice that he suffered as a result of his appellate counsel failing to seek appellate review of the trial court's holding in his appellate brief as instructed by the D.C. Circuit in its order denying the motion to unseal.

The material sealed by the trial court contains impeachment evidence related to the murder of Timothy Benton. Agent Lisi's handwritten notes reveal that Montgomery described the murder of Benton, and identified Carson and Proctor as the perpetrators. The notes state as follows:

> 1994 Chin [Carson] borrowed Grey Cadillac
> Said he & Poo-Poo [Proctor] killed Tim [Benton] in it.

---

the trial court failed to follow the proper procedure in regard to *in camera* review of *Brady* material. *See In re Sealed Case*, 151 F.2d 1059 (D.C. Cir. 1998). The court's improper procedure with regard to the sealed material compounded the error in suppressing *Brady* evidence, and rendered the trial fundamentally unfair.

> Tim owed Poo-Poo $
> Chin was driving
> Poo-Poo shot Tim from
> Behind, he just sat there like he was DAZED

Ex. 9 (Agent Lisi's Notes of James Montgomery Interview).

Critically, it was Maurice Proctor and James Montgomery who were charged with the murder of Timothy Benton. What Montgomery did in his interview was substitute Carson for himself. The probative value of Montgomery's statement was priceless for its impeachment value. Defense counsel could have utilized that materially false and misleading narrative, contained within the Agent's notes, to further support the argument that Montgomery was not only a liar, but an incorrigible liar. *See* Tr. 3/15/01 (AM), pp. 10-13.

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

### 5. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO SEEK APPELLATE REVIEW OF TRIAL COURT'S RULING WITH REGARD TO SEALED MATERIAL RELATING TO ARTHUR RICE

Appellate counsel's failure to seek appellate review of the trial court's ruling with regard to the sealed material relating to Arthur Rice constituted ineffective assistance. At trial, the Court had reviewed the FBI 302 pertaining to Arthur Rice dated January 27, 1999, and stated that it contained no information that would permit it to be characterize as *Brady* material, and that it was clearly not Jencks material. (Tr. 4/24/01 (PM), p. 3). The trial court failed to state a reason why the 302 did not constitute a Jencks statement and information that should be disclosed to defense counsel.

If appellate counsel had raised the foregoing, and a proper review of Rice's 302 had been done by the Court of Appeals, the following would have been discovered, and counsel would have prevailed pursuant to the trial court's abuse of discretion. The cumulative effect of all the errors is such that there is a reasonable probability that, had the evidence not been sealed and instead released to the defense, the results of the proceedings would have been different.

Arthur Rice was a jailhouse witness who was allegedly an associate of the defendants. Even though Rice did not testify as to who committed the murder of Leonard "Slick" Hyson, and Maurice Hallman, the previously sealed FBI 302 reveals that Rice told Agents Vincent Lisi and Kevin White, in the presence of AUSA Kenneth Wainstein, that defendants Martin and Carson killed Hyson and Hallman. *See* Ex. 5 (Arthur Rice 302 at p. 5).

The foregoing contradicts the government's theory of prosecution that Carson and James Montgomery were the individuals who killed Hallman and Hyson. Montgomery also testified, corroborating the government's theory of prosecution, placing himself as one of the killers of Hallman and Hyson. (Tr. 3/12/01 (AM), pp. 55-62).

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

## 6. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO SEEK APPELLATE REVIEW OF COURT'S RULING WITH REGARD TO SEALED MATERIAL RELATING TO ANDRE MURRAY

As with all of the other materials place under seal by the trial court in this case Petitioner Sweeney's appellate counsel failed to include a request to have the appellate court review the rulings of the trial court which sealed the material.

During trial, Montgomery testified that he and Carson killed Hallman and Hyson, and prior to that, Hallman had a shoot-out with some New Yorkers.  The previously sealed detective notes of interviews with Arthur Murray reveal that Murray stated that some New Yorkers killed Hallman and Hyson.  This contradicts Montgomery's testimony regarding who killed Hallman and Hyson, while at the same time; Montgomery's testimony corroborates Murray's statement because Montgomery was fully aware that Hallman had a shoot-out with some New Yorkers.  *See* Ex. 10 (Detective Notes of Arthur Murray Interview Regarding Hallman and Hyson Murder).  Once again, all this contradiction might have left doubt in the jury's minds, towards the credibility of Montgomery, who was the government's key witness.

