## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| | : | |
| **v.** | : | **Criminal No. 98-329-2 RCL** |
| | : | |
| **JEROME MARTIN, JR.,** | : | |
| | : | |
| *Petitioner.* | : | |

## SUPPLEMENT TO MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. §2255 BY A PERSON IN FEDERAL CUSTODY

The Petitioner, Jerome Martin, by and through counsel, Michael E. Lawlor, moves this Court for relief from his convictions and sentences which were obtained in violation of the United States Constitution. Mr. Martin joins in the claims made by his co-defendants to the extent they apply to him. In addition, he files this Supplement to his previously filed Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. §2255 by a Person in Federal Custody.

### I.      PROCEDURAL HISTORY

Petitioner, Jerome Martin, and codefendants Vincent Hill, Samuel Carson, William Sweeney, and Sean Coates, were initially charged on September 18, 1998, by indictment for numerous offenses including drug conspiracy, participation in a

Racketeering Influenced and Corrupt Organization (RICO), and numerous other offenses.

On March 25, 1999, the government filed a 101-count superseding Indictment. Martin was charged with: conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. §846 (Count 1, narcotics conspiracy); racketeering influenced corrupt organization in violation of 18 U.S.C. §1962(d) (Count 2, RICO conspiracy); first-degree murder of Anthony Fortune, in violation of 22 D.C. Code §§105, 2401 and 3202 (Count 9); numerous charges relating to a shootout with police on September 10, 1991 (Counts 10-19);[1] first-degree murder of Maurice Proctor, in violation of 22 D.C. Code §§105, 2401 and 3202 (Count 20); and

---

[1]Count 10—assault with intent to kill while armed (Keith Bradley), in violation of 22 D.C. Code §§105, 2401 and 3202; Count 11—assault with intent to kill while armed (Jimmy Thomas), in violation of 22 D.C. Code §§105, 2401 and 3202; Count 12—assault with intent to kill while armed (Ofc. Adrian Treadwell), in violation of 22 D.C. Code §§105, 501 and 3202; Count 13—assaulting, resisting and interfering with a police officer with a dangerous weapon, in violation of 22 D.C. Code §§105, 505(b); Count 14—assault with intent to kill while armed (Ofc. Edward McDonald), in violation of 22 D.C. Code §§105, 501 and 3202; Count 15—assaulting, resisting and interfering with a police officer with a dangerous weapon, in violation of 22 D.C. Code §§105, and 505(b); Count 16—assault with intent to kill while armed (Ofc. Marc Little), in violation of 22 D.C. Code §§105, 501 and 3202; Count 17—assaulting, resisting and interfering with a police officer with a dangerous weapon (Ofc. Marc Little), in violation of 22 D.C. Code §§105, and 505(b); Count 18—assault with intent to kill while armed (Ofc. Alvin Ray), in violation of 22 D.C. Code §§105, 501 and 3202; Count 19—assaulting, resisting and interfering with a police office with a dangerous weapon (Ofc. Alvin Ray), in violation of 22 D.C. Code §§105, and 505(b).

numerous charges regarding the shooting of James Coulter (Counts 37, 38, 58, 67);[2]

and several drug-related charges (Counts 84, 88, 90, 101).[3]

Trial commenced on November 15, 2000, and jury deliberations began on July

9, 2001.

The superseding indictment was retyped before submission to the jury (Dkt

No. 760, filed July 2, 2001). Martin was found guilty and sentenced as follows:

| Re-typed Count | | Sentence |
|---|---|---|
| 1 | Conspiracy to distribute narcotics 1988 through March 1999 | Life concurrent w/Count 2 Fine $500,000 |
| 2 | RICO– conspiracy 1988 through March 1999 | Life concurrent w/Count 1 |
| 8 | First degree murder while armed, Aiding and abetting (August 6, 1991, Anthony Fortune) | 240 months to life consecutive to Counts 1 and 2 |

---

[2] Count 37—assault with intent to kill James Coulter, in violation of 22 D.C. Code §§501 and 3202; Count 38—attempted murder in aid of racketeering activity (James Coulter), in violation of 18 U.S.C. §1959(a)(3) & (5); Count 58—use of a firearm (assault on James Coulter), in violation of 18 U.S.C. §§2 and 924(c); Count 67— possession of a firearm during a crime of violence or dangerous offense (assault on James Coulter), in violation of 22 D.C. Code §§105 and 3204(b).

[3] Count 84—distribution of marijuana on November 15, 1995, in violation of 21 U.S.C. §841(a)(1); Count 88—distribution of marijuana on December 6, 1995, in violation of 21 U.S.C. §841(a)(1) ; Count 90—distribution of marijuana on December 13, 1995, in violation of 21 U.S.C. §841(a)(1); Count 101—possession with intent to distribute marijuana on February 1, 1996, in violation of 18 U.S.C. §2 and 21 U.S.C. §§841(a)(1) and 841(b)(1)(D).

| | | |
|---|---|---|
| 9 | Assault or Impede Officer w/weapon<br>Aiding and abetting<br>September 10, 1991 | 40-120 months<br>consecutive to<br>Counts 1, 2, and 8 |
| 18 | Attempted murder VICAR<br>(May 30, 1995, James Coulter) | 240 months concurrent |
| 31 | Use of firearm on James Coulter<br>May 30, 1995, RICO assault | 60 months consecutive to<br>Counts 1, 2, 8, 9 |
| 49, 53<br>55, 64 | Distribution of marijuana | 60 months<br>on each of four counts<br>concurrent with each other and<br>all other counts |

On direct appeal, the defendants jointly argued that: the Court erred in dismissing a juror after deliberations had begun and ordering the remaining 11 jurors to continue to verdict; and the Court was biased against appellants. Martin and Carson also argued that murders charged under D.C. Code §22-2401 were mis-joined with the narcotics conspiracy and RICO conspiracy charges.[4] The defendants additionally challenged their sentences under *United States v. Booker*, 543 U.S. 220 (2005) because the guidelines were mandatory at the time they were sentenced.  The United States Court of Appeals for the District of Columbia Circuit affirmed all convictions and

---

[4] Sweeney, Carson, and Coates also argued that their right to confront witnesses was violated when Agent Vincent Lisi was permitted to testify about statements made by a deceased witness; Carson and Sweeney claimed that the Court erred in refusing to admit the transcript testimony of two witnesses who had testified before a Maryland grand jury investigating the murders of Alonzo Gaskins, Darnell Mack, and Melody Anderson.

sentences. *See United States v. Carson et al.*, 455 F.3d 336 (D.C. Cir. 2006), *petition for rehearing and rehearing en banc denied.*

The United States Supreme court denied *certiorari* on February 20, 2007. *Carson et al. v. United States*, 549 U.S. 1246 (2007).