### 7. SWEENEY WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE BY THE FAILURE TO CALL EXPERT WITNESS AT TRIAL

At the outset of this case, Petitioner Sweeney and his immediate family advised trial counsel that Petitioner Sweeney had been diagnosed with Tourette Syndrome ("TS").  Tourette syndrome is a neurological disorder characterized by repetitive, stereotyped, involuntary movements and vocalizations called tics.  Tics often become more severe with excitement or anxiety and lessen during calm, focused activity.  *See* Tourette Syndrome Fact Sheet, National Institute of Neurological Disorders and Stroke at the National Institute of Health,

http://www.ninds.nih.gov/disorders/tourette/detail_tourette.htm  (last visited November 28, 14).

In preparation for trial, trial counsel retained expert witness Jonathan Pincus, M.D., a distinguished professor in the field of neurology.  Dr. Pincus has been qualified

as an expert and testified on numerous occasions, in state and federal courts. Dr. Pincus reviewed all of Petitioner Sweeney's available medical records, and on December 10, 1999, conducted a clinical evaluation of Petitioner Sweeney, during which he determined that Petitioner Sweeney suffers from Tourette Syndrome. At trial, Dr. Pincus would have explained the nature and symptoms of Tourette Syndrome to the jury, and described the individual characteristics in Petitioner Sweeney's case. Further, Dr. Pincus would have told the jury that Petitioner Sweeney's tic symptoms during trial would typically be less pronounced than those displayed by him five to ten years prior. Most importantly, Dr. Pincus would have testified that in his opinion, a high-stress event (such as a violent incident) would typically trigger the display of more pronounced tic symptoms in Petitioner Sweeney. *See* Ex. 11 (Dr. Pincus Affidavit).

This testimony was critical to Petitioner Sweeney's defense, as it would have served as exculpatory evidence with regard to the triple murder of Alonzo Gaskins, Darnell Mack, and Melody Anderson, in Temple Hills, Maryland.[19] Dr. Pincus' testimony would have corroborated the testimony of several other witnesses who testified that Sweeney could be easily identified by his disorder. James Montgomery, who was with Petitioner Sweeney on the night of the murder, testified that Sweeney's T.S. was highly active and noticeable that night. (Tr. 3/14/01 (AM) at p. 45; 3/14/01 (PM) at pp. 74-77; 3/15/01 (PM) at p. 81). Dorene Key also testified of that she was aware for years that Petitioner Sweeney has T.S., and that his symptoms are noticeable. (Tr. 4/23/01 (PM) at p. 50). Dwight Deloach, the arresting officer in the triple murder, also testified

---

[19] As described *supra*, it was clear from the record that the Government's case against Petitioner Sweeney was weak: the credibility of nearly all of their witnesses was impeached by their admissions of prior commissions of perjury, or providing false statements to law enforcement. Further, their testimony often conflicted with that given by other witnesses, as well as with other evidence.

that Petitioner Sweeney's T.S. symptoms were noticeable.  (Tr. 4/24/01 (AM) at pp. 23-

4).  Anthony Pryor, the alleged victim of a kidnapping and attempted murder, testified

that he was fully aware of Petitioner Sweeney's T.S., and that if Sweeney had been when

of the perpetrators, Pryor would have recognized him by his T.S. symptoms.  (Tr. 6/11/01

(AM) at p. 25).  Finally, Shaheem Johnson testified that even though he did not know

Petitioner Sweeney personally, Sweeney was easily recognizable because of his disorder.

(Tr. 6/12/01 (PM) at pp. 68-9).

   Critically, the witness to the triple murder, Cinama Hawkins, testified that neither

of the assailants displayed any of the physical or verbal tics that are typical of Tourette

Syndrome.[20]  (Tr. 4/2/01 (AM) at p. 75; 4/2/01 (PM) at p. 7).   There is a reasonable

probability, given Ms. Hawkins' description of the triple murder assailants, that Dr.

Pincus' testimony would have provided the jury with reasonable doubt that Petitioner

Sweeney committed the triple murder.  Accordingly, trial counsel's failure to call Dr.