On February 18, 2008, Martin filed, *pro se*, a Motion to Vacate, Set Aside, Correct Sentence Pursuant to 28 U.S.C. §2255 (Dkt. No. 1021).

On June 23, 2016, undersigned counsel filed a Supplement to Motion to Vacate in Light of *Johnson v. United States*, 135 S.Ct. 2551 (2015).

## II.    FACTS RELATING TO MARTIN'S CONVICTIONS

The government charged Martin and others with a large-scale narcotics and racketeering conspiracy to which it attributed numerous murders and other acts of violence. The facts underlying Martin's convictions may be grouped broadly into: events involving the drug and RICO conspiracies generally, including a shootout in which Martin and others unwittingly engaged four police officers; the murder of Anthony Fortune; and the attempted murder of James Coulter. As to the individual distributions of marijuana, Martin conceded that he sold marijuana on the four occasions alleged by the government, but contended that he sold them as an individual and was not part of any conspiracy. (Tr. 1/9/01 AM p. 33-34).

### Narcotics and RICO Conspiracy

The government claimed that from 1988 through March 1999, Vincent Hill led a conspiracy to distribute primarily marijuana, but also crack cocaine and PCP, in the 200 block of K Street, SW, and surrounding areas (Retyped Indictment p. 3-5, Dkt. No. 760). The government alleged that Hill protected his territory from other drug dealers by beating them with sticks or using firearms to settle disputes. (Dkt. No. 760. at 22-23).

The government alleged that Martin began selling marijuana in the 200 block of K Street, SW, and, in 1991, extended his activity to crack cocaine sales in the area of 37th Place, SE. (Dkt. No. 760 p. 23). Anthony Fortune, a member of a rival group from the 58th Street neighborhood, had robbed Martin and others at gunpoint. According to the government, Martin and Samuel Carson retaliated by killing Fortune. *Id.* A feud ensued between the two groups, resulting in increased violence and drive-by shootings. Martin, Carson, and others, were alleged to have engaged in a shootout on September 10, 1991, with four individuals who, unbeknownst to defendants, were police officers who happened to be in the neighborhood. *Id.* at 24.

Much of the evidence was supplied by cooperators who were complicit in the drug dealing and violence in the neighborhood. Chief among them were James Montgomery, who admitted to multiple murders in addition to drug and RICO conspiracies and was facing life without parole (Tr. 3/7/01 PM p. 74-75), and Donald

Nichols, who was also facing life in prison without the possibility of parole (Tr. 2/27/01 PM p. 83).

The government's witnesses testified that people took turns selling on the street--out of respect for each other and not because of any agreement. (Testimony of Reginald Switzer, Tr. 1/24/01 PM p. 23-24, 26; Testimony of Paul Franklin Tr. 5/2/01 PM p. 69). Hill sold most of the $50 bags of marijuana while others sold $20 bags. *Id.* at 24. Hill would tell outsiders trying to sell marijuana to leave. *Id.* Government witnesses also admitted that Martin did not answer to anyone and came and went as he pleased as far as selling marijuana. (Testimony of Paul Franklin Tr. 5/2/01 PM p. 67-68).

Martin was also charged with four counts of distribution of marijuana. Martin conceded that he was guilty of those four distributions (Tr. 1/9/01 AM p. 33; Tr. 7/2/01 PM p. 51), but maintained that he was not part of a drug conspiracy.

## *Uncharged Overt Acts and Violent Crimes in Aid of Racketeering (VICAR)*

The government introduced evidence of several murders that were not charged in the indictment but were included as racketeering or overt acts to the conspiracy. Martin was alleged to have encouraged Antonio Knight to shoot Curtis Edwards who was driving in a car with tinted windows and was suspected to be from 58th Street. (Dkt. No. 760 p. 35). The government alleged that Martin directed co-conspirators to kill Chrishauna Gladden, who he believed was a witness against him in a murder trial

in the Superior Court of the District of Columbia. (Dkt. No. 760 p. 24). James Montgomery testified that he and Carson sought out Gladdon to kill her and prevent her from testifying against Martin in the Curtis Edwards' murder. Montgomery testified that he saw Carson shoot and kill Gladden (Tr. 3/13/01 PM p. 38-39, 59-61). Arthur Rice testified that Carson was looking for Gladden because she was a witness against Martin in his murder case. (Tr. 4/25/01 PM p. 46-47).

### Murder of Anthony Fortune

Anthony Fortune was shot and killed on August 6, 1991. The government alleged that Martin grew up in the Southwest neighborhood with the other co-defendants. Subsequently, Martin's friend moved to 37th Place, SE, and Martin began frequenting that neighborhood and selling drugs there. (Tr. 1/8/01 PM p. 14-15). Anthony Fortune disliked Martin encroaching on his neighborhood and robbed him on one occasion. On August 6, 1991, Martin, Carson, and others were playing a craps game on the street when Fortune approached. According to the government, Carson asked Martin whether he should shoot Fortune and then shot and killed Fortune. *Id.* at 15-16.

The government's only eye-witness to the murder was Charlene Wilson. Wilson testified that on the night of Fortune's murder, she visited a friend, Regina[5] Knight, who lived in the building at the street where Fortune was shot. (Tr. 2/13/01 AM p.

---

[5] This witness testified that her name was "Reena Knight" Tr. 6/21/01 PM p.41).

13-14). She remembered there were approximately a dozen people in Knight's apartment, including Martin and Carson. *Id.* at 14-17. There was a discussion about disliking Fortune because he robbed people. However, she could not recall what any particular person said. *Id.* at 19-22.