Pincus at trial rendered his assistance constitutionally ineffective under *Strickland*.  *See*

*Strickland*, 466 U.S. at 695.

### 8. SWEENEY'S TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO RETAIN CO-COUNSEL PURSUANT TO THE TRIAL COURT'S ORDER

   Petitioner Sweeney, along with co-defendant Carson, were both indicated for

capital crimes in this case.  They were, therefore, pursuant to 18 U.S.C. § 3005, each

appointed two attorneys to represent them in this case.

   18 U.S.C. § 3005 states in part:

---

[20] The exculpatory nature of Dr. Pincus' testimony would have been bolstered by the testimony that in Ms. Hawkins' original description of the assailants, which she gave to the investigating officer at the scene, she described both men as about six feet tall.   (Trial Tr. 6/12/01 at pp. 60-61, 65, 70-72).  Mr. Sweeney is not nearly that tall.

> Whoever is indicted for treason or other capital crime shall be
> allowed to make his full defense by counsel; and the court before
> which the defendant is to be tried, or a judge thereof, shall promptly,
> upon the defendant's request assign 2 such counsel, of whom at least
> 1 shall be learned in the law applicable to capital cases....

18 U.S.C. § 3005 (2000).

Not only was Sweeney entitled to have two attorneys represent him as a result of
the indictment in this case, but also the trial court was obligated to inform him of this
right.

> Cunningham contends that, in any event, the trial court should have
> advised him of his right under 18 U.S.C. § 3005 to have a second
> counsel appointed. An accused's right to additional counsel in a
> capital case should not, of course, be lost solely because of lack of
> awareness of its existence. Therefore, the trial court here should
> have advised Cunningham of his rights under § 3005.  We presume
> prejudice from the failure of the trial court so to inform him.

*Smith v. United States,* 353 F2d 838, 846-47, 122 U.S. App. D.C. 300, *cert. denied* 86
S.Ct 1350, 384 U.S. 910, 16 L.Ed 2d 362 *cert. denied* 86 S.Ct 1867, 384 U.S. 974, 16
L.Ed 2d 684 (1965).

Sweeney was, however, never advised of his right to have two attorneys represent
him in this case by the trial court.  At Petitioner Sweeney's arraignment on October 2,
1998, the Court responded to a request, by Sweeney's then-attorney Mr. O'Toole, to have
the court appoint a particular attorney to represent Sweeney along with Mr. O'Toole.
The Court stated, "I have asked Mr. Kramer to make an appointment of the second
counsel to assist you, and Mr. Kramer will make that decision." (Tr. 10/2/1998, pp. 11-
12).

Thereafter at the conclusion of the October 2, 1998, arraignment the trial court
stated ". . .  I note the presence of Mr. Kramer here in court and the obligation he has just
incurred to make at least two appointments." (Tr. 10/2/1998, p. 20).

70

Even though the trial court appointed two attorneys to represent Sweeney, the court at no point ever advised or otherwise informed Sweeny of his right to be represented by two attorneys, pursuant to 18 U.S.C. § 3005.

Eventually Steven Kiersh and Paul DeWolfe were appointed to represent Sweeney in this case before the Attorney General had decided whether or not to seek the death penalty against Sweeney.

By December 1999, the Attorney General had chosen not to seek the death penalty against Sweeney and Carson.  During a hearing on December 16, 1999, the issue of the continued representation of Sweeney and Carson by two attorneys each was addressed by the trial court.

At this hearing the trial court stated "Well, one of the consequences of the decision made by the Attorney General not to seek the death penalty is that this case is no longer a capital case, and the law no longer authorizes two counsels for any defendant. * * *" (Tr. 12/19/99, pp. 12-13).

It was error for the trial court to find that the decision of the Attorney General not to seek the death penalty in this case, ended Sweeny's entitlement to two attorneys.  As the clear language of 18 U.S.C. § 3005 states, the entitlement to two attorneys is determined at the time of indictment and not by any subsequent decision of the Attorney General whether or not to seek the death penalty in the case.

> In this case, the current language of § 3005 is clear — the requirement of two attorneys is triggered upon indictment. The statute begins with the phrase "Whoever is *indicted* for ... *capital crime* ..." (emphasis added). 18 U.S.C. § 3005 (2000). This language provides the statutory trigger for the section, and the text is clear that the statute becomes applicable upon *indictment* for a capital crime and not upon the later decision by the government to seek or not to seek the death penalty. As discussed above, § 844(i) qualifies as a

capital crime because the death penalty is the maximum sentence that could be imposed on Boone.