Later that evening, Wilson accompanied a friend outside to wait for a ride. *Id.* at 24. Across the street, Fortune was participating in a craps game. *Id.* at 56-57. She saw a group of five people, including Carson and Martin, exit the building, *Id.* at 24. Approximately five to seven minutes later, she heard gunshots and saw Carson walking toward Fortune, shooting. *Id.* at 25; Tr. 2/13/01 PM p. 44. Fortune had robbed the craps game and was walking toward his car when he was shot. (Tr. 2/13/01 AM p. 25). After shooting Fortune, Carson ran down the street and got into a white Astro Van. According to Wilson, Martin was the driver of the van. *Id.* at 26-27. On cross-examination, Wilson clarified that she did not actually see Fortune robbing anyone at the craps game but had heard from others that Fortune had committed a robbery at the craps game. (Tr. 2/13/01 PM p. 7).

Wilson did not initially tell police that she witnessed the shooting, claiming that she feared for her safety. (Tr. 2/13/01 AM p. 31-32). Her ire was roused, however, because drug dealers refused her demand to stop putting drugs in her mailbox and she risked losing her housing. *Id.* at 31-33. It was then, months later, that she gave police information about the Fortune murder. *Id.* The government paid her approximately

$3,600 for information about the Fortune murder, i*d.* at 35-37, 47, and possibly paid another $4,900 for moving expenses (Tr. 2/13/01 PM p. 33).

FBI Agent Chris Warrener testified that it was about three or four months after the FBI began paying Wilson for information, that she started talking about the Fortune shooting. (Tr. 6/14/01 PM p. 30-31). In his report documenting Wilson's statement about Fortune's murder, Warrener wrote that Wilson had *heard* about the details of Fortune's murder and did not say that she actually witnessed the shooting. *Id.* at 55. Warrener explained that it was a writing style he used to protect witnesses and that Wilson said she did witness the shooting. *Id.* at 60. Nonetheless, Warrener confirmed that no arrests were made in the Fortune murder case for many years after Wilson provided the information. *Id.* at 59.

Other government witnesses testifying about the Fortune murder were not eye-witnesses but testified about circumstantial evidence or statements allegedly made by Carson or Martin. Officer Tyrone Best testified that a day or so after learning about Fortune's murder, he saw that Martin's right hand appeared to have two hash marks which could have been made by the slide of a weapon. (Tr. 3/6/01 PM p. 70). Many witnesses testified pursuant to a plea agreement and expected to benefit from a reduced sentence in exchange for their testimony.

Donald Nichols testified that Martin told him that Fortune tried or did rob a craps game and that Martin said he shot Fortune (Tr. 2/15/01 PM p. 58-59). Nichols

was facing a sentence of up to life in prison without the possibility of parole. (Tr. 2/27/01 AM p. 83).

James Montgomery, who was facing life in prison, testified that Carson told him that Martin won most of the money at the craps game and Fortune said that Martin could not quit but had to give some of the money back. Carson whispered in Martin's ear, asking if he should kill Fortune. Carson did not say how Martin responded, but Carson retrieved a gun from his car and shot Fortune. (Tr. 3/12/01 PM p. 34-35).

Charles Bender testified that Martin said that Fortune was making motions like he was going to rob the craps game and that Martin said he punished him. Bender understood that to mean that Martin killed Fortune. (Tr. 4/4/01 AM p. 85-87). This contradicted Wilson's testimony that Carson, and not Martin, shot Fortune. Bender pleaded guilty to RICO conspiracy and admitted to murder, armed robbery, and narcotics distribution. He was awaiting sentencing and was hoping to be released. (Tr. 4/4/01 AM, p. 50-54).

Eugene Byars testified that, while incarcerated, he was receiving medical care at D.C. General Hospital and saw Martin there. Martin told him that Fortune was trying to take advantage of them while gambling and that Martin shot Fortune. (Tr. 4/9/01 PM p. 13-14). This contradicted Wilson's testimony that Carson, and not Martin, shot Fortune. Byars was facing a sentence of up to 60 years. (Tr. 4/9/01 PM, p. 41-42).

Arthur Rice testified that Fortune was from 58th Place and was nicknamed "Cookie Monster" because he would take people's property. (Tr. 4/25/01 AM p. 35-36). Rice believed for a time that Martin had shot Fortune but later found out that Carson had killed Fortune. Rice testified that he said to Carson, "man, all that time I thought it was [Martin], and come to find out it was you, man." Carson started laughing and said "well now you know." (Tr. 4/25/01 AM p. 40-41).

Reena Knight, a witness for Martin, testified that Martin was married to her niece and was a friend of her son. On the evening Fortune was shot, she recalled that Martin and others were in her apartment. (Tr. 6/21/01 PM p. 42-44). She testified that Martin was not with anyone else that evening. She did not know Carson and did not recognize a photograph of him. *Id.* at 44-46.

## Assault with intent to kill James Coulter

The government's theory was that Hill and Martin believed that Coulter was cooperating with law enforcement and wanted him dead. On May 30, 1995, Martin shot Coulter at Hill's behest and wounded him. (Tr. 1/8/01 PM p. 37). At trial, there were no eye-witness to the shooting and no physical evidence connecting Martin to the shooting. The government presented numerous witnesses who claimed that Hill or Martin made inculpatory statements. These witnesses expected a reduced sentence in their own cases in exchange for their testimony.

The government presented several witnesses to show that Hill thought Coulter was cooperating with police. Cindy Perkins, who was Coulter's girlfriend, testified that a few days after the shooting, Hill gestured toward her and said, "little hot bitch . . . She's hot just like her boyfriend."[6] (Tr. 1/30/01 PM p. 54-57, 62).

Donald Nichols testified that in 1995, Hill made general comments saying that Coulter was "hot." Nichols interpreted Hill to be suggesting that Coulter should be killed (Tr. 2/15/01 PM p. 62). After Coulter was shot, he heard Hill talking to Martin and say something to the effect of, "you should have used two guns, and what the fuck the gun had to jam for." *Id.* at 62. Nichols further testified that after Martin was arrested for shooting Coulter, Martin asked Nichols to take his lawyer's investigator to get a statement from Coulter. (Tr. 2/15/01 PM p. 63-64). Coulter told Nichols that he did not know who the shooter was so there was no reason to give a statement; Coulter did not want to go to court and did not want to get involved. (Tr. 2/15/01 PM p. 63-64; Tr. 2/26/01 PM p. 22-23).