*United States v. Boone,* 245 F.3d 352 (4th Cir 2001)

Mr. Kiersh, instead of arguing that the action of the Attorney General in not seeking the death penalty was irrelevant to Sweeney's right to be represented by two attorneys, simply remained silent on this issue at the hearing.

Moreover, the trial court's misstatement of the law that Sweeney was no longer entitled to two attorneys deprived him of his rights pursuant to 18 U.S.C. § 3005, and, therefore, prejudice should be presumed from the trial court's error. *See Smith v. United States,* 353 F2d 838, 122 U.S. App. D.C. 300, *cert. denied* 86 S.Ct 1350, 384 U.S. 910, 16 L.Ed 2d 362 *cert. denied* 86 S.Ct 1867, 384 U.S. 974, 16 L.Ed 2d 684 (1965).

One of the attorneys for Carson did, however, address the issue of the continued representation of Carson by two attorneys, but instead of arguing that this right attached upon indictment for a capital crime, pursuant to 18 U.S.C. § 3005, argued that:

> Your Honor, in this case we are talking about a ten-year conspiracy with anywhere from five to eight homicides and numerous other complicated violent charges against individual defendants.
>
> This is as complex a case as I think we can run into. It may not be Microsoft, but as a criminal case goes, it doesn't get too much more complicated that this in the United States District Court here. And I think that this court can look at this case and decide that it merits two attorneys for some of the defendants, particularly the ones who they were considering capital defendants, because of the number and the nature and the time period of the charges against them. And I would ask the court to do so . . .."

(Tr. 12/19/99, p. 13-14).

The trial court did not rule on the issue of continued representation by two attorneys for Carson and Sweeney at that time but asked that additional information be submitted addressing this issue.

Thereafter by way of a letter, filed with the trial court on January 3, 2000, written by Carson's counsel and signed by said attorney on behalf of Sweeney's counsel, set out the justification for the continued need for two attorneys to represent both Sweeney and Carson. The main ground advanced in the January 3, 2000, letter was the "extremely difficult" nature of the case as it pertained to Carson and Sweeney. This is simply arguing the rationale that supports the need for 18 U.S.C. §3005. As "[t]he provision was meant to insure that a sufficient number of attorneys would be appointed so the defense would not suffer from insufficient manpower. *See Crum v. Hunter,* 151 F.2d 359 (10th Cir. 1945) *cert. denied*, 325 U.S. 850, 66 S.Ct 1117, 90 L.Ed. 1623 (1946); *see also Smith,* 353 F.2d at 846-47.

Another justification contained within the letter for the continued representation of Sweeney and Carson by two attorneys each, was that:

> Dismissal of the capital attorneys is not likely to result in significant cost savings. Because there are so many serious charges over such a long period of time, to this point each defendant's counsel have divided the tasks of investigation, legal research, and legal writing between them. If only one attorney per defendant is permitted to remain in the case, he will have to spend a considerable amount of time familiarizing himself with the facts and issues previously assigned to his co-counsel.

Ex. 12 (December 28, 1999, Letter, at p. 2).

The trial court, after considering the matter agreed and by way of an order, dated January 4, 2000, determined that Sweeny's and Carson's cases were " . . . 'extremely

difficult cases where . . . in the interest of justice' appointment of co-counsel is appropriate."  (Order (TPJ), dated January 4, 2000 [#252]).

Sometime thereafter, Paul DeWolfe, one of Sweeney's attorneys, was appointed as the Public Defender for Maryland, and withdrew as co-counsel for Sweeney.

On September 8, 2000, (a little over two months before jury selection was to begin) the trial court and Sweeney's remaining attorney all believed, that the interests of justice required that Sweeney be represented by two attorneys, otherwise why would the trial court have appointed attorney Leonard L. Long, Jr., to replace Mr. DeWolfe, as one of Sweeney's attorneys.

The Government, on October 24, 2000, filed, under seal, a motion to disqualify attorney Long, as one of Sweeney's attorneys.  At a hearing on November 13, 2000, (jury selection began in this case on November 15, 2000) the trial court granted the government's motion and removed attorney Long as co-counsel for Sweeney.  (Tr. 11/13/00, p. 13).