Martin also asked Nichols to get Michael Floyd to testify about what he saw that night, but Floyd did not want to get involved with the FBI. *Id.* at 65. According to Nichols, Martin asked him to show Coulter and Floyd to Martin's uncle, Dino, presumably so that Dino could do some harm to Floyd. *Id.* at 65, 69. Despite the government's intimation that Martin was seeking to harm witnesses, Nichols admitted

---

[6] "Hot" was a term used to mean cooperating with police.

that Martin only wanted statements and did not ask him to harm anyone. (Tr. 2/26/01 PM p. 23). Nichols was facing a sentence of up to life without parole and was hoping for a reduction in sentence in exchange for his cooperation with the government. (Tr. 2/26/01 PM p. 83).

Eugene Byars claimed that that Martin said he started shooting Coulter at a craps game. Coulter tried to run, so Martin ran behind him and continued to shoot, but the gun jammed. (Tr. 4/9/01 PM p. 22-23). Byars testified that when he saw Martin in D.C. Jail, he jokingly said, "Creeko [Coulter], what's up?" Martin said don't play with him, he's going to kill his ass.[7] (Tr. 4/9/01 PM p. 24).

Paul Franklin testified that after Coulter had been shot, Martin asked him (Franklin) to see if Coulter and Michael Floyd were going to testify in court. Franklin testified that by telling Coulter that Martin asked if he was coming to court, Martin was sending a message to Coulter to not testify. (Tr. 5/2/01 PM p. 55). Coulter gave Franklin a phone number to give to Martin, but Martin complained that the phone number was fake. Martin then told Franklin to visit Coulter with his uncle, Dino. Franklin believed Dino wanted to see what Coulter looked like so he could kill him. (Tr. 5/2/01 PM p. 56). According to Franklin, Michael Floyd told him to tell Martin that he was not going to court. (Tr. 5/2/01 PM p. 56).

---

[7] James Coulter's nickname was "Creeko." *See* Tr. 5/22/01 AM p. 9.

Cross-examination brought out Franklin's bias against Martin. Franklin admitted that he was jealous of Martin because Martin had a relationship with his son's mother. Franklin was often teased about whether or not his son was fathered by Martin. On one occasion, Franklin punched Martin for teasing him. (Tr. 5/2/01 PM p. 60-61).

Michael Smith testified that he first met Martin in jail in 1998, three years after the Coulter shooting. Smith knew both Coulter and Michael Floyd. Martin wanted Floyd to make a statement saying that he did not know who shot Coulter because it was a person with a drawstring and had a pistol at the craps game. (Tr. 5/22/01 AM p. 17-19). Smith told Martin that he would contact Floyd but, not wanting to get involved, did not do so. *Id.* at 20-21. A week later, Martin said, "I'm fucked up at your man—I talked to your man on the phone and that bitch ass nigger hung the phone up on me and started crying, and if it wasn't for him Creeko [Coulter] would be dead, I should have hit him in his head." (Tr. 5/22/01 AM p. 22). Martin said that Floyd owed him a favor because if it wasn't for Floyd getting in the way, Coulter would be dead. (Tr. 5/22/01 AM p. 22). This contradicted Donald Nichols' testimony that Coulter was not killed because the gun jammed. Smith was facing up to 20 years of imprisonment for heroin distribution and carrying a pistol without a license. (Tr. 5/22/01 AM p. 32).

On cross examination, defense counsel sought to establish it was unlikely that Martin would speak to Smith about criminal conduct. Smith testified that he was not from the neighborhoods that Martin frequented and was not friends with Martin. They were total strangers until they had the conversations in jail. (Tr. 5/22/01 PM p. 40-43). Smith then testified that Martin "never told me he shot Creeko [Coulter]. He never said that to me, never." (Tr. 5/22/01 PM p. 42).

Smith admitted that he had in the past been convicted of numerous drug offenses. At the time of his testimony, he had been convicted of four counts of heroin distribution and was awaiting sentencing. His convictions were serious enough to keep him in jail for the rest of his life. (Tr. 5/22/01 PM p. 25-26). Nevertheless, after he testified against Martin before in grand jury, he was released and remained free while awaiting sentencing. *Id.* at 50. Despite the possibility of receiving 240 years of imprisonment, he hoped for a sentence of probation in exchange for his testimony. (Tr. 5/22/01 PM p. 31-32).

Agent Vincent Lisi testified that on June 5, 1995, he was in the 200 block of K Street with Detective Neal Trugman and Detective Steve Kirschner. (Tr. 5/23/01 AM p. 7). They saw Vincent Hill who yelled to Detective Trugman something to the effect that, "oh yeah, Truman [sic]. By the way, all your snitches are going to die." *Id.* at 8. Hill repeated, "you heard me. All your snitches are going to die, including your little buddy who is over at the hospital now with four holes in him under the name of John

Doe, whose [sic] in room 2299 . . . he shouldn't be alive right now." *Id.* Lisi testified that Hill was referring to Coulter, who had been shot and was hospitalized as "John Doe." *Id.* at 9. A few hours later, Lisi received a phone call from Coulter's girlfriend, who was very upset. As a result, the government relocated her and her family. *Id.* at 10.

James Montgomery testified that he was in jail at the time Coulter was shot. (Tr. 5/23/01 AM p. 45). After he was released in June 1995, he recalled a time when he, Coates, Carson, and Martin were sitting outside. Montgomery asked everyone, including Martin, for money, but they were all broke. (Tr. 5/24/01 PM p. 38). Martin, specifically, did not give Montgomery any money. Montgomery claimed that Martin started talking about the Coulter shooting and said, "They keep fucking with me . . . they keep trying to push it on me." (Tr. 5/23/01 *Id.* at 47). "He said that they are trying to say that he had something to do with 'Creeko' getting shot. And he was like, 'they can't prove it. I had a mask on.'" *Id.* Defense counsel cross-examined Montgomery on a critical difference in Agent Lisi's report of Montgomery's statement to law enforcement—that Martin said, "mother fucker had a mask on" (Tr. 5/24/01 PM p. 40). This was in contrast to Montgomery's trial testimony that Martin said, "I had a mask on."