After the trial court disqualified Long, at the November 13, 2000, hearing, Sweeney's remaining attorney Mr. Kiersh argued that:

> **Mr. Kiersh**: You Honor, if I can make some other related representations, not with respect to Mr. Long, but **this creates a very significant prejudice to me and my ability to go forward**.  I am not moving for a continuance right now, but I am just thinking this through.
>
> When we were in court at the motions hearing back in September, the Government requested that an agent be allowed to sit at their table.  I asked the court if my investigator, who has been with me on this case working around the clock for the past two years on this case – if he could be seated with me at   the table.  And the court said, "Well, that is a problem because if I allow you to do it, then everyone else is going to ask to have their investigators."
>
> I have gone to each defense attorney individually and said, "Would you waive any request to have your investigators to be

present?"  And they all have.  They all said they don't want their
investigators to be present.  I am the only one making that request.
And if Mr. Long is now being removed from the case, I am terribly
handcuffed on what I can do.

> **The Court**: Why?

> **Mr. Kiersh**: Because so much of this case is directed at Mr.
Sweeney.  We have cabinets and cabinets filled with information.
That's why Mr. Long came into it.  Having my investigator there,
who knows this case inside out, would be not only of assistance, but
necessary, given the amount of evidence the Government is going to
be directed towards Mr. Sweeney and what I have to do to be able to
sit there and confront it.  I am having a very able co-counsel being
removed from the case, and replacing him with my investigator
doesn't seem to me to prejudice anyone.

> **The Court**: Well, there may be an occasion at which it
would be appropriate for you to have your investigator there.  I don't
think your investigator has to be there for the duration of the case
and certainly not at this stage of the case.

> * * *

> **Mr. Kiersh**: Very well.  And then I would also note for the
record on behalf of Mr. Sweeney our objection to Mr. Long being
disqualified from the case.

(Tr. 11/13/2000, pp. 13-15) (emphasis added).

Following the removal of Mr. Long as co-counsel for Sweeney and with jury

selection set to begin in two days, Mr. Kiersh did not seek a continuance of the trial of

this case.  This is particularly surprising in that Kiersh had told the trial court that the

removal of attorney Long created "**a very significant prejudice to me and my ability to**

**go forward.**"  (Tr. 11/13/2000, pp. 13-15) (emphasis added).  One would have thought

he would have been more concerned about the prejudice to Mr. Sweeney, but maybe that

is what he meant.

Mr. Kiersh had for approximately eleven months before the removal of Mr. Long

worked with another lawyer on Sweeney's case.  Yet two days before jury selection

begins Kiersh is now representing Sweeney alone, and instead of asking the court to

appoint another attorney to assist him, in a case that the trial court had already determined

that as a result of the extreme difficulty of the case the interests of justice required that Sweeney be represented by two attorneys.

Moreover, during the hearing on the removal of Mr. Long, Mr. Kiersh failed to argue that Sweeny was entitled to two attorneys pursuant to 18 U.S.C. § 3005, as Sweeney had been indicted for a capital offense.

In addition, the trial court did not advise Sweeney, at the time that it removed Mr. Long, of Sweeney's right under 18 U.S.C. § 3005 to be represented by two attorneys. *See Smith,* 353 F.2d at 846-47.

That Sweeney's trial counsel was overwhelmed by this case which resulted in Sweeney being convicted at trial.  Sweeney's' trial counsel admitted he was prejudiced by the removal of co-counsel and nothing was done to address that prejudice.

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

### 9. SWEENEY WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL FOR THE FAILURE TO REQUEST A CONTINUANCE TO OBTAIN CO-COUNSEL

While Sweeney's remaining trial counsel recognized the "**very significant prejudice**" that was caused by the trial court's removal of his co-counsel, he took no steps to remedy the prejudice that the removal of Mr. Long created.  Instead of asking for a continuance and for appointment of co-counsel to assist him in an extremely difficult case which the interests of justice required that Sweeney be represented by two attorneys, he asked simply that his investigator be allowed to sit with him at counsel table and when that request was deferred by the trial court, Kiersh merely went forward with the case in spite of the prejudice that his client would suffer as a result of Mr. Kiersh having to learn

and manage the "cabinets and cabinets filled with information," which was one of the reasons why the court had seen fit to appoint two attorneys to represent Sweeney in the case.