Montgomery testified extensively in Martin's trial about facts the government used to establish a conspiracy and also testified about numerous acts of violence.

Montgomery himself admitted to involvement in numerous murders, including the murders of Maurice Hallman and  Leonard Hyson (Tr. 3/12/01 PM p. 3). He not only admitted to several murders but also admitted to falsely accusing someone of murder to benefit himself. For example, after he escaped from a halfway house and was charged with assault on a police officer while armed, Montgomery called law enforcement and falsely accused Wayne Perry of three murders. (Tr. 3/12/01 PM p. 27-30).

## III.  ARGUMENT

### A.    Introduction

28 U.S.C. §2255 permits a person in federal custody to bring a motion to vacate, set aside, or correct a sentence on the grounds that: the sentence was imposed in violation of the Constitution or laws of the United States; the Court lacked jurisdiction to enter the judgment; the sentence exceeded the maximum allowed by law; or the judgment or sentence is otherwise subject to collateral review. A hearing is to be held "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. §2255(b).

In this case, Martin's claims center on prosecutorial misconduct and ineffective assistance of counsel regarding the murder of Anthony Fortune and the shooting of James Coulter. Because those offenses formed the basis for his drug and RICO

conspiracy convictions, he is entitled to a new trial on the conspiracies as well as the counts related to the Fortune and Coulter incidents.

**B.    The Government Withheld Evidence of Martin's Innocence in the Anthony Fortune Murder and Violated his Right to Due Process.**

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.*, 373 U.S. at 87. Later, the Court recognized that the prosecution had a duty to disclose favorable evidence even without a defense request. *See United States v. Agurs*, 427 U.S. 97 (1976). The state's duty to disclose exculpatory evidence is to ensure that a defendant receives a fair trial. *See Brady*, 373 U.S. at 87 ("[s]ociety wins not only when the guilty are convicted but when criminal trials are fair"). *See also United States v. Bagley*, 473 U.S. 667, 675 (1985) (stating that the *Brady* rule is "based on the requirement of due process . . . [T]he prosecutor is . . . to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial").

Three elements must be satisfied to prevail on a *Brady* claim:

(1) the evidence at issue must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) it must have been suppressed by the state, whether willfully or inadvertently; and (3) it must be material.

*Strickler v. Green*, 527 U.S. 263, 280-82 (1999); *United States v. Pettiford*, 627 F.3d 1223, 1227 (D.C. Cir. 2010). Favorable evidence includes evidence affecting a witness's credibility. *See United States v. Walter Bowie*, 198 F.3d 905, 908 (D.C. Cir. 1999) (stating that "[e]vidence affecting the credibility of government witnesses is a category of exculpatory information potentially within *Brady*'s, disclosure obligation") (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)); *United States v. Cuffie*, 80 F.3d 514, 517 (D.C. Cir. 1996) (stating that the prosecutor has the same duty to disclose impeachment as exculpatory evidence).

Evidence is "suppressed" even if withheld unintentionally. *See Strickler*, 527 U.S. at 288 (quoting *United States v. Agurs*, 427 U.S. 97, 110 (1976)). The prosecution must disclose the evidence in a timely manner, "to allow the defense to use the favorable material effectively in the preparation and presentation of its case . . . " *United States v. Celis*, 608 F.3d 818, 835 (D.C. Cir. 2009) (quoting  *United States v. Pollack*, 534 F.2d 964, 973 (D.C. Cir. 1976)).

Evidence is material, requiring a new trial, if "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (quoting *Bagley*, 473 U.S. at 682). The Supreme Court has explained that the test is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence" in its outcome. *Kyles*, 514 U.S. at 435; *Strickler*, 427 U.S. at

290. "'The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" *Kyles*, 514 U.S. at 434. This Court has held, "to reverse a conviction for a *Brady* violation, it does not have to be more likely than not that the defendant would have been acquitted had the evidence been disclosed." *Bowie*, 198 F.3d at 909.

When there are multiple nondisclosures, this Court must consider the cumulative effect of the nondisclosures. "The effect of each nondisclosure must not only be considered alone, but the cumulative effect of the nondisclosures might require reversal even though, standing alone, each bit of omitted evidence may not be sufficiently material to justify a new trial." *United States v. Lloyd*, 71 F.3d 408, 411 (D.C. Cir. 1995) (quotations and citation omitted).

Years after the trial in this case, defense counsel Joanne Hepworth located a witness, Steven Thomas, who was an eye-witness to Anthony Fortune's murder. Thomas was interviewed by Hepworth's investigator. Thomas stated he was present at the Fortune shooting; that he knew what Martin looked like; and that the shooter was not Martin. Thomas stated that the shooter had a very dark complexion, was stocky, and taller than Martin. Thomas further stated that police officers interviewed him on the evening of the shooting and that he gave the same description of the

shooter to police. This was exculpatory information that should have been disclosed to defense counsel.

The government's theory was that Carson shot and killed Fortune at Martin's urging and left the scene in a van driven by Martin. Thomas's description of the shooter as having a very dark complexion ruled out both Martin and Carson as the shooter. This was exculpatory evidence directly encompassed by *Brady* and its progeny.

The evidence was suppressed by the government. Evidence is "suppressed" even if withheld unintentionally. "[A]n inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment. 'If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor.'" *Strickler*, *supra*, at 288 (quoting *Agurs*, *supra*, at 110). Accordingly, the prosecutor is responsible for disclosing *Brady* information in police files. *See In re Sealed Case*, *supra*, at 896 (stating that, "prosecutors in this District are responsible for disclosing Brady information contained in MPD files, 'given the close working relationship between the Washington Metropolitan police and the U.S. Attorney'").

Thomas stated that he gave his description of the shooter to law enforcement officers on the night of the shooting. Yet defense counsel never received information about this witness or the substance of what he told police. It matters not whether it

was suppressed willfully or inadvertently—only that the government possessed this information failed to give it to Martin in time for him to use it. *See Strickler*, 527 U.S. at 288.

There is a reasonable probability that, had the government fulfilled its obligation to disclose the information, the result of the trial would have been different. Trial counsel would have interviewed Thomas and called him as a witness to testify. Charlene Wilson was the government's only eye-witness to the Fortune shooting. She testified that she saw Carson shoot Fortune and then run down the street and enter a van driven by Martin. Her view of the driver was fleeting at best. Thomas's testimony would have directly contradicted the government's theory.