Mr. Sweeney suffered prejudice in this case by Mr. Kiersh's failure to seek a continuance to obtain co-counsel in this case. The trial court had already made a finding the case was too difficult for one attorney and that the interests of justice required that Sweeney be represented by two attorneys in this case. Kiersh himself recognized that Sweeney was prejudiced by the removal of Mr. Long, yet he failed to request a continuance or that the court conforms with its order of January 4, 2000, and appoint another attorney to replace Mr. Long.

Moreover Kiersh, by failing to request that Sweeney continued to be represented by two attorneys, as is his right under 18 U.S.C. § 3005, deprived Sweeney of this right, all of which resulted in prejudice to Sweeney.

In addition, Kiersh failed to argue at any point in the case that Sweeney's right to be represented by two attorneys attached at the time of his indictment for a capital offense and that the subsequent decision of the Attorney General not to seek the death penalty was irrelevant to his right to be represent by two attorneys.

That Sweeney's trial counsel was overwhelmed by this case which resulted in Sweeney being convicted at trial. Sweeney's' trial counsel admitted he was prejudiced by the removal of co-counsel and nothing was done to deal with that prejudice.

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

**10. SWEENEY WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS COUNSEL FAILED TO ARGUE THAT HE WAS ENTITLED TO TWO ATTORNEYS PURSUANT TO 18 U.S.C. §3005**

Petitioner Sweeney's attorneys should have argued at both the December 16, 1999, and at the November 13, 2000, hearings that the clear language of 18 U.S.C. §3005 states that the entitlement to two attorneys is determined at the time of the indictment and not by any subsequent decision of the Attorney General whether or not to seek the death penalty in a case.

> In this case, the current language of § 3005 is clear — the requirement of two attorneys is triggered upon indictment. The statute begins with the phrase "Whoever is *indicted* for ... *capital crime...*" (emphasis added). 18 U.S.C. § 3005 (2000). This language provides the statutory trigger for the section, and the text is clear that the statute becomes applicable upon *indictment* for a capital crime and not upon the later decision by the government to seek or not to seek the death penalty. As discussed above, § 844(i) qualifies as a capital crime because the death penalty is the maximum sentence that could be imposed on Boone.

*United States v. Boone,* 245 F.3d 352 (4th Cir 2001).

Mr. Kiersh failed to argue at any point in this case that the action of the Attorney General in not seeking the death penalty was irrelevant to Sweeney's right to be represented by two attorneys.

This failure resulted in Kiersh not properly advising Sweeney that he had a right to be represented by two attorneys in this case and not bringing to the trial court's attention the authority that supports the right of Sweeney to be represented by two attorneys throughout this case.

As a result of Kiersh's failure in this regard, Sweeney was forced to go to trial, in an extremely difficult case in which the interests of justice required that he be represented by two attorneys, with only one attorney.  Moreover the attorney that Sweeny was forced

to go to trial with had stated, two days before jury selection began, that he had suffered "a very significant prejudice" by the removal of co-counsel.

In sum, Petitioner Sweeney has shown that trial counsel's error clearly deprive him of a statutory right to representation by co-counsel, but he has also shown that throughout trial and on appeal, counsel's errors were so serious as to deprive Sweeney of a fair trial.  Counsel's conduct, especially as it was hampered by the removal of co-counsel on the eve of trial, so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.  Accordingly, relief must be granted.

### 11. COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT AT TRIAL AND FOR NOT CHALLENGING ON APPEAL THE TRIAL COURT'S IMPROPER *IN CAMERA* PROCEDURE USED WITH RESPECT TO THE SEALED MATERIAL

Counsel for Petitioner Sweeney was ineffective for not objecting at trial and for not challenging on appeal the improper *in camera* procedure used by the trial court with respect to the material that it reviewed under seal.  Throughout the trial, the Court reviewed material submitted to it by the Government *ex parte* and under seal.  The D.C. Circuit has recognized that "*in camera, ex parte* submissions 'generally deprive one party to a proceeding of a full opportunity to be heard on an issue,' and thus should only be used where a compelling interest exists."  In re *Sealed Case*, 151 F.2d 1059 (D.C. Cir. 1998) (*citing* In re *John Doe, Inc.*, 13 F.3d 633, 636 (2d Cir.1994); In re *John Doe Corp.*, 675 F.2d 482, 490 (2d Cir.1982)).  Further, in *In re Sealed Case*, the D.C. Circuit instructed that once the compelling interest in keeping the material secret has been demonstrated, the proper procedure for conducting *in camera, ex parte* proceedings includes keeping a transcribed record of what transpired in any *in camera* proceeding, in

order to preserve the excluded party's ability to contest decisions made on the basis of the sealed material.