As detailed further in section C, Wilson was not a credible, reliable witness. She did not report the information to the police for several months; she was paid for giving information to the police; and she testified about events as if she had witnessed them even though she had only heard about it from others.

Certainly, there is a reasonable probability of a different result. The United States Court of Appeals for the D.C. Circuit has noted the following about "reasonable probability" in the context of a *Brady* claim:

> What is a "reasonable probability"? Probability is often expressed in terms of percentages, with 100% representing certainty. We know, because the Supreme Court has told us, that a "reasonable probability" can be less than 50.01%. In other words, to reverse a conviction for a Brady violation, it does not have to be more likely than not that the

> defendant would have been acquitted had the evidence been disclosed. *See Kyles*, 514 U.S. at 434, 115 S.Ct. 1555. We are also sure that a "reasonable probability" is somewhat greater than 1%. How much greater? Enough, the Supreme Court says, to "undermine confidence in the verdict," *id.* at 435, 115 S.Ct. 1555, which may lead us in a circle: one cannot be confident of the outcome when there is a "reasonable" probability that it may be wrong, and a "reasonable" probability is one high enough to undermine confidence in the outcome.

*Bowie*, 198 F.3d at 909.

Here, the government failed to disclose evidence critical to Martin's defense. As the D.C. Circuit recognized in *United States v. Cuffie*, 80 F.3d 514, 517 (D.C. Cir. 1996), the "focus is on the potential impact that the undisclosed evidence might have had on the fairness of the proceedings rather than on the overall strength of the government's case." Furthermore, "we must look not to the ways defense counsel was able to impeach . . . [the witness], but to the ways in which the witness' testimony was allowed to stand unchallenged." *United States v. Smith*, 77 F.3d 511, 515 (D.C. Cir. 1996). Here, because of the government's non-disclosure, Charlene Wilson's testimony was allowed to stand unchallenged. Thomas's description of the shooter that was contrary to the government's case would have put the case in such a different light as to undermine confidence in the outcome. *See Kyles*, 514 U.S. at 435. Thus, a new trial is required.

**C.  The Government's Refusal to Produce James Coulter to Testify as a Defense Witness Violated Martin's Right to Present a Defense and Right to Compulsory Process.**

There can be no question that the right to present witness testimony is fundamental to our criminal justice system.   The right to present a defense is guaranteed by the Due Process clause of the Fifth Amendment.   "Few rights are more fundamental than that of an accused to present witnesses in his own defense. Indeed, this right is an essential attribute of the adversary system itself." *Taylor v. Illinois*, 484 U.S. 400, 408 (1988); *see also Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). As the Supreme Court has stated,

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Washington v. Texas*, 388 U.S. 14, 19 (1967); *see also Webb v. Texas*, 409 U.S. 95 (1972).

The right to present witnesses in one's defense is grounded in the Sixth Amendment, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. The right to compulsory process is integral to the right to present a defense.

> The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and

> public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of the courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense.

*United States v. Nixon*, 418 U.S. 683, 709 (1974); *see also Washington v. Texas*, 388 U.S. 14, 19 (1967) ("[t]he right to offer the testimony of witnesses and to compel their attendance, if necessary, is in plain terms the right to present a defense"). *See also Washington*, 388 U.S. at 19; *Taylor*, 484 U.S. at 409 (stating, "[t]he right to offer testimony is thus grounded in the Sixth Amendment even though it is not expressly described in so many words"). "The Compulsory Process clause protects the presentation of the defendant's case from unwarranted interference by the government, be it in the form of an unnecessary evidentiary rule, a prosecutor's misconduct, or an arbitrary ruling by the trial judge." *Government of the Virgin Islands v. Mills*, 956 F.2d 443, 445 (3d Cir. 1992). *See also*, *Michigan v. Lucas*, 500 U.S. 145, 149 (1991) (acknowledging that to the extent a statute operates to prevent a criminal defendant from presenting relevant evidence, the defendant's ability to present a defense is diminished).

In this case, the government charged Martin with shooting and wounding James Coulter, but did not produce Coulter to testify. Coulter had previously stated to a defense investigator that Martin did not shoot him or that he did not know who had shot him. Defense counsel attempted to subpoena Coulter to testify, believing that his

testimony would exonerate Martin. Counsel was unable to locate Coulter and sought the government's assistance in serving a subpoena. The government represented that it had no knowledge of Coulter's whereabouts and Coulter never testified. Yet the government was able to locate Coulter when needed for its own purposes.

Martin was convicted of shooting Coulter in the guilty verdicts rendered on August 7, 2001. Approximately six months later, on February 13, 2002, Coulter was arrested and charged in this district with a drug offense in violation of 21 U.S.C. §841(a)(1) in case no. 02-mj-00104-AK.[8] According to the docket in that case, Magistrate Judge Alan Kay ordered Coulter to be temporarily detained "to permit revocation of conditional release, deportation or exclusion." There is no evidence that Coulter is subject to deportation or exclusion and therefore only "revocation of conditional release" was applicable. The order suggests that Coulter was being supervised at the time, such that he would be subject to revocation of conditional release. If Coulter was being supervised, the government would have been able to locate him for trial. Even if Coulter was not being supervised, the government was able to locate him for its own case. The government's representation that it would not be able to serve a subpoena on Coulter for Martin's trial constituted prosecutorial misconduct.

---

[8] The docket sheet to case no. 02-mj-00104-AK states that the magistrate's case merged into criminal case no. 02-074. However, that criminal case number does not appear on the public docket.

Some courts have held that the government may be compelled to grant immunity to a potential defense witness where the government's refusal is an abuse of discretion under the Immunity Act. *See United States v. Moussaoui*, 365 F.3d 292 (4th Cir. 2004); s*ee also United States v.* Abbas, 74 F.3d  506, 511-12 (4th Cir. 1996) (holding that a district court may compel the government to grant immunity upon a showing of prosecutorial misconduct and materiality); *United States v. Westerdahl*, 945 F.2d 1083 (9th Cir. 1991) (recognizing that government's grant of immunity to government witness while denying immunity to a contradictory defense witness would deny the defendant a fair trial).