At trial in this case, although the trial court viewed the sealed *ex parte Brady* evidence submitted by the Government *in camera*, the trial court failed to articulate a compelling interest for reviewing the *Brady* material *in camera* and subsequently sealing the material, and further, failed to keep a transcribed record of the *in camera* proceedings. No findings were made regarding the requested material, and no record was released to the defense indexing the material presented to the court. Accordingly, the trial court failed to follow the proper procedure in regard to *in camera* review of *Brady* material. *See In re Sealed Case*, 151 F.2d 1059 (D.C. Cir. 1998). The court's improper procedure with regard to the sealed material compounded the error in suppressing *Brady* evidence, and rendered the trial fundamentally unfair. Accordingly, counsel should have raised this issue on appeal.

There is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different.

## 12. SWEENEY WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE CUMULATIVE ERROR DOCTRINE

Assuming arguendo that no single error on the part of Sweeney's counsel denied him effective assistance of counsel, counsel's errors, when taken as a whole, denied Sweeney effective assistance of counsel.

From a review of the law of this circuit it does not appear that this court has decided if the prejudice prong of the *Strickland* test for ineffective assistance of counsel can be met as a result of the cumulative errors of counsel.

The 7th Circuit has approved of this doctrine stating:

In order to obtain relief under *Strickland,* it is not sufficient that a petitioner can point to her attorney's deficient performance. In addition, she must be able to demonstrate that the complained of deficiency resulted in prejudice, or, as discussed above, a "reasonable probability" that in the absence of error the result of the proceedings would have been different, *Strickland,* 466 U.S. at 694, 104 S.Ct at 2068, and was fundamentally unfair or unreliable. *Lockhart,* ___ U.S. at ___, 113 S.Ct. at 842-43. In making this showing, a petitioner may demonstrate that the cumulative effect of counsel's individual acts or omissions was substantial enough to meet *Strickland*'s test. *United States ex rel. Kleba v. McGinnis,* 796 F.2d 947 (7th Cir. 1986; *Montgomery,* 846 F2d. at 416.

*Williams v. Washington,* 59 F.3d. 673, 682 (7th Cir. 1995).

The 9th Circuit has also found that the prejudice can be found from the cumulative errors of counsel holding that:

We offered the cautionary comment that [i]f counsel is charged with multiple errors at trial, absence of prejudice is not established by demonstrating that no single error considered alone significantly impaired the defense — prejudice may result from the cumulative impact of multiple deficiencies. *Id.* Thus, the law in this Circuit is clear that where an allegation of ineffective assistance by counsel is premised on specific acts or omissions of counsel, the allegation must be buttressed by a showing of injury or prejudice to the defendant. And even where, as here, several specific errors are found, it is the duty of the Court to make a finding as to prejudice, although this finding may either be "cumulative" or focus on one discrete blunder in itself prejudicial.

*Ewing v. Williams,* 596 F.2d 391, 395-396 (9th Cir. 1979).

The 2nd Circuit has also approved of this doctrine stating that:

Since Rodriguez's claim of ineffective assistance of counsel can turn on the cumulative effect of all of counsel's actions, all his allegations of ineffective assistance should be reviewed together. *See Strickland v. Washington,* 466 U.S. 668, 695-96, 104 S.Ct. 2052, 2068-69, 80 L.Ed.2d 674 (1984). "The state courts should have been given the opportunity to consider all the circumstances and the cumulative effect of all the claims as a whole." *Grady v. LeFevre,* 846 F.2d 862, 865 (2nd Cir. 1988). Even if Rodriguez's claims, evaluated individually, might not amount to a due process violation sufficient to require habeas relief, nevertheless, given the number of

> questionable circumstances in this case, before a federal court
> intervenes, the state court should be given an opportunity to
> carefully review all of Rodriguez's claims together to determine
> whether collateral relief may be appropriate.