Actions by the government tending to make a witness unavailable to the defense may constitute prosecutorial misconduct warranting a new trial. *United States v. Lord*, 711 F.2d 887 (9th Cir. 1983) (remanding for an evidentiary hearing where the record suggested that prosecutorial misconduct caused a witness to invoke his Fifth Amendment privilege against self-incrimination and denied the defendant a fair trial); *cf. United States v. Quinn*, 728 F.3d 243, 248 (3d Cir. 2013) (stating that government refusing to immunize a witness in order to keep clearly exculpatory and essential testimony from trial without a strong countervailing reason constitutes a type of prosecutorial misconduct).

Here, Coulter was a crucial witness for the defense. The government represented that it did not know how to find Coulter. Yet, the government was able

to arrest Coulter just months after Martin was convicted. The government's misrepresentation deprived Martin of his right to present a defense and his right to a fair trial.

> **D.    Trial Counsel Was Ineffective For Failing to Recall Charlene Wilson to Impeach Her Testimony that She had Witnessed Fortune's Shooting.**

A defendant's Sixth Amendment right to counsel includes the right to effective assistance of counsel. *See Yarborough v. Gentry*, 540 U.S. 1, 5, (2003); *Roe v. Flores-Ortega*, 528 U.S. 470, 476-77 (2000); *Strickland v. Washington*, 466 U.S. 668, 685-86, (1984); *Rubin v. Gee*, 292 F.3d 396, 401 (4th Cir. 2002). Therefore, a defendant is entitled to reasonably competent counsel who gives advice within the range of competence required in criminal cases. *See Wiggins v. Smith*, 539 U.S. 510, 521-23 (2003); *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986); *Strickland*, 466 U.S. at 687; *United States v. Mohammed*, 863 F.3d 885 (D.C. Cir. 2017).

To prevail on a claim of ineffective assistance of counsel, a petitioner must meet the two-prong requirement set forth in *Strickland* and show that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Id.*, 466 U.S. at 687. To demonstrate deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms." *Id.* at 688. There is a strong

presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See Mohammed*, 863 F.3d at 889 (D.C. Cir. 2017).

While deference is accorded to trial counsel's reasonable trial strategies, such strategies must, at the outset, be reasonable. *See, e.g.*, *Huynh v. King*, 95 F.3d 1052, 1057-58 (11th Cir. 1996) (holding that purposeful strategy of trial counsel was unreasonable); *Holsomback v. White*, 133 F.3d 1382, 1387-88 (11th Cir. 1998) (holding that trial counsel's failure to investigate was unreasonable and therefore his failure to introduce medical evidence was not based on an informed tactical decision); *Berryman v. Norton*, 100 F.3d 1089 (3d Cir. 1996) (holding that trial counsel's decisions were unreasonable because they were not supported by adequate investigation or sound trial strategy and the defendant was prejudiced).

First and foremost, counsel must make an informed decision taking into consideration the state of the law and its consequences. *See Kimmelman v. Morrison*, 477 U.S. 365 (1986) (concluding that trial counsel's failure to conduct discovery and consequent failure to file a timely motion to suppress evidence constituted deficient performance).

In this case, the government's key witness in the Fortune murder, Charlene Wilson, testified that she saw Carson shoot Fortune and enter a van driven by Martin. Approximately four months later in the trial, Agent Chris Warrener testified that Wilson began providing information to the FBI in mid-August 1992, approximately

one year after the Fortune shooting. (Tr. 6/14/01 PM p. 28). She initially provided information about drug activity without payment, and then the FBI began paying Wilson for information shortly thereafter. *Id.* at 28-29. Warrener testified that Wilson was supporting two children and was struggling financially. *Id.* at 29. Warrener did not indicate that there was any limit to how much money he would pay her, and she may have had the impression that some types of information would be more valuable than others. (Tr. 6/14/01 PM p. 30). According to Warrener, approximately three or four months after she first approached the F.B.I with information, and after she began receiving payments, she began speaking to police about the Fortune murder. *Id.* at 30-31.

Because Warrener used his 302 report to refresh his recollection during his testimony, a copy was provided to the defense over the government's objection. (Tr. 6/14/01 PM p. 48). Defense counsel discovered that Warrener had written in his report that Wilson had *heard* the information about Fortune's murder—not that she had witnessed it first-hand as she had testified. (Tr. 6/14/01 PM p. 55). Upon cross-examination about this point, Warrener acknowledged that the report said that Wilson had only heard about the Fortune murder. Warrener contended that he had phrased the report in that way to protect Wilson's identity. *Id.* at 55-56. He testified, however, that when he took Wilsons's statement, he did not intend for her to testify at trial and

he wrote the information in the form of an investigative insert to protect her identity. *Id.* at 35, 55-56.

Warrener's report also provided new information about how long Wilson waited before she began talking about the Fortune murder. Warrener's report showed that Wilson first began providing information about the shooting on January 28, 1993, more than 16 months after Fortune's death. (Tr. 6/14/01 PM p. 56).

Having obtained a copy of Warrener's report, trial counsel discovered evidence to contradict Wilson's claim that she witnessed Fortune's shooting. Counsel failed, however, to use this information to Martin's advantage. Counsel should have, but failed, to recall Wilson for cross-examination and establish whether she had only heard about the events she had testified to earlier. There was no strategic or tactical reason not to recall the witness after obtaining the 302. The jury had already heard Wilson testify that Carson was the shooter and that Martin drove Carson away after the shooting. That testimony stood virtually unchallenged. Agent Warrener's report indicated that Wilson was not an eye-witness as she had claimed.

Trial counsel also should have cross-examined Wilson about how long she waited before giving information to police. Whereas previously it was thought that Wilson began providing information about the shooting a few months after the shooting, Warrener's report showed that it was more than 16 months—a year longer

than previously thought. This was an additional area of cross-examination counsel could have used to defeat Wilson's credibility.

There is a reasonable probability that, had trial counsel recalled Wilson to cross-examine her with the new evidence, the result of the trial would have been different. Warrener's report stating that she had only heard about the shooting was not the first time Wilson claimed to have seen something she had only heard about. During her testimony, she said that while she was standing outside, there was a craps game going on across the street and that Fortune had robbed the craps game.