*Rodriguez v. Hoke,* 928 F.2d 534, 538 (2ⁿᵈ Cir. 1991).

Counsel failed to challenge on appeal the ruling of the trial court denying access to material of which Sweeney was entitled to under *Brady*, *Giglio* and the Jencks Act; failed to seek review by the trial court of Theodore Watson's Greenbelt file; failed to call an expert witness to testify concerning Sweeney's Tourette's Syndrome; failed to request the appointment of a second attorney; failed to seek a continuance after removal of co-counsel on the eve of jury selection; failed to argue that Sweeney was, by law entitled to be represented by two attorneys at trial and the other errors set forth herein.   Sweeney's counsel's errors at trial and on appeal had the cumulative effect of creating a "reasonable probability" that in the absence of counsel's errors the result of the proceedings would have been different.

## C. THE TRIAL COURT DENIED SWEENEY HIS RIGHT TO BE REPRESENTED BY TWO ATTORNEYS

As argued herein, 18 U.S.C. §3005 gives a defendant, who has been indicted for a capital offense, the right to be represented by two attorneys.  Petitioner Sweeney was therefore, entitled to be represented by two attorneys in this case.

The trial court incorrectly stated the law when it held, at the hearing on December 16, 1999, that once the Attorney General declined to pursue the death penalty in the case, Sweeney lost his entitlement to be represented by two attorneys.  Therefore, the trial court committed prejudicial error when it stated that Sweeney was no longer entitled to be represented by two attorneys pursuant to 18 U.S.C. §3005.

82

This error of the trial court to properly advise Sweeney of his right to be represented by two attorneys was further compounded by the court removing Mr. Long as one of Sweeney's attorneys on the eve of jury selection and by not advising Sweeney of his right to be represented by two attorneys in this case.

> An accused's right to additional counsel in a capital case should not, of course, be lost solely because of lack of awareness of its existence. Therefore, the trial court here should have advised Cunningham of his rights under § 3005.  We presume prejudice from the failure of the trial court so to inform him.

*Smith,* 353 F.2d at 845-46.

Likewise in this case, the Court must now presume prejudice to Sweeney as a result of the trial court improperly advising him that, once the Attorney General declined to pursue the death penalty against Sweeney, he lost his right to be represented by two attorneys.  Further, when the trial court removed Mr. Long, Sweeney, as a result of the trial court's previous decision, would not have known to insist on his entitlement to two attorneys.

Sweeney was prejudice by this as was admitted to by this trial counsel and then does not address the prejudice.

## CONCLUSION

As demonstrated above, when viewed in the light of the weakness in the Government's case against Petitioner Sweeney, given the combination of the ineffective assistance of counsel, the trial court's error, and the misconduct of the Government, there is a reasonable probability that the outcome of the proceedings would have been different.  Petitioner Sweeney was convicted, and sentenced to multiple life sentences, by a trial that was fundamentally unfair.  Accordingly, relief must be granted.

Pursuant to Rule 8 of the Rules Governing Section 2255 Proceedings, Petitioner Sweeney requests that an evidentiary hearing be conducted, at which proof may be offered concerning the issues raised in his motion(s) and memorandum.  After an evidentiary hearing is held, the Court should vacate Petitioner Sweeney's convictions and sentence, and grant such other relief, as it deems appropriate.

_____/s/_____
Eric Kirchman
D.C. Fed. Bar No. MD09002
Attorney for William K. Sweeney
15 West Montgomery Avenue, Suite 205
Rockville, Maryland 20850
(301) 762-2909
Kirchlaw@cs.com

_____/s/_____
Shana Madigan
D.C. Bar No. 1015317
Attorney for William K. Sweeney
The Law Office of Shana Madigan
6205 Massachusetts Avenue
Bethesda, Maryland 20816
(202) 270-3989

## CERTIFICATE OF SERVICE

I hereby certify, on this 28th day of November 2014, that a copy of the foregoing was mailed by first class mail, postage prepaid to:

**Margaret J. Chriss**
U.S. ATTORNEY'S OFFICE
555 Fourth Street, NW
Washington, DC 20530-0001