> Q.    At what point did you notice Tony Fortune being out there?
>
> A.    While I was standing out there with Regina, he was walking towards his car. There was a crapgame [sic] going on across the street where he had robbed and was on his way to his car.

Tr. 2/13/01 AM p. 25. The next day, Wilson admitted that she did not actually see Fortune commit a robbery.

> Q.    Did you see Anthony Fortune rob someone at that crap game?
>
> A.    No, I didn't see it. *It was told.*

(Tr. 2/13/01 PM p. 7) (emphasis added). In her testimony, Wilson did not distinguish between what she saw and what she heard from someone else. In the above excerpt, she testified as if she witnessed all the events first-hand. Cross-examination revealed that she did not witness Fortune committing a robbery but had only heard about it. With new evidence that Wilson did not see everything she reported, it was incumbent

on trial counsel to recall Wilson and examine her further about what she had actually witnessed and what she had heard from others.

The additional information that Wilson had waited more than a year to provide information about the shooting further lessened her credibility. It was telling that police did not act on Wilson's information. Even after Wilson told Warrener that she saw Carson shoot Fortune and get into a car driven by Martin, the police did not arrest anyone in connection with Fortune's murder for many years. (Tr. 6/14/01 PM p. 58-59). Given Wilson's importance in the government's case, trial counsel was ineffective for failing to pursue additional opportunities to cross-examine her.

### E.   Trial Counsel Was Ineffective For Failing to Investigate and Present Evidence that Martin Did Not Shoot Coulter.

Adequate investigation by trial counsel is fundamental to a defendant's right to effective assistance of counsel. "Only when reasonable investigation has been performed is counsel in a position to make informed tactical decisions." *United States v. Barbour*, 813 F.2d 1232, 1234 (D.C. Cir. 1987). "In assessing the reasonableness of an attorney's investigation ... a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527, (2003).

Here, Coulter was shot while playing craps in the company of other people. Yet no eye-witnesses testified for the government or the defense. After Martin's trial, his

family retained an investigator to pursue witnesses to the Coulter shooting. The investigator located and interviewed Michael Floyd, who was playing craps next to Coulter at the time the gunman approached the group. Michael Floyd stated that a man ran up and pulled out a gun; he believed there was about to be a robbery. He ran, and Coulter ran past him.   Michael Floyd further stated that he had known Martin for approximately four years and that the gunman was not Martin. *Id.*

Martin's investigator furthermore talked to Juan Floyd who was also present when Coulter was shot. Juan saw the gunman's face and recognized him as someone he knew by name of Avery.  Juan Floyd believed that Avery shot Coulter because of a financial dispute. *Id.*

Trial counsel was ineffective for failing to conduct an adequate pre-trial investigation. "[A]n attorney must, at a minimum, 'conduct appropriate investigations, both factual and legal, to determine if matters of defense can be developed, and to allow himself enough time for reflection and preparation for trial.'" *Sneed v. Smith*, 670 F.2d 1348, 1353 (4th Cir. 1982) (quoting *Coles v. Peyton*, 389 F.2d 224, 226 (4th Cir. 1968)). Furthermore, "[c]ounsel must ordinarily 'investigate possible methods for impeaching prosecution witnesses.'" *See Huffington v. Nuth*, 140 F.3d 572 (4th Cir. 1998) (quoting *Hoots v. Allsbrook*, 785 F.2d 1214, 1221 (4th Cir. 1986)).

There is a reasonable probability that, had trial counsel conducted an adequate investigation and presented the testimony of Michael Floyd and Juan Floyd at trial,

Martin would not have been convicted of shooting Coulter. The government's evidence against Martin consisted of cooperator testimony about inculpatory statements made by Hill or Martin. There was no physical evidence connecting Martin to the shooting and the government did not present a single witness who was on the scene of the shooting.

Michael Floyd and Juan Floyd were eye-witnesses to the shooting. Their testimony that Martin was not the shooter, and that Juan Floyd recognized the shooter as Avery, would have been powerful evidence in Martin's defense. Given the government's weak circumstantial case against Martin, there is a reasonable probability that Martin would not have been convicted of shooting Coulter if this evidence had been presented in his trial.

### F.   A New Trial is Required on Martin's Drug Conspiracy and RICO Conspiracy Convictions.

The government presented the murder of Antonio Fortune and shooting of James Coulter as evidence of Martin's participation in a drug conspiracy and a RICO conspiracy. The Fortune murder was charged as an overt act of the drug conspiracy (Second Retyped Indictment, Dkt No. 760 p. 9), and the government alleged that the Fortune murder started a violent feud between Hill's group and a rival group of drug dealers. *Id.* p. 23. The Fortune murder was also charged as a racketeering act supporting the RICO conspiracy charge. (See Racketeering Act 23, *id.* p. 33). The

Coulter shooting was similarly charged as an overt act of the drug conspiracy, *id.* p. 13, and as a racketeering act. (See Racketeering Act 44, *id.* p. 46). In closing arguments, the government emphasized that violence, including the murder of Fortune, was connected to "beefs" between rival drug groups. (Tr. 6/26/01 PM p. 72-74).

The indictment alleged that Martin shot Coulter "for the purpose of gaining entrance to and maintaining and increasing his position in . . . an enterprise engaged in racketeering activity . . . " *id.* p. 65. The government alleged that Martin shot Coulter at Vincent Hill's behest, because Coulter was seen talking to a homicide detective and was believed to be cooperating with police. Tr. 1/8/01 PM p. 36-37.

The drug conspiracy and RICO conspiracy convictions rest on the violent acts of the Fortune murder and Coulter shooting. Because of Martin's convictions arising out of the Fortune murder and Coulter shooting were obtained in violation of the Constitution, his convictions for drug conspiracy and RICO conspiracy cannot stand. A new trial is required on those counts.

## IV.  CONCLUSION

For the forgoing reasons, Martin requests a new trial and sentencing.

Respectfully submitted,

/s_____
Michael E. Lawlor
6305 Ivy Lane
Suite 700
Greenbelt, Maryland 20770

301.474.0044

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of November 2018, a copy of the foregoing was delivered via ECF to all interested parties.

/s _____
Michael E. Lawlor